**EXHIBIT H**

**Nichols Deposition Transcript**

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

----------------------------------------------------------

Lisa Lewandowski,

       Plaintiff,

     vs.                              Case Number 1:2009CV04949

Columbia College Chicago,

       Defendant.

----------------------------------------------------------

Deposition of Eliza Nichols

Thursday

October 5th, 2010

-at-

David L. Lee Law Offices

53 West Jackson Boulevard

Suite 660

Chicago, Illinois

Page 2

1    APPEARANCES
2
3        For the Plaintiffs:
4        David L. Lee
5        David L. Lee Law Offices
6        53 West Jackson Boulevard
7        Suite 660
8        Chicago, Illinois 60604
9
10       For the Defendant:
11       Jennifer Helen Kay
12       Tribler, Orpett & Meyer, P.C.
13       225 West Washington Street
14       Suite 1300
15       Northbrook, Illinois 60606
16
17       For the Defendant:
18       Paul Andrew Denham
19       Columbia College
20       600 South Michigan Avenue
21       Chicago, Illinois 60605
22
23       RECORDER: Good afternoon, we are now on the
24   record. Today is Tuesday, October 5th, 2010. The time
25   is now 1:05 p.m. We are located at David Lee Law

Page 3

1    Offices, 53 West Jackson Boulevard, Suite 505, Chicago,
2    Illinois, for a deposition in the matter of Lisa,
3    L-I-S-A, Lewandowski, L-E-W-A-N-D-O-W-S-K-I, v.
4    Columbia College Chicago, Case Number 1:2009 CV 04949.    0:00:31
5    The venue is Northern District of Illinois, Eastern
6    Division. The witness today is Eliza Nichols,
7    E-L-I-Z-A, no middle name, N-I-C-H-O-L-S. Ms. Nichols,
8    my name is Erin Sloan, I'm a notary public and an
9    employee of Textnet Court Reporter. At this time,
10   would you please raise your right hand for the oath?    0:00:54
11       (Witness sworn)
12       RECORDER: Would the attorneys please state
13   their appearances for the record?
14       MR. LEE: David Lee, L-E-E, for the
15   plaintiff.
16       MS. KAY: Jennifer Kay, K-A-Y, for the
17   defendant.
18       MR. DENHAM: Paul Denham, D-E-N-H-A-M,
19   assistant general counsel, Columbia College Chicago.
20       RECORDER: Can you state your name as well?
21       MS. CARON: Lisa Caron, C-A-R-O-N, court
22   reporter in training.
23       RECORDER: That completes the required
24   information. We can proceed.    0:01:26
25       EXAMINATION

Page 4

1    BY MR. LEE:
2        Q.  Dean Nichols, I'm going to hand you what the
3    court reporter has marked as deposition Exhibit I,
4    which is the notice of 30(b)(6) deposition of the
5    defendant, and I'll give a copy to Ms. Kay. Have you
6    ever seen this notice of 30(b)(6) deposition before?    0:01:51
7        A.  No.
8        Q.  If you'll turn to the last page, above my
9    signature you see that it says the deposition will be
10   recorded by audiovisual means?
11       A.  Mm-hmm.
12       Q.  Were you informed of that?
13       A.  Yes.
14       Q.  Okay. And above that it says, "Each person
15   designated is requested to bring with him or her a copy
16   of his or her current or last available job
17   description, resume, and business card." Did you bring
18   any of those?    0:02:21
19       A.  No, I didn't. I do have a business card.
20       MS. KAY: David, we can -- if you need it. I
21   think we neglected to ask to bring a CV. We can have
22   one sent if you want it --
23       MR. LEE: Sure.
24       MS. KAY: -- emailed.
25       Q.  Can I see your business card?

Page 5

1        A.  Yeah. I'm looking for it. Think I still
2    have it. Yeah.    0:02:46
3        Q.  And is what you handed me a true and correct
4    copy of your current business card?
5        A.  Let me make sure it's mine. Yes. It is.
6        Q.  And you're a Dean at Columbia College
7    Chicago?
8        A.  Yes.
9        Q.  Dean of the School of Fine and Performing
10   Arts?
11       A.  Yes.
12       Q.  Is that the same position you held when Lisa
13   Lewandowski worked for you?
14       A.  Yes.    0:03:09
15       Q.  Okay.
16       MR. LEE: I'm going to ask the court reporter
17   to mark this card as Exhibit 2.
18       RECORDER: Exhibit 2.
19       Q.  Okay. If you'd go back to Exhibit I, the
20   notice of 30(b)(6) dep, starting on the -- sort of the
21   middle of the first page, do you see there's a bunch of
22   numbered paragraphs?
23       A.  Mm-hmm.    0:03:34
24       Q.  Okay. Is that -- I'm sorry, is that yes?
25       A.  Yes, I'm sorry.

2 (Pages 2 to 5)

Page 6

1    Q.  Okay.  Do you know which, if any, of these
2  numbered paragraphs you're here to talk about?
3    A.  I have to read them first.
4    Q.  Would it help if we went through them one by
5  one?
6    A.  Yeah, sure.
7    Q.  Okay.  Number 1, "Defendant's policies,
8  procedures, and practices, if any, as they existed in
9  2006 and 2007 with respect to investigations of
10  complaints of sexual harassment."  Did I read that
11  correctly?                              0:04:05
12    A.  It sounds like you did read it correctly,
13  yes.
14    Q.  And are you here to talk about that at all?
15    A.  I don't think so.
16    Q.  Paragraph --
17      MS. KAY:  Can we take just a moment, David?
18  I can --
19      MR. LEE:  Uh-huh.
20      WITNESS:  Oh, okay.
21      MS. KAY:  But -- go ahead, David.
22      MR. LEE:  Well, if -- if you wanted to say
23  which paragraphs this witness --
24      MS. KAY:  Sure.
25      MR. LEE:  -- could shortcut it a bit.

Page 7

1      MS. KAY:  We're bringing Dean Nichols in to
2  testify regarding paragraph 6 and 7.  Pardon?  And with   0:04:47
3  regard -- well, we may need to -- to talk about this a
4  little bit off the record.  With regard to some of the
5  other paragraphs within the -- like paragraphs 8 --
6      MR. LEE:  Mm-hmm.
7      MS. KAY:  -- and 9 and 10, breaking them down
8  -- it might be helpful breaking down paragraph by
9  paragraph.  There may be some of these that you have     0:05:18
10  identified which come within the -- the category
11  addressed in paragraphs 6 and 7.
12      MR. LEE:  Okay.
13      MS. KAY:  So, most likely any of those
14  paragraphs identified in paragraphs 8, 9, and 10 which
15  concern the termination of the plaintiff's employment,
16  investigations of the alleged reasons for the
17  termination of employment, Ms. -- Dean Nichols would
18  also be testifying regarding those items.              0:05:50
19      MR. LEE:  Okay.  Thank you.  I'm going to ask
20  the court reporter to mark as deposition Exhibit 3 --
21      RECORDER:  Exhibit 3.
22      MR. LEE:  Yes.  The First Amended Complaint,
23  and I'll tender a copy to Ms. Kay.
24      MS. KAY:  Sure.
25    Q.  Okay.  If you'll continue to look at the

Page 8

1  Exhibit 1, the notice of 30(b)(6) dep, on the second
2  page, which I --
3    A.  Mm-hmm.
4    Q.  -- believe you have there, in paragraph 8,
5  the topic is "All facts or opinions bearing on the
6  accuracy or inaccuracy of defendant's denials, in its
7  Answer to the Amended Complaint, of the allegations of
8  the following paragraphs of the Amended Complaint," and
9  then there's a whole bunch of numbers -- numbered
10  paragraphs, right?                        0:06:27
11    A.  Mm-hmm.
12    Q.  Okay.  And did I read that correctly?
13    A.  Yes.
14    Q.  Okay.  So, will you look at Exhibit 3, which
15  was just handed to you, which was -- is the First
16  Amended Complaint?
17    A.  Mm-hmm.
18    Q.  And if you would turn to paragraph 22.        0:06:49
19    A.  Okay.
20    Q.  Paragraph 22 reads, quote, "On approximately
21  August 1, 2007, defendant returned Ms. Lewandowski to
22  her previous position of Assistant to the Dean of the
23  School of Fine and Performing Arts", end quote.  Did I
24  read that correctly?                      0:07:19
25    A.  You read it correctly.

Page 9

1    Q.  Okay.  Is any of that true?
2    A.  Well, let me -- let me ask clarification.  Am
3  I the defendant?  Or is the college the defendant?
4    Q.  The college is the defendant.
5    A.  Okay.  So, what you're asking me is, is it
6  true that the college returned Ms. Lewandowski to her
7  previous position?                        0:07:42
8    Q.  I'm asking if any of the paragraph that I
9  just read is -- is true.
10    A.  I think so, yes.
11    Q.  Okay.  Is any of the paragraph I just read
12  false?
13    A.  Not that I know of.
14    Q.  So the entire paragraph 22 of the First
15  Amended Complaint marked as Exhibit 3 is true?
16    A.  Yes.
17    Q.  And at that time, approximately August 1st,
18  2007, you were the Dean of the School of Fine and
19  Performing Arts?                          0:08:08
20    A.  That was my first day on the job.
21    Q.  Okay.  And Ms. Lewandowski was -- had the
22  position of assistant to you?
23    A.  Yes.
24    Q.  Okay.  If you look at the next paragraph of
25  the First Amended Complaint, which the court reporter's

Page 10

1   marked as Exhibit 3, does that paragraph read, "After
2   defendant returned Ms. Lewandowski to her prior
3   position as Assistant to the Dean of the School of Fine
4   and Performing Arts, defendant denied Ms. Lewandowski
5   her own computer which she needed to do her work, took
6   Ms. Lewandowski's former office space away, assigned
7   Ms. Lewandowski's former assistants elsewhere, withheld
8   work-related information from Ms. Lewandowski, and
9   made Ms. Lewandowski do extra, unnecessary work."   0:08:52
10  Okay. First of all, is it true that once Ms.
11  Lewandowski became your assistant as -- in your
12  position as Dean of the School of Fine and Performing
13  Arts, that she did not have her old computer?
14     A. Well, I'm going to have to say that this
15  whole thing is false. Let's start with that, because
16  you asked me with the other one whether it was accurate
17  or inaccurate. This whole thing is inaccurate. But to   0:09:18
18  my knowledge, nobody owns equipment. You get the
19  equipment to do your job --
20     Q. Mm-hmm.
21     A. -- and Ms. Lewandowski did have a computer.
22     Q. Mm-hmm. Did she have the same computer that
23  she used to have when she worked --
24     A. I have no idea. I had arrived on August 1st.
25  I have no idea --

Page 11

1      Q. Okay.
2      A. -- what anybody had before I got there.
3      Q. Okay. Did she have the same office space
4   that she had had?
5      A. I guess I'm not sure I understand the
6   question. Are you asking whether I reassigned office
7   space?                                                0:09:50
8      Q. No, I said did she have the same office space
9   that she had when she worked for Dean Lehrer?
10     A. No, she didn't.
11     Q. Okay. And was it you who assigned the office
12  space?
13     A. No. Allison Ratliff, who was a full-time
14  employee, had that office space when I arrived as Dean,
15  and I understand that Lisa Lewandowski occupied it
16  before.                                               0:10:14
17     Q. The next paragraph, paragraph 24, of the
18  First Amended Complaint that's marked as Exhibit 3,
19  reads, "In August 2007, Dean Eliza Nichols became Ms.
20  Lewandowski's direct supervisor." That's the first
21  sentence of the paragraph. Did I read that correctly?
22     A. Yes.                                            0:10:37
23     Q. And is that sentence true?
24     A. Yes.
25     Q. Okay. Then the second sentence of that

Page 12

1   paragraph read -- starts, "Dean Nichols worked out of
2   New York". Is that clause true?
3      A. As Dean?
4      Q. Is it true that you worked out of New York?
5      A. Not --
6         MS. KAY: Objection.
7      A. -- when I was Dean.
8         MS. KAY: I object to the form of the
9   question. With regard to the way it's -- it's stated,
10  I don't know if it's possible to give an answer the way
11  it's phrased, "worked out of New York".               0:11:07
12     Q. When you were appointed Dean of the School of
13  Fine and Performing Arts, were you living and working
14  in New York?
15     A. Before being appointed Dean, yes.
16     Q. Okay. And when did you move to Chicago
17  full-time?
18     A. Beginning -- I think the beginning of August.
19     Q. Okay.
20     A. Or end of -- no, it would've been the last
21  few days of July.
22     Q. Okay. So are you saying that as of the
23  beginning of August 2007 you were in Chicago full-time?   0:11:36
24     A. Yes.
25     Q. Okay. Okay. And then the next paragraph,

Page 13

1   paragraph 25, of the First Amended Complaint that the
2   court reporter marked as Exhibit 3. I'd -- I'd like to
3   take that -- I'm sorry. The first sentence of that
4   reads, "On October 18, 2007, Ms. Lewandowski was
5   scheduled to take a pre-approved Family and Medical
6   Leave Act leave for knee surgery."                    0:12:05
7         MS. KAY: I'm going to object to the form.
8   Well, I'm sorry. Ask your question.
9      Q. Is that true?
10        MS. KAY: I'm going to object to the form of
11  the question with regard to pre-approved, but if you
12  can answer, go ahead.
13     A. Well, I was going to say I -- I don't know
14  about pre-approval. I certainly approved her to take a
15  FMLA.
16     Q. And had you approved that before the leave
17  was scheduled to begin?
18     A. Well, there's paperwork that happened before
19  that and I signed all the paperwork, so yes --
20     Q. Okay.
21     A. -- I approved it. I approved the leave.       0:12:34
22     Q. Okay. So --
23     A. I think that's --
24     Q. -- can you explain --
25     A. -- the pre-approval, but I'm not sure I

Page 14

1 understand.
2 Q. Can you explain the difficulty you've having
3 with the word "pre-approved"?
4 A. Well, you just approve it, don't you? So --
5 Q. Okay. So, you're saying it was approved.
6 A. Yes.
7 Q. The -- I'm sorry, that Ms. Lewandowski's
8 family and medical leave was approved?
9 A. Mm-hmm.
10 Q. Yes?
11 A. Yes.
12 Q. And it was approved before the leave was to
13 have begun.
14 A. Yes.                          0:13:00
15 Q. Okay. Okay. And then the next paragraph --
16 and -- I'm sorry -- and that you're the person who
17 approved the leave.
18 A. Yes.
19 Q. Okay. The next paragraph, paragraph 26, of
20 the First Amended Complaint that the court reporter's
21 marked as Exhibit 3, the first sentence of that reads,
22 quote, "One day before Ms. Lewandowski was to begin her
23 pre-approved, scheduled Family and Medical Leave Act
24 leave, Dean Nichols terminate -- terminated Ms.
25 Lewandowski's employment", end quote. Other than

Page 15

1 stumbling over the word, did I read that correctly?   0:13:36
2 A. Yes, you did.
3 Q. Okay. Is that true?
4 A. I don't remember the exact day when I
5 terminated her but I am clear that I terminated her and
6 that I did terminate her before her FMLA.
7 Q. Okay. So, it's true that you had approved
8 her family and medical leave?
9 A. Mm-hmm.
10 Q. It's true that Family and Medical Leave
11 Act leave had been scheduled.
12 A. Yes.                          0:14:02
13 Q. It's true that you terminated her employment,
14 correct?
15 A. Yes.
16 Q. And it's true that you terminated her
17 employment before the scheduled Family and Medical
18 Leave Act leave was to have begun?
19 A. Yes.
20 Q. Okay. And the only thing that you're unsure
21 about in that first sentence is whether it was one day?
22 A. Yes. I just don't remember the dates.
23 Q. Okay. Okay. And then if you'll look at
24 paragraph 27 of the First Amended Complaint that's
25 marked as deposition Exhibit 3, does that read, quote,

Page 16

1 "The reason defendant gave Ms. Lewandowski for firing
2 her was that it allegedly", quote, "could not trust Ms.
3 Lewandowski anymore", end quote. First of all, did I
4 read that correctly?                    0:14:50
5 A. You did read it correctly.
6 Q. And is that true?
7 A. Yes, that is true.
8 Q. And the person who said that defendant could
9 not trust Ms. Lewandowski anymore, was that you?
10 A. Yes.
11 Q. You told that to Ms. Lewandowski?
12 A. Yes.
13 Q. And you told that to her when you were firing
14 her?
15 A. Yes.
16 Q. Okay.
17 MR. LEE: Okay, I'm going to ask the court
18 reporter to mark as deposition Exhibit 4 --       0:15:26
19 RECORDER: Exhibit 4.
20 MR. LEE: Exhibit 4, a document that was
21 previously marked as Exhibit 75 to plaintiff's request
22 for admissions. It's Bates stamped LL0093 through
23 LL0098. And the first page is headed "Complaint by
24 Lisa Lewandowski, Assistant to the Dean, about
25 impairment behavior by Leonard Lehrer, Dean of School

Page 17

1 of Fine & Performing Arts and her immediate
2 supervisor", and I'll tender a copy to Ms. Kay. I'm
3 sorry.                          0:16:18
4 Q. Dean Nichols, I'm handing you what the court
5 reporter's just marked as Exhibit 4, which I just
6 described. And my first question to you is, have you
7 ever seen this before?
8 A. No, I haven't.
9 Q. Did anybody ever tell you about the complaint
10 that Ms. Lewandowski had made about Dean Lehrer?
11 A. No.
12 Q. Okay. Was Dean Lehrer your immediate
13 predecessor --                     0:16:46
14 A. Yes.
15 Q. I'm sorry, may -- I didn't quite finish the
16 question. Was Dean Lehrer your immediate predecessor
17 as Dean of the School of Fine and Performing Arts?
18 A. Yes, he was.
19 Q. Okay. Did you and Dean Lehrer talk at all
20 about the job during the transition period from him to
21 you?
22 A. We had one meeting.
23 Q. Okay. And approximately when was that?
24 A. I think it would've been probably June of
25 2007, possibly July. I don't know.           0:17:17

5 (Pages 14 to 17)

Page 18

1      Q.  Okay.
2      A.  I can't remember.
3      Q.  And was that after you had been appointed as
4  Dean?
5      A.  Yes.
6      Q.  Okay.  In addition to that meeting, was there
7  any other type of communications between you and Dean
8  Lehrer concerning the job as Dean of the School of Fine
9  and Performing Arts or the school that you would be the
10  Dean of?
11      A.  No.  We only had one meeting.
12      Q.  Anything beside a meeting?  Phone calls,
13  emails, letters, any other type of communication?      0:17:43
14      A.  No.  He left me a document with his thoughts
15  on things that needed to be followed up on.
16      Q.  Okay.
17          MR. LEE:  Okay, I'm going to ask the court
18  reporter to mark deposition Exhibit 5, a document that
19  previously marked as Exhibit 98 to plaintiff's request
20  for admissions.  It's a handwritten note dated 8/30/07      0:18:22
21  and then there's other handwriting on the document.
22          RECORDER:  Thank you.
23      Q.  Let me hand you what the court reporter just
24  marked as deposition Exhibit 5, which I just described.
25  Have you ever seen this handwritten note before?      0:18:52

Page 19

1      A.  I don't think so.
2      Q.  Do you recognize any of the handwriting on
3  it?
4      A.  No, I don't.
5      Q.  There is handwriting at the top and then
6  there is handwriting at the bottom.
7      A.  Mm-hmm.
8      Q.  Do you recognize either the handwriting at
9  the top or the handwriting at the bottom?
10      A.  No.
11      Q.  Okay.  The handwriting at the bottom refers
12  to Abbie Kelley.
13      A.  Mm-hmm.
14      Q.  Who was Abbie Kelley?
15      A.  Abbie Kelley at the time was a graduate
16  student assistant, part-time assistant in the office.      0:19:20
17      Q.  In which office?
18      A.  The Office of the Dean of the School of Fine
19  and Performing Arts.
20      Q.  So, in your office.
21      A.  Yes.
22      Q.  Okay.  Okay.  And nothing about either of
23  these handwritings or the note look at all familiar to
24  you?
25      A.  Doesn't.

Page 20

1      Q.  Does the content of the note look at all
2  familiar to you?
3      A.  No.  Doesn't.      0:19:47
4      Q.  Anything about pick -- picking up Eliza's
5  book shelves ASAP, does that sound familiar?
6      A.  It says "pack", doesn't it?  "Please pack
7  Eliza's book shelves"?
8      Q.  I guess you can read the handwriting better
9  than I can.
10      A.  I don't know.  It looks like there's a dot
11  over the "a", so it's a --
12      Q.  Okay.
13      A.  -- little confusing.
14      Q.  Okay.
15      A.  I don't know what that means because I just
16  had moved in, so I don't know anybody'd be packing my
17  book shelves.      0:20:17
18      Q.  Okay.  And anything -- so nothing about the
19  note on the top looks familiar to you or the content of
20  that?
21      A.  No.
22      Q.  Okay.  And anything about the content on the
23  bottom or the note on the bottom, "Abbie Kelly does not
24  report to Lisa -- Lisa Lewandowski." about that look
25  familiar to you?

Page 21

1      A.  Well, you mean is it a truthful statement?
2  Is that a -- I don't know what you're trying to get.      0:20:45
3      Q.  Okay.  Was it a truthful statement?
4      A.  Abbie did not report to Lisa Lewandowski.
5      Q.  Okay.  Was whether or not Abbie reported to
6  Lisa Lewandowski or whether or not somebody -- did that
7  ever become an issue in your office?
8      A.  Not that I know of.
9      Q.  Okay.
10          MR. LEE:  Let me ask the court reporter to
11  mark as Exhibit 6 a document that was previously marked
12  as Exhibit 101 on plaintiff's request for admissions.      0:21:18
13      Q.  And I will tender a copy to Ms. Kay and
14  tender what the court reporter marked to you.  And what
15  the court reporter marked as Exhibit 3 (sic) is a
16  two-page document headed "COLUMBIA COLLEGE CHICAGO
17  EMPLOYEE REQUEST FOR FAMILY OR MEDICAL LEAVE".  Have
18  you ever seen this document before?      0:21:46
19      A.  If it's her MF -- if it's her request that I
20  signed and there's my signature on it, I would've seen
21  it before, yes.
22      Q.  Okay.  So, on the second page of Exhibit
23  number 6, which is Bates stamped LL0127, there is a
24  handwriting that appears to say "Eliza Nichols".  Is
25  that -- first of all, there's printing on the left.  Is

Page 22

1    that your printing?                    0:22:13
2        A.  I don't think so.
3        Q.  Okay.  Then there is a signature on the
4    right.  Is that your signature?
5        A.  Yes.  That is my signature.
6        Q.  Do you remember actually signing this
7    document?
8        A.  Yes, I do.
9        Q.  Okay.  And do you remember approximately when
10   you signed this document?
11       A.  I don't remember.  It was three years ago.
12       Q.  Anything about this document help you
13   remember approximately when you signed it?    0:22:39
14       A.  Well, there's a date.  I don't see a date
15   next to my name, so I can't verify when I would've
16   signed it.
17       Q.  Okay.  Any way to tie down how closely to the
18   date on the document of September 25th, 2007 you signed
19   this document?                          0:23:09
20       A.  I don't know how I would.
21       Q.  And as of when you signed the EMPLOYEE
22   REQUEST FOR FAMILY AND MEDICAL LEAVE that marked as
23   deposition Exhibit 6, you knew that Lisa Lewandowski
24   had requested and you had approved family and medical
25   leave beginning on October 18th, 2007 and expected to

Page 23

1    continue until approximately October 29th, 2007.
2        A.  Yes.                           0:23:38
3        Q.  Okay.
4            MR. LEE:  I'm going to ask the court reporter
5    to mark as deposition Exhibit 7 a document that was
6    previously marked as request for admissions Exhibit
7    102.  As soon as I can pull it out.  And I will tender
8    a copy to Ms. Kay.
9        Q.  And that's --
10                                          0:24:07
11           MS. KAY:  Thank you.
12       Q.  -- a document that's Bates stamped LL0128
13   through LL0131 headed "Columbia College Chicago
14   Certification of Health Care Provider."  Ask you please
15   look at that document and let me know if you've ever
16   seen it before.
17       A.  I don't recall.                 0:24:51
18       Q.  Okay.  If you go back on Exhibit to Exhibit
19   6, the EMPLOYEE REQUEST FOR FAMILY AND MEDICAL LEAVE,
20   do you recall whether or not as you were reviewing
21   and/or approving that request you saw anything that was
22   doctor's certification?
23       A.  I don't remember this.
24       Q.  Okay.  Is there anything about looking at the
25   EMPLOYEE REQUEST FOR FAMILY AND MEDICAL LEAVE which has

Page 24

1    been marked as Exhibit 6 and the doctor's Certification
2    of Health Care Provider which is marked as Exhibit 7,
3    looking at them together, that helps you remember
4    whether or not you've ever seen Exhibit 7 before?    0:25:29
5        A.  No.
6            MR. LEE:  Okay.  I'm going to ask the court
7    reporter to mark as deposition Exhibit 8 an Exhibit
8    which was previously marked as request for admissions
9    Exhibit number 115 and I'll tender a copy to Ms. Kay.    0:25:54
10           MS. KAY:  Thanks.
11       Q.  And it's a printout of an email.  The first
12   one from Lisa Lewandowski to G. Mora dated Friday,
13   October 19, 2007 at 8:35 a.m.  Have you ever seen the
14   -- any of these emails before, that have been marked as
15   Exhibit number 8?                       0:26:23
16       A.  I don't believe I've seen them before and I'm
17   not copied on them.
18       Q.  The very first email, which starts, "Dear
19   Gabina", begins, "My medical leave had been approved by
20   my supervisor."  That was true, correct?
21       A.  Yes.
22       Q.  You approved the medical leave.  And then
23   there's a reply from Mora, Gabina right under that?    0:26:55
24       A.  Mm-hmm.
25       Q.  Who's -- who -- who is Gabina Mora?

Page 25

1        A.  She is the Director of Benefits for Columbia
2    College Chicago working in the Human Resources
3    department.
4        Q.  Okay.
5            MR. LEE:  Okay.  Let me ask the court
6    reporter to mark as deposition Exhibit 9 a document
7    that was previously marked as request for admissions
8    Exhibit number 127.  I'm sorry, is request for    0:27:41
9    admission Exhibit number 134.  Did I give you the right
10   one?
11           MS. KAY:  134?  Yes.  Is that what --
12           MR. LEE:  Yeah.  I'm sorry.
13           MS. KAY:  It's all right.
14           MR. LEE:  And --
15           MS. KAY:  This is number 9?
16           MR. LEE:  It's number 9.  And it's headed
17   "Out of Office AutoReply".              0:28:03
18       Q.  Do you remember putting in -- Out of Office
19   AutoReply or having an Out of Office AutoReply on your
20   Columbia College email stating, "I will be in the
21   office beginning October" -- I'm sorry -- "August 2,
22   2007" and going on from there, as in Exhibit number 9?
23       A.  I don't remember this.
24       Q.  Okay.  Is there any way to check on this that
25   you know of?                           0:28:34

7 (Pages 22 to 25)

Page 26

1    A.  I don't know.
2       MR. LEE:  Okay.  I'm going to ask the court
3  reporter to mark a document deposition Exhibit 10 a document
4  that was previously marked as request for admission
5  Exhibit 100 and it's Bates stamped LL0115 and LL0116,
6  and I will tender a copy to Ms. Kay.        0:29:12
7       MS. KAY:  Thank you.
8    Q.  Would you please take a look at what the
9  court reporter just marked as deposition Exhibit 10,
10  which is an exchange of emails, and have you ever seen
11  this exchange of emails marked as deposition Exhibit 10
12  before?                              0:29:39
13    A.  I have to read it first.
14    Q.  Sure.
15    A.  I don't recall getting this, no.      0:30:29
16    Q.  Okay.  On sort of the bottom two-thirds of
17  the first page of deposition Exhibit 10, there's what
18  looks like an email from Lisa Lewandowski to Patricia
19  Olalde.  Did -- were any of the concerns in that email
20  ever shared with you?
21    A.  Lisa told me she was frustrated.       0:30:57
22    Q.  Do you remember approximately when Lisa told
23  you that?
24    A.  I don't.  I scheduled a meeting to talk to
25  her about it.

Page 27

1    Q.  How far in advance of your choosing to
2  terminate her employment was that meeting supposed to
3  be?
4    A.  Oh, I had several meetings with Lisa about
5  her role, so I -- and I don't know.
6    Q.  Do you have any way to tie down when those
7  meetings occurred?                     0:31:25
8    A.  Well, I started the job beginning of August,
9  and she left mid-October, so between October and the
10  beginning of August would've had several meetings to
11  discuss her role.
12    Q.  Okay.  Do you have any way to tie it down any
13  better than the beginning of August to the middle of
14  October?
15    A.  No.  It was a very busy time.
16    Q.  What was discussed in those meetings?
17    A.  My expectations of her, what I expected from
18  an Assistant to the Dean, how to work with me.  My
19  preferred working style.  What her assignments would
20  be.  What I expected from her.              0:32:07
21    Q.  Okay.  And what was your preferred working
22  style?
23    A.  That I have an assistant who assists me.
24  That I do not have an assistant who makes decisions for
25  me.  That she keep my calendar, that she file my files,

Page 28

1  that she be responsible for keeping things organized in
2  my office.  And that she do things according to my
3  assignments to her.                     0:32:38
4    Q.  Anything else?  That's it?  Sorry, can you
5  answer out loud, please?
6    A.  Oh, I'm sorry.  Yes, that is it.
7    Q.  Okay.  And did Lisa respond to that in those
8  meetings?
9    A.  Lisa made it clear that she had had a lot of
10  liberty in her position as Assistant to Dean Lehrer,
11  and I explained to her that that was not my style of
12  leadership and that I needed very specific relationship
13  with my Assistant to the Dean and that I expected her
14  to work with me as I was a different person.    0:33:15
15    Q.  Was anybody in any of these meetings besides
16  you and Lisa Lewandowski?
17    A.  I don't know.
18    Q.  Any --
19    A.  I can't remember.
20    Q.  Anything that can help you remember?
21    A.  I -- you know, I'm a very consistent person,
22  and I think if you asked anybody in my office what my
23  expectations are, you would get the same answer from
24  every single person.  Whether I expressed that in a
25  staff meeting with more than Lisa I can't recall at

Page 29

1  this point.                            0:33:42
2    Q.  Okay.  My question was actually, was there
3  anybody else in those meetings besides you and Lisa?
4    A.  And I said I don't remember.
5    Q.  Okay.  And then I asked you is there anything
6  that could help you remember.
7    A.  And I can't think of anything.
8    Q.  Okay.  Okay.  Did you do anything like make a
9  memo to file about any of these meetings with Lisa?
10    A.  I don't recall.
11    Q.  Okay.  Did you send off an email confirming
12  anything about any of these meetings with Lisa?   0:34:11
13    A.  I can't recall.
14    Q.  Okay.  As far as you're sitting here there's
15  nothing that you can think of that would help you
16  recall whether or not anybody else was in the meetings
17  with you and Lisa?
18    A.  Not that I can think of, no.
19    Q.  Okay.  So, there's your version of what
20  happened in those meetings and then there's Lisa's
21  version of what happened in those meetings, correct?
22       MS. KAY:  Object to the form of the question.
23  It's argumentative.                      0:34:37
24    Q.  Please answer.
25       MS. KAY:  You can answer.  Can you repeat the

8  (Pages 26 to 29)

Page 30

1  question, please?
2       MR. LEE:  Sure.
3       Q.  There's your version of what happened in
4  those meetings and Lisa's version of what happened in
5  those meetings, correct?
6       MS. KAY:  Let me also object on the basis of
7  foundation with regard to what Lisa's version is.  I
8  don't know that there's been anything presented to this
9  witness regarding what Lisa's version is.
10       MR. LEE:  Okay.
11       MS. KAY:  So there's no foundation.
12       Q.  Please answer.
13       MS. KAY:  If you can, answer --
14       A.  Well, I don't think I can since I don't know
15  what her version is.                        0:35:05
16       Q.  Okay.
17       A.  I told you what mine is, so I can verify --
18       Q.  Okay.
19       A.  -- what mine is.
20       Q.  And there's no witnesses to these meetings
21  other than you and Lisa?
22       A.  And I said I don't recall.
23       Q.  And there's nothing that can help you
24  remember right now?
25       A.  And I said that I didn't think so.

Page 31

1       Q.  Okay.  Do you remember approximately how many
2  such meetings there were?
3       A.  I met with Lisa several times a week.  I saw
4  her every day.  There were many occasions for us to
5  talk.                                       0:35:34
6       Q.  Okay.  And are you saying that when you saw
7  her every day you would set forth your expectations?
8       A.  No, I'm just saying that I don't know whether
9  it was always in a formal meeting or whether it was
10  informally.
11       Q.  Okay.  Do you have any way to -- to come with
12  a number, an accurate number, an accurate approximate
13  number, of how many times you communicated your
14  expectations to Lisa?
15       A.  I don't think I could come up with an
16  approximate number, but I would venture that there were
17  at least three or four occasions when I would've made
18  it clear to Lisa.                           0:36:07
19       Q.  Okay.  So, three or four occasions sometime
20  between August 1st and when Lisa's employment was
21  terminated in roughly mid-October?
22       A.  Well, the first occasion when I would've made
23  it clear to Lisa was prior to taking on the position
24  when I had been offered it.
25       Q.  Mm-hmm.

Page 32

1       A.  And Lisa and I met and I told her what I
2  expected from an Assistant --
3       Q.  Okay.  And --
4       A.  -- to the Dean.
5       Q.  -- when was that?                   0:36:35
6       A.  I can't recall.  It would've been June or
7  July of 2007.
8       Q.  And where was that?
9       A.  That meeting was held at Columbia College
10  Chicago.  It was held on the ninth floor in Room 908 in
11  the conference room.
12       Q.  Okay.  Were you and Lisa the only people in
13  that meeting?
14       A.  Yes.
15       Q.  Okay.  Approximately how long did that
16  meeting last?                               0:37:00
17       A.  No more than half an hour.
18       Q.  Okay.  Is there anything that memorializes
19  that meeting, like a memo to file or anything else?
20       A.  Yes.  I wrote a memo to file.
21       Q.  Okay.  And does that memo to file still
22  exist?
23       A.  Yes, it does.
24       Q.  Okay.  Have you turned it over to your
25  attorney?

Page 33

1       A.  Yes, I have.
2       Q.  Okay.
3       MR. LEE:  Okay.  I request that that be
4  produced.  Okay.                            0:37:27
5       Q.  Do you remember any of the other meetings
6  that you had with Lisa in which you communicated your
7  expectations to her?
8       A.  I recall her bursting into my office on
9  several occasions very frustrated or coming in when we
10  had a meeting to discuss something particular and her
11  blurting things out to me and me saying to her I expect
12  you to make an appointment to talk to me about these
13  things.  We're having a meeting about something else   0:38:00
14  right now.  If you want to take to me about any
15  questions you have, please set up a meeting and make it
16  clear that that's what the meeting is going to be
17  about.
18       Q.  Okay.  Do you remember when these occasions
19  were?
20       A.  Throughout the fall.
21       Q.  Okay.  And do you remember how many there
22  were, occasions like this?
23       A.  At least three or five.
24       Q.  Okay.  Were there other people in the office
25  when this happened?                         0:38:27

TEXTNET Internet Court Reporters    888-TEXTNET Toll Free             www.textnet.com

Page 34

1    A. I don't recall.
2    Q. Anything that can help you recall?
3    A. No.
4    Q. Is there anything else you remember about any
5    of these meetings with Lisa in which you communicated
6    your expectations to her?
7    A. No.
8    Q. Okay. Is there anything that could help you
9    recall more about these meetings with Lisa in which you
10   communicated your expectations to her?
11   A. I don't think so.                         0:38:52
12   Q. Is there anything that could help you tie
13   down the number of meetings you had with Lisa in which
14   you communicated your expectations to her?
15   A. I don't think so.
16   Q. Okay. And is there anything that could help
17   you remember when, other than the first meeting before
18   you took over, the meeting in Room 9 -- 908, other than
19   that meeting, is there anything that can help you
20   remember where those meetings were?               0:39:18
21   A. I'm not sure I understand the question.
22   Q. Okay. Out of this -- this series of meetings
23   that you say you had with Lisa in which you
24   communicated your expectations, you testified that
25   there was one before you took over in Room 908 where

Page 35

1    you and Lisa were -- is there anything that could --
2    well, first of all, do you remem -- I withdraw that.
3    Is there anything that can help you remember when any
4    of these other meetings were?                     0:39:47
5    A. No. I don't think so.
6    Q. Okay. And is there anything that can help
7    you remember whether or not anybody besides you and
8    Lisa were in any of these other meetings?
9    A. I don't think so.
10   Q. And I may have asked this, and I apologize if
11   I'm repeating myself, is there anything memorializing
12   any of these other meetings like a memo to file?
13   A. I think it would be the same memo to file
14   that I've already given to Ms. Kay.                0:40:15
15   Q. Okay. This memo to file, when was that
16   created roughly?
17   A. It would've been created mid-October.
18   Q. Roughly simultaneously with your -- your
19   choosing to terminate Lisa's employment at Columbia?
20   A. Yes.
21   Q. And do you recall if this memo to file was
22   created before or after you terminated Lisa's
23   employment with Columbia?                          0:40:44
24   A. No, I don't remember.
25   Q. Okay. And was this file then put in Lisa's

Page 36

1    personnel file? I'm sorry. Was this memo then put in
2    Lisa's personnel file?
3    A. Yes.
4    Q. And does this memo basically set out your
5    side of the story as to the reason that Lisa
6    Lewandowski was terminated?
7    A. I'm not sure what you refer to as the side of
8    the story, but it did document my conversations with
9    Lisa.                                              0:41:11
10   Q. And did it document the reason --
11   A. My -- my expectations.
12   Q. Did it document the reason that you say was
13   the reason that you terminated Lisa's employment?
14   A. I actually don't recall.
15   MS. KAY: I'm going to object to the form of
16   the question, but if you --
17   A. I don't recall.
18   Q. Okay. When was the last time you saw this
19   memo?
20   A. I saw it yesterday but I didn't read it very
21   thoroughly.                                        0:41:34
22   Q. Okay. Okay. And were you located when you
23   saw the memo?
24   WITNESS: Trying to remember where your
25   office is --

Page 37

1    Q. Was -- was it at Ms. Kay's office?
2    A. No. Columbia College Chicago, eighth floor.
3    WITNESS: And I'm looking at you because I
4    don't know the office number.
5    MS. KAY: Okay.
6    Q. Okay. So, why did you terminate -- why did
7    you -- I'm sorry, withdraw that. Why did you choose to   0:42:12
8    terminate Ms. Lewandowski's employment at Columbia
9    College?
10   A. Because she lied to me on several occasions
11   and she was not doing the job that I expected her to do
12   as my assistant.
13   Q. Okay. Are those two different reasons or one
14   big reason?
15   A. One big reason.
16   Q. Okay. You said she lied to you on several
17   occasions. What were these lies?                   0:42:40
18   A. She lied to me about contacting the chairs.
19   She lied to me about a meeting that she had with
20   Allison Ratliff. She lied to me about documents. I
21   can't remember the details of it, but she had prepared
22   something that she hadn't prepared.                0:43:11
23   Q. Anything else?
24   A. Not that I remember.
25   Q. Okay. And did you put what you thought about

10 (Pages 34 to 37)

Page 38

1  the -- these lies that you mentioned in this memo that
2  you mentioned?
3      A. I believe I did.
4      Q. Okay. What was it about the chairs? And --
5  and by chairs, you mean chair of a department?
6      A. Chairs of departments.
7      Q. Not a piece of furniture.          0:43:36
8      A. No, that's true.
9      Q. Okay.
10     A. I had made it clear to Ms. Lewandowski that I
11  did not want her communicating with the chairs unless I
12  explicitly asked her to. And I found that she had
13  communicated information to the chairs that I had not
14  authorized her to communicate. And when I asked her
15  why she did that, she said that she had been solicited
16  from the chairs, that she had only done it in response
17  to chairs asking for that information. When I asked    0:44:09
18  her why she would do that even though she had explicit
19  orders from me not to do that, she said she was -- she
20  didn't know but that they'd asked for it. Then when I
21  asked the chairs, they said that they had not solicited
22  that information, that she had contacted them.
23     Q. And -- and what's the information you're
24  talking about?                          0:44:32
25     A. Information about budgeting -- budgeting and

Page 39

1  hiring lines of full-time faculty.
2      Q. What sort of information about budgeting?
3      A. Whether positions were open and whether they
4  were funded.
5      Q. Okay. Was that the sort of information the
6  chair of a department would have legitimate access to?
7      A. No, it's the Dean's decision to determine
8  where positions are going to go and whether or not a
9  department is going to get a position or get funding
10  for a position. It's information that a Dean has, that
11  a Dean can choose to share with a chair.      0:45:09
12     Q. And do you know how this information was
13  shared?
14     A. I don't know that.
15     Q. I mean, email, face --
16     A. I --
17     Q. -- to face conversation?
18     A. I think it was email.
19     Q. Okay.
20     A. Unless it was a phone call. I really don't
21  know.
22     Q. Okay. Do you know if this was like a blast
23  email to all the chairs or all the departments or just
24  went to a specific chair or -- or anything like that?
25     MS. KAY: Object to the form of the question.

Page 40

1  I don't think she's testified that it was necessarily
2  email. She said she doesn't know.          0:45:36
3      MR. LEE: Okay. I -- I -- that's a fair
4  point. Withdraw the question.
5      Q. Did this information go to all the chairs of
6  all the departments or only certain chairs of certain
7  departments?
8      MS. KAY: I'm going to object to the form
9  again. I think you've referred to it as an email, and
10  again there's no foundation that it was necessarily
11  email.
12     MR. LEE: I thought I said information, but
13  I'll --
14     MS. KAY: I'm sorry.
15     MR. LEE: -- try again.
16     MS. KAY: If you did, then it's my error.
17  I'm sorry.
18     MR. LEE: Okay.
19     Q. Did this information go to all the chairs of
20  all the departments in your school or just to some of
21  the chairs of the departments in your school?    0:46:06
22     A. I don't know if they went to all --
23     Q. Okay.
24     A. -- if this information went to all.
25     Q. How did you find out about this information

Page 41

1  allegedly being sent to some or all the chairs of the
2  departments in your school?
3      A. Because a few chairs contacted me saying that
4  they had positions and wanting to verify with me that
5  that was the case. And I asked them how they got that
6  information and they said they'd gotten that from Lisa.   0:46:33
7      Q. Okay. And did you ask them whether or not
8  they had solicited that information.
9      A. After Lisa -- after I confronted Lisa and she
10  said that they had asked her for it and that they had
11  taken initiative, I did ask them.
12     Q. Okay. Would it have been appropriate or
13  inappropriate for a chair of a department to have asked
14  Lisa for that information?
15     A. It would've been inappropriate given that I
16  had spoken to all of the chairs and asked them not to
17  go through my assistant but to go directly to me.    0:47:00
18     Q. Okay. And so the chairs knew that it was
19  inappropriate --
20     A. I believe --
21     Q. -- for them to ask Lisa for that information?
22     A. Yes.
23     Q. And then you asked one or more chairs if they
24  had asked Lisa for that information.
25     A. Yes.

11 (Pages 38 to 41)

Page 42

1    Q.  Okay.  And knowing that it was inappropriate
2  for them to do so, they said to you, no, we had not, I
3  take it.
4         MS. KAY:  Can you repeat the question,
5  please?                              0:47:25
6         MR. LEE:  Sure.
7    Q.  The chairs had been informed by you that it
8  would be inappropriate that -- for them to ask Lisa for
9  such information.  And then you asked them if they had
10  asked Lisa for such information.  Correct?
11    A.  I'm having difficulty answering the question
12  because it sounds like a cause and effect question.
13  And it's not a cause and effect --
14         MS. KAY:  If you don't understand it or you
15  can't answer --
16         WITNESS:  I don't --
17         MS. KAY:  -- it, tell him you don't
18  understand.
19    Q.  Okay.  I just want to make sure I understand
20  the time sequence.  You told the chairs that it would
21  be -- or that they should not ask Lisa directly for
22  this information but should go through you.  Is that
23  correct?                              0:48:00
24    A.  Well, when I came in as a new Dean --
25    Q.  Mm-hmm.

Page 43

1    A.  -- I informed the chairs --
2    Q.  Mm-hmm.
3    A.  -- of what my style was and that I wanted to
4  work with them directly.  That I did not want my staff
5  mediating or interpreting, that I needed a direct
6  rapport with them.  So, on all information, they should
7  have come to me.  Wasn't just this information.    0:48:30
8    Q.  Okay.  And that's something you meant
9  seriously.
10    A.  Yes.
11    Q.  And you communicated that you meant that
12  seriously.
13    A.  Yes.
14    Q.  And then sometime after this, you asked some
15  of the chairs if they had requested budgeting
16  information from Lisa Lewandowski.
17    A.  I asked them if she had contacted them or
18  whether they had contacted her.
19    Q.  Okay.  And how many chairs did you ask
20  actually?                             0:48:54
21    A.  I can't recall how many.  I -- I can think of
22  two.
23    Q.  Okay.  How many chairs were there in the --
24  the School of Fine and Performing Arts at that time?
25    A.  There were eight.

Page 44

1    Q.  Okay.  So you asked two of the --
2    A.  -- probably three.
3    Q.  -- eight?
4    A.  Two or three --
5    Q.  Okay.
6    A.  -- of the eight.
7    Q.  So you asked two or three of the eight
8  chairs.
9    A.  Mm-hmm.
10    Q.  And at the point you had asked them, you had
11  previously told them that you did not want them talking
12  to your staff but talking to you directly.       0:49:22
13    A.  That's correct.
14    Q.  Okay.  And when you asked them if they had
15  talked to your staff, they said no, they had not.
16    A.  Correct.
17    Q.  Okay.  And then you asked Lisa whether she
18  had initiated that or the chairs had initiated that.
19  Correct?
20    A.  Well, it's your "and then" that makes it a
21  different sequence.
22    Q.  Okay.  At some point do you ask Lisa whether
23  she had initiated or the chairs had initiated that
24  exchange of information?                  0:49:51
25    A.  That's correct.

Page 45

1    Q.  Okay.  And Lisa said that the chairs had
2  initiated it.
3    A.  Yes, that's correct.
4    Q.  And the chairs said that Lisa had initiated
5  it.
6    A.  That's correct.
7    Q.  Okay.  And when the chairs told you that Lisa
8  -- that -- I withdraw that.  And when -- and -- and you
9  chose to believe the chairs' version rather than Lisa's
10  version.
11    A.  Yes.                           0:50:16
12    Q.  Okay.  And when the chairs told you that Lisa
13  had initiated it, they had previously been told by you
14  seriously that you wanted them to communicate directly
15  with you and not with your staff.
16    A.  That's correct.
17    Q.  Okay.  So, had the chairs said that Lisa --
18  that they initiated that communication rather than
19  Lisa, the chairs would be admitting to you that they
20  were disobeying your serious instructions, correct?   0:50:44
21    A.  That's correct.
22    Q.  Okay.  And under those circumstances, you
23  chose to believe the chairs rather than to believe
24  Lisa.
25    A.  Yes, that's correct.

Page 46

1  Q. Okay. Is there anything else about the
2  budgeting information with the chairs that you believe
3  was a lie on Lisa's part?
4  A. No.
5  Q. Okay. You said something about a meeting
6  with Allison, that you said was a lie on Lisa's part.    0:51:14
7  A. Yes. When I asked Lisa to make sure that the
8  office was organized to pick up any slack when she was
9  going to be on her family medical leave, I asked her to
10  meet with the staff in the office to go over anything
11  that could come up while she was gone. And she did not
12  seem to be making any attempt to actually have the
13  meeting and to convey that information. And when I    0:51:53
14  asked her -- then she -- she told me that she was going
15  to have a meeting. And when I came back later that
16  day, I said did you have the meeting. And she said I
17  could not have the meeting because Allison was called
18  away by Jim McDonald, the Associate Dean. And I -- I
19  did not believe her because I had made it clear to
20  everyone in the office that she was going to be leaving
21  soon and that it was important that she convey any
22  information she had to the people in the office. And    0:52:24
23  so I asked Jim McDonald, the Associate Dean, if he had
24  indeed called Allison Ratliff away when she was meeting
25  with Lisa Lewandowski, and he said he had not.

Page 47

1  Q. Was -- what was Jim McDonald's position?
2  A. Associate Dean.
3  Q. You were his boss.
4  A. Yes.    0:52:51
5  Q. Okay. Was Jim McDonald one of the people
6  that you made clear to that it was important that Lisa
7  meet with Allison to arrange for matters while she was
8  going to be out on family and medical leave?
9  A. Yes.
10  Q. Okay. And you did that before you checked
11  about Jim McDonald supposedly calling Allison away from
12  a meeting with Lisa.
13  A. Yes.
14  Q. Okay. So, had Jim McDonald said to you at
15  that point, yes, I did call Allison away from a meeting
16  with Lisa, he would have been going against your having
17  said that it was very important for Allison to meet
18  with Lisa.    0:53:28
19  A. That's correct.
20  Q. Okay. And you chose to believe Jim McDonald
21  rather than to believe Lisa under those circumstances.
22  A. Yes.
23  Q. And do you recall when this happened?
24  A. A date?
25  Q. Roughly.

Page 48

1  A. It would've been before she was scheduled to
2  leave on Family and Medical Leave Act.
3  Q. Do you know how far before?
4  A. I don't.
5  Q. Are we talking weeks, days, hours?    0:53:54
6  A. I don't recall.
7  Q. Any way to tie it down?
8  A. I don't think so.
9  Q. Does the memo that you talked about earlier,
10  does that tie it down as far as you remember?
11  A. I don't recall.
12  Q. Okay. And also, this thing about the --
13  supposed lie about the chairs and the budgeting
14  information, do you recall when that happened?
15  A. I don't recall.    0:54:18
16  Q. Do you recall how far before Lisa's scheduled
17  family and medical leave that was?
18  A. I don't.
19  Q. Okay. Is there anything that would help you
20  remember that?
21  A. I can't think of anything.
22  Q. Okay. Okay. And then the -- third thing
23  you mentioned that you said -- you claimed was a lie on
24  Lisa's behalf was documents be -- not being prepared,
25  what was that about?    0:54:44

Page 49

1  A. I remember on one occasion asking her to
2  prepare a memo from me about the chairs' reappointment.
3  They're -- they serve on three-year terms. And I
4  checked in with the college of how the other deans did
5  it and how it was done at the college. There's three
6  schools. I'm the dean of one school. And found out
7  that the two other deans did it differently than how
8  Dean Lehrer had done it. I asked Lisa to do it the    0:55:17
9  same way that the other deans did it. And she handed
10  me something that I didn't understand and asked her if
11  this was a template I had asked her to prepare and she
12  said yes. And it turned out to be a mishmash of things
13  that she had created that was not what I had asked her
14  to do and she lied about that.    0:55:47
15  Q. What -- what's the lie part?
16  A. The lie was she said that she had done what
17  I'd asked her to and then it turned out that she hadn't
18  done what I had asked her to.
19  Q. And what you asked her to do was to do -- do
20  it the same way the other two deans did it. Correct?
21  A. That's correct.
22  Q. Okay. And did you compare what Lisa had done
23  to what the other two deans had done?
24  A. Yes, I did.
25  Q. Okay. And in what way did they vary?    0:56:13

13 (Pages 46 to 49)

| Page 50 |
| --- |

1    A.  They were completely different.
2    Q.  And did you sit down with Lisa and point out
3  the differences or --
4    A.  Yes.
5    Q.  Okay.  And what did Lisa say in response to
6  that?
7    A.  She seemed unable to explain to me what she
8  had done, and it took a long, long time for her to
9  finally tell me that she hadn't done what I'd asked her
10  to do.                                    0:56:40
11    Q.  Okay.  And when was this?
12    A.  The day, I have no idea.
13    Q.  How long before Lisa was to go on family
14  medical?
15    A.  I don't recall.
16    Q.  Are -- are we talking months or days or
17  weeks?
18    A.  I can't recall.
19    Q.  Is there anything that can help you recall?
20    A.  Not that I know of.
21    Q.  Okay.  So, other than the chairs and the
22  budgeting information, the meeting with Allison, and
23  this document template, is there anything else that you
24  consider was a lie that Lisa said to you?      0:57:11
25    A.  Not that I can recall right now.

| Page 51 |
| --- |

1    Q.  Is there anything that can help you recall?
2    A.  Not that I know of.
3    Q.  Okay.  Was there any other reason that you
4  chose to terminate Lisa's employment with Columbia
5  College?
6    A.  No.
7    Q.  The -- the three things, the chairs and the
8  budgeting information, the meeting with Allison, and
9  the document -- that's the entirety of the reasons that
10  you chose to terminate Lisa's employment with Columbia
11  College?                                  0:57:40
12    A.  I chose to terminate her relationship with
13  the college because she lied to me, and as the
14  Assistant to the Dean, I need to trust the people who
15  work for me.
16    Q.  Okay.  And the lies that you're talking about
17  are those three things, the --
18    A.  Yes.
19    Q.  -- chairs and the budgeting information being
20  one, the meeting with Allison being the second, and the
21  document template being the third.
22    A.  Yes.
23    Q.  There's nothing else that you considered a
24  lie.
25    A.  Not that I can recall.          0:58:07

| Page 52 |
| --- |

1    Q.  Okay.  And there's nothing that can help you
2  recall?
3    A.  Not that I can think of.
4    Q.  How many people currently work in the office
5  of -- of the Dean of School of Fine and Performing
6  Arts?
7    A.  Ten.
8    Q.  Okay.  And at the time Lisa was terminated,
9  immediately prior to Lisa's termination, so Lisa was
10  still an employee, how many peopled worked in the
11  Office of the Dean of the School of Fine and Performing
12  Arts?                                    0:58:38
13    A.  Four.
14    Q.  So, the office has increased by 250%?
15    A.  I'm not good at percentages --
16    Q.  Okay.
17    A.  -- but it's increased.
18    Q.  It's gone from four to 10.  Yes?
19    A.  Yes.
20    Q.  Okay.  And what are the current positions in
21  the Office of the Dean of the School of Fine and
22  Performing Arts?
23    A.  There is -- well, I guess one question is,
24  are open positions included as positions?  I mean,
25  there's, you know, people who have left.      0:59:08

| Page 53 |
| --- |

1    Q.  Okay.  Sure.
2    A.  We have a hiring freeze.  So, am I telling
3  you the total number of positions that would be
4  available if there wasn't a hiring freeze?
5    Q.  I don't know.  What did you tell me?
6    A.  Well, you're asking how many positions and
7  what they are.  So, I can tell you what they are.  But
8  I can also explain to you that --
9    Q.  Mm-hmm.
10    A.  -- not all of them are filled right now.
11    Q.  Okay.
12    A.  So I'm --
13    Q.  Sure.
14    A.  -- asking you what would you like.
15    Q.  Well, when you said there were 10 positions
16  --
17    A.  Mm-hmm.
18    Q.  -- you said both filled and unfilled?      0:59:34
19    A.  Yes.
20    Q.  Okay.  Of those 10, how many are filled?
21    A.  There is -- there are two Associate Deans.
22    Q.  Mm-hmm.
23    A.  There is an Assistant Dean.
24    Q.  Mm-hmm.
25    A.  There is a -- there are three Directors.

Page 54

1    Q. Mm-hmm.
2    A. There is the Dean. There are two
3 Administrative Assistant positions open, one that is
4 disputed. And there is a Director position open. And
5 actually an Assistant Dean position that's open.    1:00:12
6    Q. By open you mean unfilled due to the hiring
7 freeze?
8    A. Un -- un -- unfilled because of the hiring
9 freeze, yes.
10    Q. And what does it mean that one Administrative
11 Assistant position is disputed?
12    A. That Human Resources deems that a new
13 position and I do not deem it a new position.
14    Q. And what practical consequence does that
15 have?    1:00:38
16    A. Means I can't fill it until the dispute is
17 over.
18    Q. Okay. Okay. And immediately prior to Lisa's
19 termination of employment, you said there were four in
20 the office?
21    A. There was the Dean, the Associate Dean, Lisa
22 Lewandowski as the Assistant to the Dean, the
23 Administrative Assistant, Allison Ratliff.
24    Q. Mm-hmm.
25    A. That was it.    1:01:05

Page 55

1    Q. Okay. Okay. And was Lisa Lewandowski's
2 position filled after -- after her employment
3 terminated?
4    A. Her position was filled on an interim basis
5 initially and then it was filled permanently.
6    Q. Okay. What does it mean, on an interim
7 basis?
8    A. At the college you do a full-blown search for
9 any full-time position.
10    Q. Mm-hmm.
11    A. I was a new Dean, and I didn't have a lot of
12 time to get some assistance, so I asked special
13 permission from Human Resources to delay a search until
14 I had more time. And I hired an interim person.    1:01:44
15    Q. And how long did the interim person serve in
16 that position?
17    A. I can't remember, three or six months.
18    Q. Okay. And what's the name of that interim
19 person?
20    A. Abbie Kelley.
21    Q. Same Abbie Kelley who's on the handwriting
22 exhibit that --
23    A. Yes.
24    Q. -- that we've looked at?
25    A. She was a student worker --

Page 56

1    Q. Okay.
2    A. -- in the office.
3    Q. Okay. Does she still work in -- in Columbia
4 College?
5    A. Yes, she does.
6    Q. Okay. What's her current position?    1:02:09
7    A. She is Director of Communication for the
8 School of Fine and Performing Arts.
9    Q. Okay. And then you said she worked there
10 approximately three to six months on an interim basis
11 in Lisa's old position?
12    A. Mm-hmm.
13    Q. And -- and -- yes?
14    A. Yes. Sorry.
15    Q. Okay. And then that position was filled on a
16 permanent basis?
17    A. Yes.
18    Q. And who filled that position on a permanent
19 basis?
20    A. Abbie Kelley filled it on a permanent basis
21 for approximately a year --
22    Q. Mm-hmm.
23    A. -- and then when Abbie was promoted to a
24 newly created position of Director of Communication, I
25 filled that position with somebody whose name is

Page 57

1 Candice Hill-Buchbinder.    1:02:45
2    Q. And does Ms. Hill-Buchbinder still work in
3 that position?
4    A. Yes.
5    Q. Okay. And there are currently open
6 Administrative Assistant positions in the Office of the
7 Dean of the School of Fine and Performing Arts?
8    A. Yes.
9    Q. At least one of which there is a dispute
10 between you and Human Resources whether that position
11 can be filled or not due to the hiring freeze.
12    A. Yes.    1:03:08
13    Q. Okay. Any reason if Lisa Lewandowski were to
14 win this case, any reason she couldn't be put in one of
15 those positions?
16    MS. KAY: Object to the form of the question.
17 Calls for hypothetical and speculation.
18    Q. Okay. Please answer.
19    A. If there were a search and Lisa applied for
20 the position, is that --
21    Q. Mm-hmm.
22    A. -- what you're asking?
23    Q. No. I'm saying if Lisa Lewandowski wins this
24 case and the judge says she should be reinstated to her
25 old position, is there any reason that you can think of

15  (Pages 54 to 57)

Page 58

1   why she should not be reinstated?          1:03:39
2       A.  To the Assistant to the Dean position or to
3   an Administrative Assistant position?
4       Q.  To the -- I'm sorry -- to the Assistant to
5   the Dean position.
6       A.  Well, it's already filled.
7       Q.  Other than it being filled, is there any
8   reason you can think of?
9           MS. KAY:  The question is, any reason she can
10  think of why she shouldn't be brought back?
11          MR. LEE:  Right.
12          MS. KAY:  Okay.  I'm going to object to the
13  form of the question, but if you can answer --    1:04:05
14      A.  I don't think I can.  I think it's an absurd
15  question.  I mean, I -- I know you have to do your job,
16  but I -- I can't --
17      Q.  Well, if -- if --
18      A.  -- answer that question.
19      Q.  -- if a judge said you need to put Lisa
20  Lewandowski back to work because she won the case,
21  would you be able to do that?
22          MS. KAY:  Same objection.
23      A.  I -- I -- yeah, I don't -- I don't -- I can't
24  answer that question.
25      Q.  Why can't you answer the question?

Page 59

1       A.  I think the -- if that were to happen, that
2   Human Resources would work to determine where she was
3   located in an open position.          1:04:42
4           WITNESS:  I'm sorry, my father is ill.
5           MR. LEE:  Off the record.
6           RECORDER:  Off the record, 1:04 p.m.  Or 2:09
7   --
8           WITNESS:  I -- I won't take --
9           RECORDER:  -- p.m.
10          WITNESS:  -- it, but I may have to --
11          (Off the record)
12          RECORDER:  -- 2:10 p.m.
13      Q.  So, if Lisa Lewandowski won this case and the
14  judge said she should be put back in her position, can
15  you think of any reason why she should not be back in
16  her old position?
17      A.  I -- I still can't answer the question.  I
18  can tell you that if -- if -- if I was requested to put
19  somebody back in their position because that was what
20  had to happen, I would comply with whatever my
21  institution asked me to do, I think.  I mean, I don't
22  really --          1:05:23
23      Q.  Okay.  And -- and you'd comply with the court
24  order?
25      A.  Of course I would.

Page 60

1       Q.  Okay.  As a Dean, you're an employee of
2   Columbia College?
3       A.  Yes.
4       Q.  Do you get employment evaluations or anything
5   like that?
6       A.  Yes, I do.
7       Q.  Okay.  Is part of your evaluation whether or
8   not you've been found to have retaliated against any
9   employee?          1:05:52
10      A.  I think you have to reword that question
11  because I'm not sure I understand it.
12      Q.  Is there anything on your evaluation that
13  judges you on whether or not you've obeyed federal law
14  with regard to the treatment of employees?
15          MS. KAY:  Object to the form of the question.
16  You can answer, if you know.
17      A.  I was trying to figure out what the question
18  is.  Maybe you could rephrase that question.    1:06:22
19      Q.  You get an -- you get evaluated?
20      A.  Yes.
21      Q.  Okay.  Is any part of that whether or not
22  you've been found to have violated any federal laws in
23  the way you've treated your employees?
24          WITNESS:  Could I rephrase the question so
25  that I can answer it or should I just -- I -- I don't

Page 61

1   -- I can't answer this question because that's not how
2   it works.          1:06:47
3           MS. KAY:  Let him ask the next question.  And
4   if you can't answer it -- if you don't understand it
5   well enough to answer it, then don't answer.
6       Q.  Do you not understand the question?
7       A.  I do not understand the question.
8       Q.  Do you -- as a Dean, do you -- or an employee
9   of Columbia College, do you receive any training on
10  federal laws as they relate to the treatment of
11  employees?
12      A.  Yes.
13      Q.  Okay.  And does that include the Family and
14  Medical Leave Act --
15      A.  Yes.
16      Q.  -- that training?  And does that include not
17  retaliating against employees because they've claimed
18  rights under the Family and Medical Leave Act?    1:07:17
19      A.  Yes.
20      Q.  And does that include not interfering with
21  employees who have claimed rights under the Family and
22  Medical --
23      A.  Yes.
24      Q.  -- Leave Act?  And in that training, are you
25  told that if you in fact, contrary to federal law,

16  (Pages 58 to 61)

Page 62

1   interfere with or retaliate against any employees who
2   have claimed rights under the Family and Medical Leave
3   Act, that something bad could happen to you in your
4   employment?
5        A.  I don't know if it's phrased that way.  But I
6   think what's made clear is what our responsibility is,
7   yes.                                  1:07:46
8        Q.  Mm-hmm.  But are you told that, for example,
9   you could get a reprimand if you're found to have
10  interfered with an employee who claimed rights under
11  the Family and Medical Leave Act or retaliated against
12  an employee who claimed rights under the Family and
13  Medical Leave Act?
14       A.  I don't know.
15       Q.  Okay.  Are you told that some sort of mark
16  could go on your record, a bad mark could go on your
17  record if you're found to have retaliated against
18  employees who claimed rights under the Family and
19  Medical Leave Act or to have interfered with employee
20  rights under the Family and Medical Leave Act?  1:08:19
21       A.  I don't know.
22       Q.  Okay.  Are you told that your pay could be
23  cut if you're found to have retaliated against
24  employees who claimed rights under the Family and
25  Medical Leave Act or have interfered with employees who

Page 63

1   claimed rights under the Family and Medical Leave Act?
2        A.  I don't know.
3        Q.  Okay.  Are you told that you could be fired
4   if you're found to have interfered with employees who
5   claimed rights under the Family and Medical Leave Act
6   or to have retaliated against employees who claimed
7   rights under the Family and Medical Leave Act?  1:08:48
8        A.  I don't know.
9        Q.  Do you -- you yourself sitting there believe
10  that something bad could happen to you on the job if a
11  judge or a jury found that you had retaliated against
12  an employee who claimed rights under the Family and
13  Medical Leave Act or had interfered with an employee's
14  rights under the Family and Medical Leave Act?
15       A.  I don't know.
16       Q.  Do you sitting there think that --  1:09:14
17       MR. LEE:  Off the record.
18       RECORDER:  Off the record --
19       WITNESS:  I'm sorry.
20       RECORDER:  -- 2:14 p.m.
21            (Off the record)
22       RECORDER:  Back on the record, 2:27 p.m.
23       MR. LEE:  Okay.
24       Q.  As you're sitting here today, do you
25  understand -- I'm sorry, let me rephrase that.  As

Page 64

1   you're sitting here today, what do you understand about
2   any actions that Columbia College might take against
3   you as an employee if a judge or a jury finds that you
4   retaliated against a different employee of Columbia
5   College for claiming rights under its Family and
6   Medical Leave Act or interfered with a different
7   employee of Columbia College's rights under the Family
8   and Medical Leave Act?                         1:09:56
9        MS. KAY:  I'm going to object to the form of
10  the question in the absence of foundation and the fact
11  that it calls for speculation.  So, if you are able to
12  answer, go ahead --
13       A.  I'm not sure I can remember the beginning of
14  the question.  Whether I understand what the actions of
15  Columbia College might be?
16       Q.  No.  As you're sitting here today, do you
17  think that anything might happen to you as an employee
18  of Columbia College from Columbia College because a
19  judge or a jury -- I'm sorry -- if a judge or a jury
20  find that you either retaliated against somebody for
21  claiming rights under the Family and Medical Leave Act
22  or interfered with somebody's rights under the Family
23  and Medical Leave Act?                         1:10:40
24       MS. KAY:  Same objection.
25       A.  I don't think I can answer the question.

Page 65

1        Q.  Why not?
2        A.  Because I'm not sure I understand it.
3        Q.  Okay.
4        A.  I -- I -- I mean, I -- I don't know.  I guess
5   that's my answer, is I don't know.
6        Q.  Okay.  You understand that Lisa Lewandowski
7   has filed a lawsuit against Columbia College.
8        A.  Yes.
9        Q.  You understand that part of that lawsuit is
10  that Lisa Lewandowski claims that she was fired because
11  she was about to go out on family and medical leave.  1:11:07
12       A.  Yes.
13       Q.  And you understand that you're the person who
14  made the decision to fire Lisa Lewandowski.
15       A.  Yes.
16       Q.  You understand that if a judge -- that a
17  judge or a jury could find that in fact you fired Lisa
18  Lewandowski in violation of the Family and Medical
19  Leave Act.
20       MS. KAY:  Object to the form of the question.
21  This witness hasn't been certified as knowing what
22  would be in violation or -- or not of the Act.  But if
23  you can answer, go ahead.                        1:11:36
24       A.  I -- I -- I can't answer it because I -- I
25  didn't do any of those things.  So, I -- I can't

Page 66

1  speculate on what might happen.
2      Q. You understand that Lisa Lewandowski can win
3  her lawsuit.
4      A. Yes.
5      Q. Okay. And you understand that if she wins
6  her lawsuit, it might be because a judge or a jury
7  finds that you fired her because she was going to --
8  about to go out on family and medical leave.
9      A. Yes.
10     Q. You understand that it at least a theoretical
11 possibility.
12     A. Yes.                              1:12:04
13     Q. Okay. So you understand you might be facing
14 a situation in which a judge or a jury has said that
15 you, Dean Liza Nichols, fired Lisa Lewandowski because
16 she was about to go out on family and medical leave.
17 You understand that as at least a theoretical
18 possibility?
19     A. I do understand it now. It never occurred to
20 me.
21     Q. Okay. Okay. Now that you understand that,
22 do you think that anything might happen to your
23 employment at Columbia College were a judge or a jury
24 to find that you had fired Lisa Lewandowski because she
25 was about to go out on family and medical leave?  1:12:42

Page 67

1      MS. KAY: Object to the form of the question,
2  calling for speculation. If you can answer.
3      A. Sorry, I have no way of knowing that.
4      Q. But you're not in fear of your job should a
5  -- a judge or a jury find that you violated the Family
6  and Medical Leave Act in firing Lisa Lewandowski?
7      A. Well, I wasn't when I walked in the door and
8  I wasn't until about a minute ago. Maybe now when I
9  walk out, I will.                        1:13:10
10     Q. Okay. Okay. So, it's possible in your mind
11 that if a judge or a jury finds that you violated the
12 Family and Medical Leave Act in firing Lisa
13 Lewandowski, that -- that you could lose your job.
14     A. I -- I have no idea --
15     Q. Okay.
16     A. -- whether that could happen or not.
17     Q. Okay. Okay. Do you have any other income
18 besides what you get through your job at Columbia
19 College?
20     A. No, I don't.
21     Q. Okay. Is there anybody else who brings
22 income into your household besides you?     1:13:41
23     A. Unfortunately no.
24     Q. Okay. I'm there with you. Actually, that's
25 not true. Okay.

Page 68

1      A. If you know of anybody who would like to
2  volunteer, though, I would be happy to accept.
3      Q. I will keep my eyes out for you. Okay.
4      MR. LEE: I'm going to ask the court reporter
5  to mark as Exhibit 11 a six-page document Bates stamped
6  LL0260 through LL0265 headed "Notes to the file re:
7  Lisa Lewandowski August 2007". And I will tender a
8  copy to Ms. Kay.                         1:14:18
9      MS. KAY: Thank you.
10     Q. Dean Nichols, would you please look at the
11 document that the court reporter just marked as Exhibit
12 11, which I just described for the record.
13     A. Can I just ask Ms. Kay something?
14     Q. Yeah, sure.                       1:14:41
15     RECORDER: Do you want to go off --
16     WITNESS: Yeah.
17     RECORDER: -- the record?
18     MS. KAY: Let's go off, please.
19     RECORDER: Off the record, 2:33 p.m.
20         (Off the record)
21     RECORDER: Back on the record, 2:35 p.m.
22     WITNESS: Well, I don't know. I think you
23 might need to move one of those bookcases -- coming
24 back.
25     MR. LEE: You could scoot down a bit.

Page 69

1      WITNESS: Oh, that's true. All right.
2      Q. Okay. Would you please look at what the
3  court reporter just marked as Exhibit 11 --
4      A. Mm-hmm.
5      Q. -- which is the notes to the file re: Lisa
6  Lewandowski that I described --              1:15:09
7      A. Uh-huh.
8      Q. -- a minute ago.
9      A. Am I supposed to be reading it thoroughly, or
10 do you just want me to look at it?
11     Q. I think just --
12     MS. KAY: Take your time, if you want --
13     Q. -- looking at it.
14     MS. KAY: -- to read it.                1:15:55
15     A. I'm a very slow reader, so if you want me to
16 read all of it, it's going to take a while. Do you
17 want me to read all of it?
18     Q. Well, why don't you let me as questions --
19     A. Okay.
20     Q. -- and then if you need to read it, you can
21 tell us.
22     A. Okay.
23     Q. Okay. So, is the document headed "Notes to
24 the file re: Lisa Lewandowski" that's marked as Exhibit
25 11 the memo to file you talked about earlier in this

Page 70

1   deposition?                              1:16:20
2      A.  Yes.
3      Q.  Okay.  And are you the author of the "Notes
4   to the file re: Lisa Lewandowski" marked as Exhibit 11?
5      A.  Yes.
6      Q.  Okay.  Was the document headed "Notes to the
7   file re: Lisa Lewandowski" marked as Exhibit 11 created
8   all at once or over a period of time?
9      A.  Over a period of time.              1:16:45
10     Q.  Do you know what that period of time was?
11     A.  I can surmise from here that it was from
12  August through October.
13     Q.  So --
14     A.  Or to October.
15     Q.  The first page of the document "Notes to the
16  file re: Lisa Lewandowski" marked as Exhibit 11, where
17  it says "August 2007", are you saying that was created
18  in August 2007?
19     A.  Yes.                                1:17:12
20     Q.  Okay.  And then on the next page of that
21  document, there is a part that starts "September 2007",
22  are you saying that part was created in September 2007?
23     A.  Yes.  Looks like it.
24     Q.  Okay.  And then on the next page of the
25  document marked as Exhibit 11, about three-quarters of

Page 71

1   the way down, there is a part that starts "October
2   10th, 2007", are you saying that that part was created
3   on October 10th, 2007?                    1:17:45
4      A.  I think so.
5      Q.  Okay.
6      A.  Since that's what it says.
7      Q.  Okay.  And then the next page, about a third
8   of the way down, there's a large paragraph that's
9   headed, "10 dot" -- excuse me, let me try that again --
10  "10.11.07".  Was what follows that created on October
11  11, 2007?
12     A.  I assume so.                        1:18:11
13     Q.  Well, do you know?
14     A.  Well, that's what the date says.
15     Q.  Was it your practice to put a date on which
16  it was created immediately before you created it?
17     A.  I think so.
18     Q.  Okay.  So this document headed "Notes to the
19  file re: Lisa Lewandowski", was this a computer word
20  processing document that you would add to as time goes
21  on?                                       1:18:37
22     A.  I think so.
23     Q.  Is the computerized version still in
24  existence?
25     A.  I don't know.

Page 72

1      Q.  Do you still use the same computer that you
2   used in August through October of 2007?
3      A.  Yes.
4      Q.  And was this created at work?
5      A.  I think so.  I don't know.  I can't remember.
6      Q.  Okay.  Was it your idea to create this
7   document, "Notes to the file re: Lisa Lewandowski"
8   marked as Exhibit 11?                     1:19:07
9      A.  Yes.
10     Q.  Okay.  Did you consult with anybody during
11  the creation of this document marked "Notes to the file
12  re: Lisa Lewandowski" marked as Exhibit 11?
13     A.  No.  I don't think so.
14     Q.  Did you put into the document marked ""Notes
15  to the file re: Lisa Lewandowski" that's marked as
16  Exhibit 11 everything that you thought was important
17  concerning what lead to the termination of Lisa
18  Lewandowski's employment at Columbia College?    1:19:36
19     A.  I don't remember.
20     Q.  Okay.  Is there anything that can help you
21  remember?
22     A.  No, not that I can think of.  I mean,
23  "everything" is a big word.
24     Q.  Would you put those parts of the document
25  headed "Notes to the file re: Lisa Lewandowski" that's

Page 73

1   been marked as Exhibit 11 that were created at various
2   points of time, would you print them out and put them
3   into Lisa's personnel file, or did you just keep them
4   on your computer?                         1:20:17
5      A.  I don't remember.
6      Q.  Is there any way -- anything that can help
7   you remember?
8      A.  Not that I can think of.
9      Q.  The final version -- I shouldn't say final, I
10  withdraw that -- the version that we have marked as
11  Exhibit 11 of the "Notes to the file re: Lisa
12  Lewandowski", those were put in Lisa Lewandowski's
13  personnel file?
14     A.  Yes.
15     Q.  And was that your idea to do that?
16     A.  Yes.                               1:20:41
17     Q.  Okay.  And when did you print out what's
18  marked as "Notes to the file re: Lisa Lewandowski" and
19  place it in her personnel file?
20     A.  I don't remember.  It must've after October
21  17th because this is the last entry.
22     Q.  Okay.  Do you have any way to tie down how
23  far after October 17th that you would have printed this
24  out and had it placed in Lisa's personnel file?    1:21:13
25     A.  I don't.  If she requested her personnel file

Page 74

1  at any time, then that would help date it.
2      Q.  So, other than it being on or after October
3  17th and sometime before Lisa requested her personnel
4  file, do you have any way to tie down the date better
5  as to when you printed out the "Notes to the file re:
6  Lisa Lewandowski" and had it placed in her personnel
7  file?                                    1:21:45
8      A.  No.
9      Q.  Do you keep documents like "Notes to the file
10 re: Lisa Lewandowski" on any other employees in the
11 Office of the Dean that you're the head of?
12     A.  Yes.
13     Q.  Do you do that for every employee?
14     A.  Only employees who have reason for me to
15 write something down.                    1:22:11
16     Q.  So are you saying that in August 2007 you
17 felt you had reason to write something down about Lisa
18 Lewandowski and keep notes on her?
19     A.  Yes.
20     Q.  Okay.  Okay.  What I'd like you to do is to
21 read the document and then I'm going to ask you if
22 there's anything else that you consider important about
23 your choice to terminate Lisa Lewandowski's employment
24 at Columbia College that is not in this document.  1:22:58
25 Okay.  So I know you said it would take you a while, so

Page 75

1  why don't we go --
2      A.  Okay.
3      Q.  -- off the record.
4      RECORDER:  Off the record, 2:44 p.m.
5          (Off the record)
6      RECORDER:  Back on the record, 2:55 p.m.
7      Q.  Dean Nichols, have you finished reading the
8  document "Notes to the file re: Lisa Lewandowski"
9  marked as Exhibit 11?
10     A.  Yes.
11     Q.  Okay.  Is there anything that's not in this
12 document that you would want to add that you considered
13 important to your choice to terminate Lisa
14 Lewandowski's employment at Columbia College?  1:23:29
15     A.  No.
16     Q.  So, everything important to your choice to
17 terminate Lisa Lewandowski's employment at Columbia
18 College Chicago is in the "Notes to the file re: Lisa
19 Lewandowski" marked as Exhibit 11?
20     A.  I believe so.
21     Q.  Okay.  Having now read the document "Notes to
22 the file re: Lisa Lewandowski" marked as Exhibit 11,
23 would you want to change or add to or alter or amend
24 any of your answers about the way this document was
25 created?                                 1:23:56

Page 76

1      A.  I think it could use some serious editing.
2  It's rather repetitive and long.  And I would have
3  preferred it be shorter so that I could read it more
4  quickly.  But other than that --
5      Q.  But I mean, your -- your answers to my
6  questions about, you know, how you kept it, when you
7  kept it, when you created it, having now read the full
8  document, are --
9      A.  Uh-huh.
10     Q.  -- all those answers still your answers?
11     A.  Yes.
12     Q.  Okay.  You wouldn't want to change anything
13 about any of those answers?           1:24:21
14     A.  No.
15     Q.  Okay.  Okay.  When did you actually decide to
16 terminate Lisa Lewandowski's employment with Columbia
17 College?
18     A.  Shortly before I terminated her.
19     Q.  Same day?
20     A.  I don't think so.  But I don't remember.
21     Q.  Within a day or two of when you actually
22 terminated?
23     A.  I don't know.  I think -- if I look at this,
24 it looks like I was trying to give her adverse
25 reactions chance and a lot -- a lot indicates that she

Page 77

1  was not truthful.  So, I think as soon as I realized  1:25:08
2  that she was lying to me and seemed to have a pattern
3  of lying and pattern of covering up for herself, that I
4  made that decision.
5      Q.  Do you have any way to tie that down to a
6  actual date?
7      A.  I don't think so.
8      Q.  Do you have any way to tie it down in terms
9  of time at all?
10     A.  No.  It was four years ago.       1:25:34
11     Q.  Okay.  And reading this document, the "Notes
12 to the file re: Lisa Lewandowski" marked as Exhibit 11,
13 doesn't help you remember when you decided to terminate
14 Lisa Lewandowski's employment with Columbia College?
15     A.  No, it doesn't.
16     Q.  Okay.
17     MR. LEE:  Going to ask the court reporter to
18 mark as deposition Exhibit 12 a one-page email
19 previously marked as request for admission Exhibit
20 number 110.  And I will tender a copy to Ms. Kay and
21 tender a copy --
22     MS. KAY:  Thanks.
23     MR. LEE:  -- to you.                  1:26:13
24     Q.  Dean Nichols, on the "Cc" of the email toward
25 the top that's been marked as deposition Exhibit 12, do

Page 78

1  you see the name Nicholas, comma, Eliza?
2      A.  Mm-hmm.
3      Q.  Do you recall receiving this email?
4      A.  No.                              1:26:44
5      Q.  Does anything about this email look familiar
6  to you?
7      A.  Well, it would be the normal kind of an email
8  that we would send out if somebody was leaving.
9      Q.  Other than that, do you recall getting this
10 -- this particular email?
11     A.  No.
12     Q.  Okay.
13         MR. LEE:  All my other questions will be for
14 the other 30(b)(6) witness subject to any cross you
15 might have.                            1:27:11
16         MS. KAY:  Okay.  I just have a few follow-up
17 --
18 BY MS. KAY:
19     Q.  Dean Nichols, at the beginning of the
20 deposition, you were asked some questions about Lisa
21 Lewandowski coming to the Dean's office when you
22 started and the fact that she was in a different office
23 space apparently at that point than she had been
24 previously.  Can you provide any information about how
25 -- where she was and why she was in the office space

Page 79

1  that she was when you took the position of Dean?   1:27:52
2      A.  When I took the position of Dean, there was
3  the Dean's office which I was to occupy that was the
4  Associate Dean's office, that was Jim McDonald's
5  office.  Then there was another office that Allison
6  Ratliff was in.  And there was an office across the
7  hallway.  And I was told by Lisa that she had chosen to
8  be in that office across the hallway.  Later it came    1:28:26
9  up, and I -- I can't tell you when, that she felt that
10 the office that Allison was in was her office, and she
11 referred to it as her office.  And I let her know that
12 nobody owns office space and that office doesn't belong
13 to individuals, that whoever has it at that moment may
14 be temporary and that I had not decided what my
15 staffing plan was.  I didn't know if I would get new    1:28:59
16 staff.  And that for the time being, Allison would stay
17 in that office.  And that in fact the office that
18 Allison had that Lisa had chosen was too far away from
19 me to be my assistant.  It was three doors away from --
20 from my office.  And I needed my assistant to be close
21 by.  So I asked her to sit in the open office space in
22 the suite.                              1:29:32
23     Q.  What was Allison's position when -- while
24 sitting in the office that Lisa referred to as her
25 office?  What -- what job was she working?

Page 80

1      A.  Full-time Administrative Assistant and she
2  was the -- I had assigned her to be the assistant to
3  Jim McDonald, who was the Associate Dean at the time.
4      Q.  Did -- how long did Lisa Lewandowski work in
5  the office that was three doors from yours before you
6  moved her into the open space?              1:30:05
7      A.  I don't recall.  Could've been a matter of
8  weeks, it could've been a month.
9      Q.  Okay.
10     A.  And I will say one of the reasons that I was
11 tentative about where anybody would sit is that we
12 didn't have enough office space, appropriate office
13 space, for the Assistant Dean position.
14     Q.  Mm-hmm.
15     A.  And I was searching for that --
16     Q.  Okay.
17     A.  -- position.  And eventually Allison Ratliff
18 had to move out of that -- out of that office because I
19 put the Assistant Dean in that --             1:30:35
20     Q.  Okay.
21     A.  -- office.
22     Q.  When the -- you testified that someone came
23 in after Lisa Lewandowski left on an interim basis and
24 then eventually was brought in on a more permanent
25 basis, correct?

Page 81

1          RECORDER:  Is that a yes?
2      Q.  That -- yes?
3      A.  Yes.
4      Q.  Sorry.
5      A.  Sorry.
6      Q.  Where did that person sit?
7      A.  The same place that Lisa sat before in the
8  open office space in the suite.
9      Q.  Okay.  And did her position in that open
10 office space change during the time that she worked for
11 you?                                    1:31:05
12     A.  When she was promoted to Director, I don't
13 know if she moved immediately.  I had to repurpose a
14 copy room in order to actually make more office space
15 because we didn't have enough office space.
16     Q.  Okay.  And why did you want your assistant in
17 that open office space, just generally speaking?
18     A.  Because I'm a very busy person and I'm in
19 meetings a lot and I need my assistant to hand me
20 files, keep me organized, and be close enough to -- for
21 me to be able to call out or request information from,
22 so I need somebody outside my door.           1:31:52
23     Q.  That would've been the case with regard to
24 Lisa Lewandowski?
25     A.  Yes.

21  (Pages 78 to 81)

Page 82

1    Q.  Okay.
2    A.  And in fact there's two full-time people who
3  are in that open office situation now.
4    Q.  Okay.  What was her --
5    A.  Meaning -- meaning that it's crowded.
6    Q.  Yeah.  Sounds like it.  What was the
7  situation with regard to Lisa Lewandowski's computer?
8  I think counsel asked you a question about whether she
9  had a computer of her own when you came to the Dean's
10  office.  Can -- do you recall what her computer
11  situation was?                          1:32:27
12    A.  I recall that she didn't like the computer
13  she had or that she had ordered.  I mean, I -- I do
14  recall that she ordered a very high end Mac computer.
15  We are a PC office, not a Mac office.  At the time, we
16  were not a Mac office.  And she had said that that
17  would -- that was the computer she wanted.  And she    1:32:54
18  ordered it and it took a long time to get.  It was
19  actually incredibly inconvenient to me because she kept
20  saying that she couldn't get on the network because the
21  computer she had wasn't set up that way, and I could
22  never understand why this was taking so long.    1:33:18
23    Q.  When she referred to the computer that she
24  had and having trouble getting on the network, are you
25  referring to the Mac that she ordered for herself?

Page 83

1    A.  No.  The Mac took forever to get.  So one of
2  her reasons for not being able to get information from
3  me was that she didn't have a computer.  And yet she
4  had a computer.  She didn't seem to like that computer.    1:33:45
5    Q.  Okay.  To your knowledge, was the computer in
6  good working order?
7    A.  Yes.  I think we still use it.
8    Q.  Okay.  Did you ever take a computer away from
9  Lisa Lewandowski?
10    A.  The only time I took a computer away from her
11  was when she was terminated and I found out that she
12  had a laptop that had been purchased by the college, an
13  Apple, a Mac laptop, and asked HR to ask her to return
14  that Mac laptop.                          1:34:17
15    Q.  Okay.  Was that the one that she had that was
16  on order when you came into the Dean's office?
17    A.  No.  She had ordered a desktop.
18    Q.  Okay.  Okay.
19    A.  Twenty-four-inch or 17-inch Mac computer.
20    Q.  Did anybody in the -- did she --
21    A.  And I didn't know --
22    Q.  -- actually receive that?
23    A.  -- she had the other one at home.
24    Q.  Okay.  Did she eventually receive the -- the
25  large desktop Mac?                          1:34:41

Page 84

1    A.  She did.
2    Q.  Okay.  Did anybody else have -- else in the
3  office have a computer of that type?
4    A.  Not at the time.  My current Associate Dean
5  came with a Mac.
6    Q.  Okay.  And you didn't interfere with or -- or
7  prevent the -- her receipt of that desktop, that Mac
8  desktop, did you?
9    A.  No, I told her to order what she felt
10  comfortable with.
11    Q.  Okay.
12    A.  She also ordered a lot of expensive software
13  which was not relevant to the office.              1:35:13
14    Q.  Okay.
15    A.  And I only found that out later.
16    Q.  Did you have any knowledge coming into the
17  Dean's position regarding any complaints that Lisa
18  Lewandowski had made regarding Dean Lehrer?
19    A.  No.
20    Q.  Did you have any knowledge regarding any
21  complaints she had made specifically regarding any
22  improper conduct on the part of Dean Lehrer?        1:35:38
23    A.  No.
24    Q.  You testified that -- I believe you testified
25  that Lisa Lewandowski told you when you met with her

Page 85

1  initially that she had a lot of independence in working
2  with Dean Lehrer previously?
3    A.  Yes.                              1:36:02
4    Q.  Okay.  Did she tell you that she had
5  essentially run his office?
6    A.  Yes.
7    Q.  Okay.  Is that how you wanted her to conduct
8  herself in your office as your assistant?
9    A.  No.
10    Q.  Okay.  How did -- did you tell her that?
11    A.  Yes.
12    Q.  And how did she receive that information?
13    A.  She seemed very unhappy.
14    Q.  Did she say anything to give you that
15  impression?  Or was it something else that gave you
16  that impression?                          1:36:33
17    A.  Right after I told her that and I said -- she
18  said, well, I guess you're not going to give me as much
19  freedom as Leonard did.  And I said no, I won't.  It's
20  not appropriate for how I proceed with an Assistant to
21  the Dean.  Then she told me that the Assistant Dean
22  position was her job, that effectively she had been
23  doing that job and she expected to get that job.  So,    1:37:02
24  in inferred that she was not happy with being an
25  Administrative Assistant under the conditions that I

22  (Pages 82 to 85)

Page 86

1   had laid out for her.
2       Q.  When did you -- strike that.  Eventually you
3   -- you began a search for Assistant Dean, correct?
4       A.  Yes.
5       Q.  Okay.  And do you recall when you began that
6   search?
7       A.  It was actually posted before I got there.  I
8   had a back and forth with the institution about the
9   wording of the position.  I wanted that hired as soon
10  as possible when I got there so I had the ad go out in
11  July 2007.                              1:37:38
12      Q.  Did Lisa Lewandowski express to you at some
13  point an interest in applying for that position
14  herself?
15      A.  In the very first meeting we had prior to my
16  coming onboard in August -- so it was either June or
17  July, I think it was June -- she said that she thought
18  that was her position and that she wanted it and
19  expected it.  And I said we're going to do a national
20  search, and if you are qualified for the position, then
21  you will be considered.              1:38:11
22      Q.  Did she apply for the position?
23      A.  She did.
24      Q.  Okay.  Did you get her any instructions --
25  since she was working in your office at the time but

Page 87

1   also applying for the position of Assistant Dean, did
2   you give her any instructions regarding her involvement
3   in the search process?
4       A.  I put Allison Ratliff in charge of the files
5   and supporting that search.              1:38:38
6       Q.  Mm-hmm.
7       A.  Because Lisa had expressed the interest in
8   the position and then applied for it.  And I told her
9   that she would have nothing to do with or should have
10  nothing to do with anything that had to do with the
11  search because it would be inappropriate given that she
12  was a candidate for the search.
13      Q.  Did she follow that direction?
14      A.  No, she was constantly trying to get access
15  to the files and trying to have some role in doing
16  things for that search.              1:39:12
17      Q.  Did you address that with her?
18      A.  Yes, I told her it was inappropriate and
19  explained again why she couldn't have access to the
20  information.  And she claimed that Allison had forced
21  her, you know, asked her to do things for the search.
22  And I said that I didn't believe that because I had
23  made it clear that it was Allison's role to do that and
24  I had no reason to believe that Allison would give her
25  work to do that wasn't for her to do.       1:39:46

Page 88

1       Q.  Did you eventually come to leave whether or
2   not Allison had in fact asked her to do work on the
3   search and setting up for the Assistant Dean?
4       A.  When I questioned Lisa why she was doing
5   certain things for the search, she initially said that
6   Allison had asked her.  And when I pressed her on it,
7   she said in fact that Allison had not.  But it took a
8   while for her to admit that.              1:40:17
9       Q.  Did you consider that a -- a trust issue that
10  you had with Lisa?
11      A.  Oh, yeah.  I thought she had lied to me.
12      Q.  You testified about your instructions to the
13  chairs and also to Lisa Lewandowski regarding
14  communications, and counsel asked that -- whether you
15  believed what the chairs told you versus what Lisa
16  Lewandowski told you.  And I wanted to know why it was     1:40:46
17  that you believed the chairs when each of them that you
18  spoke to you told you that it was Ms. Lewandowski who
19  had initiated communications rather than the other way
20  around.
21      A.  Probably several factors.  One, she -- there
22  -- there seemed to be a pattern on Lisa's part of not
23  really telling the truth.  And the chairs had no --      1:41:16
24  nothing to lose in telling me the truth.  And chairs
25  are pretty good at exerting what they think are their

Page 89

1   rights and you, know -- so it seemed to me that since
2   several of them had confirmed this, that they were the
3   ones who were probably accurate in that.              1:41:44
4       Q.  The chairs were tenured faculty members,
5   correct?
6       A.  They are tenured, yeah.
7       Q.  Okay.  And the -- that would include the ones
8   that you spoke to who confirmed that Lisa had initiated
9   contact.
10      A.  Yes.
11      Q.  So, if you were upset with them had they
12  chosen not to follow your instruction, could you have
13  revoked their tenure status?
14      A.  At the time I had two chairs who were tenured
15  as chairs.  Which means that there's -- I could do to     1:42:15
16  them.  The other chairs have tenured faculty
17  appointments, so the most I could do is not reappoint
18  them to their chair position, in which case they would
19  go back into their faculty full-time tenured position.
20      Q.  The two chairs you said were tenured as
21  chairs, are those two of chairs that you spoke to about
22  this communication issue?              1:42:40
23      A.  I recall at least one of them, I think both
24  of them, but I can't remember.
25      Q.  And would they have known as -- as best that

Page 90

1  you can say -- would they have been aware of the fact
2  that you had no ability to revoke their tenured chair
3  positions?
4      A.  I -- I can't speak to that.  I think anybody
5  who holds tenure knows that it's very hard to get
6  fired.
7      Q.  Okay.  You also testified that you believed
8  Jim -- it's McDonald?
9      A.  Mm-hmm.
10     Q.  Over Lisa Lewandowski on the issues of Jim
11 having allegedly pulled Allison away so that she could
12 not meet with Lisa Lewandowski.  Why did you believe
13 Jim over Lisa?                             1:43:22
14     A.  He's in a -- he was in a position of
15 authority in the office, he had handled a lot, he
16 seemed trustworthy.  I saw no reason why he would want
17 to lie to me on that -- in -- in that or any
18 circumstance.  He also holds a tenured appointment and
19 therefore would not have lost his job.     1:43:47
20     Q.  Okay.  Do you understand that it is illegal
21 to retaliate against an employee for exercising her
22 rights under the FMLA?
23     A.  Yes.
24     Q.  Okay.  Has your testimony today been
25 truthful?

Page 91

1      A.  Yes.
2      Q.  And you understand that, as counsel has asked
3  you, that it is a theoretical possibility that Lisa
4  Lewandowski could prevail in this case, correct?
5      A.  Yes.                              1:44:13
6      Q.  Okay.  Nevertheless, would it be fair to say
7  that your testimony has been truthful despite that
8  fact?
9      A.  Yes.
10     Q.  Okay.  You're a tenured faculty member as
11 well, correct?
12     A.  Yes.
13     Q.  Okay.  And does that tenure provide certain
14 protections for your job status with the college?
15     A.  Yes, it does.
16     Q.  Okay.  Can you, in fairly general terms,
17 describe what that protection is?          1:44:43
18     A.  Well, are you asking in my position as Dean
19 or position as a faculty member?
20     Q.  Let's start with Dean.
21     A.  If I were to do anything that the college
22 deemed was inappropriate for a Dean, they can choose to
23 remove me as Dean.
24     Q.  Okay.
25     A.  In which case I have a full-time faculty

Page 92

1  position.
2      Q.  Okay.  So even your removal as Dean would not
3  eliminate your position as a -- a tenured faculty
4  member.
5      A.  No.  It wouldn't.                  1:45:15
6      MS. KAY:  I don't think I have anything else.
7  Back to you.
8      MR. LEE:  Okay.
9  BY MR. LEE:
10     Q.  Does tenure guarantee salary?
11     A.  It -- well, my arrangement guarantees salary.
12     Q.  Okay.  And the chairs' arrangement, is there
13 a salary --
14     A.  Yes, they have a -- they have a base pay that
15 is part of their faculty appointment.      1:45:47
16     Q.  And that base pay is forever?
17     A.  The base pay is forever, yes.
18     Q.  And -- and do they get things in addition to
19 base pay?
20     A.  To be a chair, they get a stipend of $23,000.
21     Q.  Okay.  And that exists only as long as they
22 are --
23     A.  That is --
24     Q.  -- chair.
25     A.  -- right.

Page 93

1      Q.  And --
2      A.  Except in the case of the two tenured as
3  chair -- chairs.  In which case their stipend -- they
4  didn't have a stipend, they just had a high salary.   1:46:19
5      Q.  Okay.
6      A.  That doesn't -- that doesn't go away.
7      Q.  And -- sorry, withdraw that.  Does their
8  departments have budgets?
9      A.  I'm not sure what the question is.
10     Q.  Do the departments have budgets?
11     A.  The departments have budgets, yes.
12     Q.  Okay.  Are those budgets guaranteed due to
13 the tenure status of the department chair?
14     A.  I'm not sure I understand your question.   1:46:50
15     Q.  Those budgets can be cut, right?
16     A.  Well, an institution doesn't cut tenured
17 positions unless they can demonstrate financial
18 exigency.
19     Q.  I'm not talking about tenured positions.  I'm
20 talking about the departmental budget.  That can go up
21 and that can go down, right?
22     A.  Yes, but not related to tenured faculty
23 members' salaries.
24     Q.  I unders --
25     A.  It can go up in supplies and services, it can

Page 94

1   go up in other areas, it can go down in other areas.    1:47:16
2      Q.  Right.  Can go up and down in support staff?
3      A.  I'm not sure what you mean.
4      Q.  The department has a budget.  Correct?
5      A.  Mm-hmm.
6      Q.  And you have influence on what the department
7   budget is, correct?
8      A.  Yes.                          1:47:42
9      Q.  Okay.  And you have influence on whether
10  non-tenure positions or whether staff positions can be
11  filled or not filled, correct?
12     A.  Yes.
13     Q.  Okay.  You have influence on the teaching
14  load of the various professors whether or not they're
15  tenured, correct?
16     A.  No, there's a standard teaching load for the
17  college.
18     Q.  Okay.  Including a standard class?  Is a
19  tenured -- I withdraw that.  Is a tenured faculty
20  guaranteed a particular class?              1:48:08
21     A.  Nobody's guaranteed --
22     Q.  Okay.
23     A.  -- particular classes.
24     Q.  And you have influence over the classes that
25  are assigned to particular faculty members, correct?

Page 95

1      A.  No.
2      Q.  Who -- who does?
3      A.  The chairs.
4      Q.  Okay.  Okay.  So, you influence the
5   department budget and the non-tenure faculty of a
6   department and the staff of the department.     1:48:34
7         MS. KAY:  Object to the form of the question
8   with regard to influence being overly broad and
9   general.
10     Q.  Go ahead.
11     A.  Well, I was going to say I'm not sure what
12  you mean by the non-tenured faculty -- whether or not a
13  -- a line can be made available?
14     Q.  Right.
15     A.  Yes.
16     Q.  Okay.  And with regard to staff, you have
17  influence on whether or not that can be put into budget
18  for a department?
19     A.  Yes.                          1:49:03
20        MS. KAY:  I'm going to object again on the
21  same basis that it's overly broad and general.  Go
22  ahead.
23     A.  Yes.
24     Q.  Okay.  And with regard to the part of the
25  department budget that does not go to tenured faculty

Page 96

1   salary, you have influence over whether that can go up
2   or down, correct?
3      A.  Yes.                          1:49:25
4      Q.  Okay.
5         MR. LEE:  Nothing further.
6         RECORDER:  Off the record, 3:21 p.m.

Page 97

CERTIFICATION
I certify that the foregoing is a correct
transcript from the record of proceedings
in the above-entitled matter.


Erin C Sloan
February 2, 2011