# Exhibit F

# Deposition Transcript of Lisa Lewandowski

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LISA LEWANDOWSKI,

       Plaintiff,    No. Case No.: 1:09-cv-04949
                          Judge: Blanche M. Manning
  vs.                     Magistrate Young B. Kim

COLUMBIA COLLEGE CHICAGO,

       Defendant.

_____

       The deposition of LISA MARIE LEWANDOWSKI called by the Defendant for examination, pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Renay Patterson-Sebanc, Certified Shorthand Reporter, Registered Professional Reporter, Notary Public, within and for the County of Cook and State of Illinois at 225 West Washington Street, Suite 1300, Chicago, Illinois, commencing at the hour of 10:15 o'clock a.m. on the 30th day of August, A.D. 2010.

Page 2

1

    APPEARANCES:

2


3     LAW OFFICES OF DAVID L. LEE
      By: Mr. David L. Lee
4     53 West Jackson Boulevard
      Suite 505
5     Chicago, Illinois  60647-3437
      (312) 347-4400
6     (312) 347-3272 (fax)
      d-lee@davidleelaw.com
7
          on behalf of the Plaintiff;
8


9
      TRIBLER ORPETT & MEYER, P.C.
10    By:  Ms. Jennifer H. Kay
      225 West Washington Street
11    Suite 1300
      Chicago, Illinois  60606
12    (312) 201-6400
      (312) 201-6401  (fax)
13    jhkay@tribler.com

14        on behalf of the Defendant.

15


16    ALSO PRESENT:

17    Columbia College

18    Mr. Paul Andrew Denham
      Ms. Eliza Nichols
19


20

21                 * * * * * * * * * * * *

22

23

24

1
2                          INDEX
3
    WITNESS                    EXAMINATION
4
    Lisa Marie Lewandowski
5
6     Direct Exam by Ms. Kay          4
7
8
9
10                        EXHIBITS
11
    NUMBER                        MARKED
12
    Lewandowski Deposition Exhibit
13
      No.  1                        259
14    No.  2                        260
      No.  3                        261
15    No.  4                        262
16    No.  5                        263
      No.  6                        265
17    No.  7                        267
      No.  8                        269
18
      No.  9                        270
19    No. 10                        272
      No. 11                        273
20    No. 12                        275
21    No. 13                        279
      No. 14                        297
22
23
24

Page 4

1    WHEREUPON:

2              LISA MARIE LEWANDOWSKI,

3    called as a witness herein, having been

4    first duly sworn, was examined upon oral

5    interrogatories and testified as follows:

6              DIRECT EXAMINATION

7    BY MS. KAY:

8        Q.  Would you state and spell your

9    full name, please.

10       A.  Lisa M. Lewandowski, Lisa Marie

11   Lewandowski, L-i-s-a, M-a-r-i-e,

12   L-e-w-a-n-d-o-w-s-k-i.

13       Q.  Thank you.  Let the record reflect

14   this is the discovery deposition of Lisa

15   Marie Lewandowski taken pursuant to notice

16   and pursuant to all applicable rules of

17   the Civil Procedure and the local rules of

18   the Northern District of Illinois.

19              Ms. Lewandowski, have you

20   ever given a deposition before?

21       A.  I have not.

22       Q.  Okay.  I assume that your attorney

23   has probably given you some information

24   about what we're going to do here today,

Page 5

1    but I want to give you just some

2    background or some foundation rules so

3    that things will go more smoothly.  I'm

4    going to ask you a series of questions.

5    I'm hoping to get answers from you to

6    those questions.

7              The court reporter is going

8    to take down everything that we say here

9    in the room, so if you would make sure

10   that you let me finish my question before

11   you give your answer so we're not talking

12   on top of each other, which people tend to

13   do in general conversation, but if we can

14   go one at a time, it will make it easier

15   for the court reporter.

16              Also, if you can give me your

17   responses out loud as opposed to a nod of

18   the head or a shrug of the shoulders, that

19   again, will make it easier for the court

20   reporter, and if -- if you do say uh-huh

21   or nod, I will -- I'm not trying to be

22   rude, but I'll probably ask you, is that a

23   yes or is that a no, just so we can get a

24   clear record.

1          If you don't understand a

2     question that I've asked you, I'd like you

3     to let me know.  If I can, I will rephrase

4     it in a way that you understand.  I'd be

5     happy to have the court reporter read it

6     back to make sure that you understand it.

7     If you don't hear a question that I've

8     asked, please let me know also.  Because

9     if you answer a question that I've asked,

10    I'm going to assume that you heard it and

11    that you understood it.  Does that sound

12    fair?

13        A.  Yes.

14        Q.  Okay.  The only other thing is

15    that I'm happy to let you take breaks.  I

16    intend that we will take breaks.  I don't

17    like to keep people hostage for hours on

18    end.  If you need a break, just let me

19    know.  I'll be happy to let you take one.

20    The only caveat to that is that if there's

21    a question hanging out there, if I've

22    asked a question that hasn't been answered

23    yet, I'm going to ask you to give me your

24    answer before we take our break.  All

1    right?

2        A.  Okay.

3        Q.  And as we go along, if you have

4    any questions for me, just general

5    questions, feel free to stop me and let me

6    know.  All right?

7                Tell me what your date of

8    birth is, please.

9        A.  January 24th, 1969.

10       Q.  And where do you live now?

11       A.  I live in Dearborn, Michigan.

12       Q.  What is your address in Dearborn?

13       A.  3440 Grindley Park Street,

14   G-r-i-n-d-l-e-y, Dearborn, Michigan

15   48124.

16       Q.  Do you live there alone?

17       A.  I do not.

18       Q.  Who do you live with?

19       A.  I live with my mother.

20       Q.  Okay.  And what's your mother's

21   name?

22       A.  Adeline.

23       Q.  And her last name is?

24       A.  Lewandowski.

Page 8

1       Q.   Lewandowski.  Do you live there

2   with anybody else?

3       A.   I do not.

4       Q.   Is that a home that your mother

5   owns or is that your home?

6       A.   That is a home my mother owns.

7       Q.   Okay.  How long have you been at

8   the Grindley Park Street address?

9       A.   Since February of 2010.

10      Q.   And before moving to the Grindley

11  Park Street address, where did you live?

12      A.   At 450 West Briar Place, Unit

13  Number 10E, Chicago, Illinois  60657.

14      Q.   Did you own that residence or rent

15  it?

16      A.   I own that residence.

17      Q.   When did you leave that residence?

18      A.   In February of 2010.

19      Q.   Do you still own it?

20      A.   Yes, I do.

21      Q.   When did you live there?  From

22  what date until February 2010?

23      A.   I purchased it in August of 2005.

24      Q.   And from August of 2005 until

1  February of 2010, did you live there with

2  anyone?

3      A.  I did not live there with anyone

4  else besides myself.

5      Q.  Okay.  Why did you -- why did you

6  move?

7      A.  My mother needed help at home.

8      Q.  Okay.  Do you have someone renting

9  your unit or your residence at Briar now?

10      A.  Yes, I do.

11      Q.  Do you have plans to return to

12  that residence?

13      A.  Yes, I do.

14      Q.  Do you know when?

15      A.  I do not know when.

16      Q.  Okay.  Are you working right now?

17      A.  I am not working right now.

18      Q.  When was your last employment?

19      A.  My last employment was July 2010.

20      Q.  And where were you employed?

21      A.  I was employed for Unity Studios

22  in Allen Park, Michigan.

23      Q.  I'm sorry.  You said Allen Park,

24  Michigan?

1      A.  Yes.

2      Q.  Okay.  What were your dates of

3  employment there?

4      A.  I'm not exactly sure.  Sometime --

5      Q.  As best you can remember.

6      A.  Sometime in March through July

7  2010.

8      Q.  March 2010 through July 2010?

9      A.  Correct.

10      Q.  What did you do at Unity Studios?

11      A.  I was an instructor for wardrobe,

12  which is costume design for film.  I also

13  costume-designed a film there.  I

14  costume-designed a video, and I costumed

15  another movie there.

16      Q.  Who was your supervisor there?

17      A.  James Lifton.

18      Q.  I'm sorry.  What was the last

19  name?

20      A.  Lifton, L-i-f-t-o-n.

21      Q.  Why did you leave in July 2010?

22      A.  It's a production-based position.

23  The production had ceased.

24      Q.  Was that your only period of

Page 11

1    employment with Unity Studios?

2        A.  Yes.

3        Q.  Do they have any production -- was

4    there any production continuing after

5    July 2010?

6        A.  There is no production.

7        Q.  Okay.  What was your compensation

8    at Unity Studios?

9        A.  I would have to double check my

10   records with that.

11       Q.  But you do have records of that,

12   correct?

13       A.  Of course.

14       Q.  Before coming to Unity Studios in

15   March of 2010, where did you work?

16       A.  I worked at T&T Property

17   Maintenance.

18       Q.  Where is T&T?

19       A.  It is in Briton, Michigan.

20       Q.  I'm sorry.  Which town?

21       A.  Briton, B-r-i-t-o-n.

22       Q.  What did you do for T&T Property

23   Maintenance?

24       A.  I shoveled snow.

Page 12

1      Q.  And what dates were you employed?

2      A.  I would have to check that.  I'm

3   not sure.  Sometime in the winter.

4      Q.  Did you go -- were you employed at

5   T&T Property Maintenance up until you went

6   to Unity Studios in March 2000 -- I'm

7   sorry -- 2010?

8      A.  It was a day-by-day situation, so

9   it wasn't a full-time position by any

10   means at least.  You know, we need someone

11   to help out; if you're in town, please

12   help us out.

13      Q.  So how many --

14      A.  So I can't say that I was full

15   time.

16      Q.  Were you taking jobs shoveling

17   snow with T&T up until March 2010 when you

18   started with Unity Studios?

19      A.  I only worked there -- much before

20   March.  So maybe February it was.

21      Q.  Okay.

22      A.  I only worked there one day.

23      Q.  Oh, just one day?

24      A.  Uh-huh.

1     Q.  That's a yes?

2     A.  Yes.

3     Q.  Okay.

4     A.  Oh, pardon me.

5     Q.  What was your employment before

6  T&T Property Maintenance?

7     A.  A server at a restaurant.

8     Q.  What restaurant?

9     A.  Jerry's Corner Cooks.

10    Q.  Jerry's Corner Cooks?

11    A.  Uh-huh.  It's in Wilmette,

12  Illinois.

13    Q.  What was your period of employment

14  there?

15    A.  Sometime in October through, I

16  think, December.

17    Q.  Of what year?

18    A.  2010.  I'm not exactly sure.

19    Q.  Do you mean 2009?

20    A.  2009, yes.

21    Q.  Okay.  Who was your supervisor

22  there?

23    A.  Ed Huelke, H-u-e-l-k-e.

24    Q.  And why did you leave in December

1   of 2009?

2       A.  Well, it was slower, and my mother

3   needed help, so I was going home.

4       Q.  Okay.  So you --

5       A.  Admittedly.

6       Q.  I'm sorry?

7       A.  I was going home to help my

8   mother.

9       Q.  Okay.  So you resigned your

10  position?

11      A.  Yes.

12      Q.  Okay.  You were not terminated?

13      A.  Correct.

14      Q.  Okay.  Without getting into

15  personal details about your mother, what's

16  -- is she -- does she have a medical

17  condition that she needs assistance with

18  or is there some other sort of assistance

19  you're giving her?

20      A.  It was a medical thing that she

21  needed help with.

22      Q.  Okay.  Before starting at Jerry's

23  Corner Cooks in October of 2009, where did

24  you work?

1      A.  I worked at Caldwell's Kitchen &

2   Tap in Niles, Illinois.

3      Q.  What was your job there?

4      A.  A server.

5      Q.  Who was your supervisor?

6      A.  I don't remember his name.

7          I actually forgot to mention

8   that I worked for Chicago Public Schools

9   as well.

10     Q.  Okay.

11     A.  And that was October through

12  January.  October '09, it was part time,

13  through January 2010.

14     Q.  What did you do for CPS?

15     A.  I was a tutor for the high school.

16     Q.  Did you work full time during

17  those months?

18     A.  As I said, it was a part-time

19  position.

20     Q.  How many hours did you work?

21     A.  About 20 hours a week.

22     Q.  And do you recall what your

23  compensation was there?

24     A.  $15 an hour.

Page 16

1     Q.  What were your -- strike that.

2          Why did you leave CPS in

3     January 2010?

4     A.  My mother needed help.

5     Q.  Okay.  When did you actually -- so

6     -- and then you moved to Michigan when?

7     A.  In February 2010.

8     Q.  Okay.  When did you start at

9     Caldwell's Kitchen & Tap?

10    A.  I don't remember exactly.  Perhaps

11    June of 2010 -- or 2009, excuse me.

12    Q.  And you were there until October?

13    A.  I believe so, yes.

14    Q.  Did you quit the job at Caldwell's

15    to take the part-time position at CPS?

16    A.  I quit the -- no.  I quit the job

17    at Caldwell's just because it was slow,

18    and with the recession there was not very

19    much money, and I was anticipating moving

20    to help my mother anyhow.  And I already

21    had -- I don't remember if I -- they --

22    they did overlap slightly, so, but it

23    wouldn't have been enough money with CPS

24    anyhow.

1    Q.  Did you work full time at

2  Caldwell's?

3    A.  No, I did not work full time at

4  Caldwell's.

5    Q.  How many hours a week did you have

6  at the time you left in October?

7    A.  It's hard to say.  Depending on

8  when they scheduled me.

9    Q.  Can you give me an estimate?

10    A.  I'd guess 20 hours a week.  Again,

11  I'm not sure.

12    Q.  And before starting at Caldwell's,

13  where were you working before June 2009?

14    A.  I believe I was baby-sitting,

15  child care, for the Segreto (phonetic)

16  family and also the Tony family.

17    Q.  How do you spell Segreto?

18    A.  I'd have to look it up.  I'm not

19  sure.

20    Q.  Where do they live, the Segreto

21  family?

22    A.  Lincoln Park.

23    Q.  And where did the Tony family

24  live?

Page 18

1      A.  Rogers Park.

2      Q.  Were you working for them at the

3   same time?

4      A.  No.  No, I was not.

5      Q.  What was your employment with the

6   Segreto family, what period of time?

7      A.  I don't recall at this time.

8      Q.  You don't have any idea?

9      A.  I don't have any idea to be

10  correct.

11     Q.  Okay.  How about the Tony family

12  in Rogers Park, when did you work for

13  them?

14     A.  That also I'd have to look up.

15  I'm not sure.

16     Q.  What was your compensation with

17  the Segreto family?

18     A.  $15 an hour.

19     Q.  And what about the Tony family?

20     A.  $10 an hour.

21     Q.  All right.  What was your

22  employment immediately before your

23  baby-sitting jobs with the Segreto and

24  Tony families?

```
 1        A.  At some point, it may have been --
 2   it must have been after this baby-sitting.
 3   I was working for the LaSalle Network, so
 4   I don't know that I was working prior to
 5   the Segreto family.
 6        Q.  Okay.  What's the LaSalle Network?
 7        A.  It's a temporary administrative
 8   service company.
 9        Q.  What did you do for them?
10        A.  Administrative temporary work.
11        Q.  So you were actually a temporary
12   worker?
13        A.  Yes.
14        Q.  Is LaSalle Network in Chicago?
15        A.  Yes, it is in Chicago.
16        Q.  What type of temporary work did
17   you do?
18        A.  I worked at theWit Hotel, and I
19   also worked at Centex Realty Company doing
20   whatever was needed, mailings and
21   packaging, accounting, data input, filing.
22        Q.  And, approximately, how long were
23   you at LaSalle Network doing temp work?
24        A.  Approximately, one year.
```

Page 20

1  Q.  Okay.  Did you work fairly

2  steadily during that one year?

3  A.  Yes.

4  Q.  Okay.  Were you given full-time

5  hours?

6  A.  No.

7  Q.  Okay.  During that one year, did

8  you ever have full-time placement?

9  A.  Actually, for a short time, I did

10  have full-time placement with LaSalle.

11  Q.  Okay.  And when was that?

12  A.  I'd have to look again.  It's been

13  some time.

14  Q.  What did they pay you?

15  A.  $15 an hour.

16  Q.  And was that your compensation

17  rate the entire time you were with

18  LaSalle?

19  A.  No, it was not.

20  Q.  Okay.  What did you start at?

21  A.  $15 an hour.

22  Q.  And for how long did you receive

23  that rate of pay?

24  A.  I'm not sure.  Actually, it may

Page 21

1  have been $12 at theWit, and then 15 at

2  LaSalle.

3      Q.  Okay.  Did you ever receive any

4  more per hour than the $15?

5      A.  I did not.

6      Q.  Before joining LaSalle Network,

7  where did you work?

8      A.  I don't believe I worked.

9      Q.  Okay.  So from the time you left

10  Columbia College Chicago in October 2007,

11  you did not have employment until you

12  joined LaSalle Network?

13      A.  I believe so.

14      Q.  Okay.  What did you do after

15  leaving Columbia in 2000 -- October of

16  2007 to try to find your next job?

17      A.  I applied for positions.

18      Q.  Okay.  And did you keep -- how did

19  you know where those positions were?

20  Where did you find those positions to

21  apply for?  How did you know where to

22  apply?

23      A.  The standard, looking online or

24  contacting people, that type of thing.

Page 22

1      Q.  Did you use a placement service?

2      A.  Well, I used the LaSalle Network,

3   which is a temporary and full-time

4   placement service.

5      Q.  Any others besides LaSalle

6   Network?

7      A.  Yes.  A company named 180 Degrees.

8      Q.  Did you find employment through

9   180 Degrees?

10     A.  I did not.  There's a recession,

11  and things were slowing down.

12     Q.  Okay.  What type of job were you

13  looking for with 180 Degrees?

14     A.  They were placing me for

15  administrative assistant jobs, executive

16  positions, primarily in the green-type

17  companies.

18     Q.  Did you ever receive any job

19  offers or any offers of employment from

20  the time that you left Columbia in

21  October of 2007 until you took your

22  position with LaSalle Network?

23     A.  I did not.

24     Q.  You didn't get any offers at all?

Page 23

1     A.  Full-time positions.

2     Q.  Okay.  What about part-time

3  positions?

4     A.  Part-time positions, just the ones

5  we discussed.

6     Q.  Okay.  So, you accepted every

7  part-time position you were offered?  When

8  you said just the ones we discussed, I'm a

9  little confused.  I'm wondering what you

10  meant by that.

11     A.  I took almost every job that I was

12  available to work for.

13     Q.  Okay.  Are there any jobs that you

14  were offered that you have not told me

15  about here?  Any jobs besides Unity

16  Studios, T&T Property Maintenance, Jerry's

17  Corner Cooks, Caldwell's Kitchen, Chicago

18  Public Schools, Segreto and Tony families,

19  and LaSalle Network, any other job offers

20  that you were given besides those?

21     A.  I did take a job as a portrait

22  model at a drawing studio at Palette &

23  Chisel.  It was a part-time position.

24     Q.  Is that in Chicago?

Page 24

1      A.  Yes, it is in Chicago.

2      Q.  What were you paid for that

3  position?

4      A.  $15 an hour.

5      Q.  How long did you work there?

6      A.  It was very brief.  Just once a

7  month or something.  If they needed a

8  portrait model, they would call.  Maybe

9  three to six hours a month or something.

10      Q.  Over how many months did you do

11  that work?

12      A.  I don't recall at this time.  I

13  don't remember.

14      Q.  Any other -- besides the jobs that

15  you have told us about here, are there any

16  other offers of employment that you

17  received since leaving Columbia College?

18      A.  I don't believe so, no.

19      Q.  Okay.  Have you -- do you keep --

20  did you keep records of the applications

21  that you submitted to various employers

22  after leaving Columbia?

23      A.  Yes, I did.

24      Q.  And have you produced those to

Page 25

```
 1    your attorney?

 2        A.  I believe I have.

 3        Q.  Did you keep the -- if any of the

 4    responses were given to you in writing,

 5    did you keep those written responses?

 6        A.  I kept some of them.  I do not

 7    have all of them.

 8        Q.  Okay.  Did you produce the ones

 9    you have to your attorney?

10        A.  No, I did not.

11        Q.  Do you still have them?

12        A.  Yes.

13        Q.  Since leaving Columbia College,

14    have you attended any or done any

15    coursework at any college or university?

16        A.  Since leaving Columbia College for

17    employment?

18        Q.  Correct.

19        A.  I was a graduate student at

20    Columbia College at the time I was

21    terminated.

22        Q.  Okay.  Since that time, though,

23    have you enrolled as a student and done

24    any coursework at any other institution?
```

Page 26

1    A.  I took an adult ed course at the

2    Center for Creative Studies in Detroit,

3    Michigan.

4    Q.  How long was that course?

5    A.  Only -- I'd have to check.  Four

6    months -- three months -- ten weeks.

7    Q.  Did you receive any sort of

8    certification or degree when you completed

9    that?

10    A.  No.  It's simply a noncredit

11    course.

12    Q.  What was -- what was the area of

13    study?

14    A.  It's a computer software program

15    called Maya.

16    Q.  I'm sorry.  Is that M-a-y-a?

17    A.  Yes.

18    Q.  And what does Maya do?

19    A.  It's a 3D modeling program.

20    Q.  Why did you sign up for this

21    course?

22    A.  To increase my employment skills.

23    Q.  Aside from this lawsuit and the

24    administrative charges that gave rise to

Page 27

1    this litigation, have you filed any other

2    lawsuits?

3        A.  No.

4        Q.  Okay.  Have you ever been named as

5    a defendant in a lawsuit?

6        A.  No.

7        Q.  Have you ever been named as a

8    respondent in an administrative

9    proceeding?

10       A.  No.

11       Q.  I ask this question -- this is a

12   standard routine question I always ask, so

13   don't be offended, please.  Have you ever

14   been convicted of a crime?

15       A.  No.

16       Q.  Okay.  Have you ever used any

17   names other than Lisa Marie Lewandowski?

18       A.  No.

19       Q.  What did you do to prepare for

20   your deposition today?

21       A.  I went for a walk yesterday, had a

22   cup of tea this morning, tried to relax.

23       Q.  Did you review any documents

24   before coming here?

Page 28

1    A.  I reviewed -- I reviewed the

2  complaint that I had filed.

3    Q.  The complaint that was filed in

4  the Northern District of Illinois Court?

5    A.  Yes.

6    Q.  Okay.  Did you review anything

7  else?

8    A.  No.

9    Q.  Have you given any statements --

10  other than the documents that you produced

11  to your attorney, have you given any

12  statements to anybody regarding the

13  circumstances that gave rise to this case?

14    A.  Statements, how so?

15    Q.  Of any kind.  Where you sit down

16  and you talk to someone and some sort of

17  recording is made of what you said either

18  in writing or on tape or digitally?

19    A.  The Human Resources office at

20  Columbia.

21    Q.  Okay.  Since leaving Columbia,

22  have you given any statements to anyone

23  regarding the circumstances that gave rise

24  to this case?

 1      A.  Family members.

 2      Q.  Okay.  Anyone besides family

 3  members?

 4      A.  No.

 5      Q.  When did you retain Mr. Lee as

 6  your attorney?

 7      A.  I don't recall.

 8      Q.  Do you have any idea at all as you

 9  sit here today when you retained him as

10  your attorney?

11      A.  I don't recall exactly.

12      Q.  Okay.  Do you remember when you

13  first made contact with him regarding this

14  case?

15      A.  Again, I'd have to look at dates.

16  It's been several years.

17      Q.  Okay.  Did you have -- you had an

18  attorney representing you for this matter

19  before Mr. Lee?

20      A.  Yes, I did.

21      Q.  And what was that attorney's name?

22      A.  Candace -- I'm not sure of her

23  last name.  Candace --

24      Q.  Gorman?

Page 30

 1    A.  Gorman.

 2    Q.  G-o-r-m-a-n?

 3    A.  Yes.

 4    Q.  When did you retain Ms. Gorman?

 5    A.  Sometime in December '06, I

 6  believe.

 7    Q.  When did you first communicate

 8  with her regarding this case?

 9    A.  I don't recall.  Probably between

10  October and December of '06, I'd guess.

11    Q.  And when did she stop being your

12  attorney?

13    A.  I don't recall.  She had a civil

14  case in Guatemala or something that she

15  had to attend.

16    Q.  You started employment with

17  Columbia when?

18    A.  Around 1997.

19    Q.  And what was your position then?

20    A.  I worked in the costume shop in

21  the Theater department at Columbia College

22  as an overhire stitcher or a student

23  worker, I believe.

24    Q.  You were enrolled as an

1  undergraduate student at that time?

2      A.  Yes.

3      Q.  Okay.  Who was your supervisor in

4  the costume shop?

5      A.  Patricia Roder.

6      Q.  How did you come to learn about

7  that position?

8      A.  They had discussed the open

9  position in class.

10     Q.  Okay.  What was your -- and you

11  received a degree from Columbia, correct,

12  an undergraduate degree?

13     A.  I did receive an undergraduate

14  degree from Columbia.

15     Q.  And that was in what?

16     A.  I'd have to check.  1999, maybe.

17     Q.  What was your degree?

18     A.  It was a liberal -- liberal arts

19  degree.

20     Q.  In what field --

21     A.  Liberal arts.

22     Q.  -- or area of study?

23     A.  Liberal arts was the bachelor's.

24     Q.  How long did you work in the

Page 32

1   costume shop?

2       A.  I'm not exactly sure.  Maybe a

3   year to two years.  I'm not really sure.

4       Q.  And where was your -- was your

5   next position at the center for -- Career

6   Center for Arts and Media?

7       A.  My next position was at the Career

8   Center for Arts and Media.

9       Q.  Okay.  What was your job there?

10      A.  To be a receptionist and assist in

11  the Student Employment office as well as

12  the Career Center, advising inquiries, and

13  once in a while student advising if they

14  were busy.  It was a shared office.

15      Q.  Why did you leave the job in the

16  costume shop?

17      A.  It was a student worker position,

18  I think, and I had graduated.  I'm not

19  sure what happened.

20      Q.  Okay.  Who was your supervisor in

21  the Career Center?

22      A.  Keith Lusson.

23      Q.  Can you spell that name?

24      A.  L-u-s-s-o-n.

1    Q.  That was a part-time position?

2    A.  Yes.

3    Q.  And how long were you there?

4    A.  Approximately, two-and-a-half

5  years, I believe, maybe two years.

6    Q.  By then you had graduated,

7  correct?

8    A.  Oh, yes.

9    Q.  By the time you took this position

10  in 2001?

11    A.  I believe so.

12    Q.  Okay.  The next job you took was

13  with the Early Childhood Education

14  department?

15    A.  Yes.

16    Q.  Okay.  And what was your job

17  there?

18    A.  I was the assistant to the program

19  director in Early Childhood Education.

20    Q.  You took that job in 2003?

21    A.  Yes, I believe so.

22    Q.  And who was the director?

23    A.  Carol Ann Stowe.

24    Q.  When you worked in -- you were

Page 34

1    there from 2003 until the summer of --

2    were you there until the summer of 2005 or

3    the spring of 2005, I should say?

4        A.  I'm sorry.  I don't understand

5    your question.

6        Q.  How long were you assistant to

7    Carol Ann Stowe?

8        A.  I assisted Ms. Stowe until I took

9    the position in the Dean's office.

10       Q.  Okay.  So you went right from

11   Early Childhood Education to the Dean's

12   office?

13       A.  Yes.

14       Q.  Who else worked in the Early

15   Childhood Education office while you were

16   there besides you and Carol Ann Stowe?

17       A.  We had student workers.

18       Q.  Aside from student workers, were

19   there any other employees?

20       A.  There were faculty -- faculty.

21       Q.  Okay.  Aside from the faculty

22   members, were there any other staff

23   members who were not students?

24       A.  No.

1    Q.  And how many student workers were

2    there?

3    A.  I believe there were three.

4    Q.  Did that number stay constant

5    during your time there?

6    A.  I don't recall.

7    Q.  What were your job

8    responsibilities as an assistant to the

9    director?

10   A.  I'd have to look at the position

11   description, but --

12   Q.  What did you do?

13   A.  -- maintaining records,

14   coordinating the lab, computer supplies,

15   things like that.

16   Q.  What about computer supplies?

17   A.  They had a lab.  So, you know, if

18   there was an issue, I would to have call

19   and ask that it be repaired.

20   Q.  Okay.  Did you answer the

21   telephone?

22   A.  Yes.

23   Q.  Okay.  And did you keep Carol Ann

24   Stowe's schedule for her?

Page 36

1    A.  She did a lot of that on her own.

2  I on occasion would, you know, give her

3  information from her calendar.

4    Q.  You started in February of 2003.

5  Does that sound right?

6    A.  Started where in 2003?

7    Q.  At Childhood -- Early Childhood

8  Education?

9    A.  Yes.

10    Q.  And in May of 2003, you nominated

11  yourself for a pay increase, correct?

12    A.  I nominated myself?

13    Q.  Yes.

14    A.  I was asked to provide

15  documentation for a pay increase.

16    Q.  Okay.  So it's your testimony that

17  it was not your idea to seek a pay

18  increase in May of 2003?

19    A.  I was requested to provide

20  documentation for a pay increase.

21    Q.  Okay.  So would the answer to my

22  question be, no, that you did not initiate

23  the request for the pay increase or, yes,

24  you did?

Page 37

1      A.  I don't recall how that

2  conversation went, but I know that had I

3  provided documentation, it would be

4  investigated.

5      Q.  Who was that conversation with

6  that you're referring to?

7      A.  That would be the program

8  director, Carol Ann Stowe.

9      Q.  And what was the conversation?

10      A.  I don't recall what the

11  conversation was.

12      Q.  Can you tell me anything about it

13  at all?

14      A.  No.

15      Q.  What was the topic of the

16  conversation?

17      A.  The topic of the conversation?

18      Q.  Right.

19      A.  I don't remember.

20      Q.  When did it take place?

21      A.  It had to be while I was working

22  there.

23      Q.  Okay.  Did you ask for a pay

24  increase in May of 2003?

1     A.  Yes, I think I did.

2     Q.  Okay.

3     A.  I also asked for a pay increase

4 while I was working for Keith Lusson.

5     Q.  Okay.  Did you get an increase in

6 your pay?

7     A.  I did get one from Keith Lusson,

8 and I did get the pay increase from Carol

9 Ann Stowe, as well as stipend money.

10     Q.  Okay.  Do you recall what the

11 amount of the increase was that you

12 received?

13     A.  I do not recall.

14     Q.  Do you recall that you again in

15 May 2004 sought a pay increase?

16     A.  No, I do not recall.

17     Q.  Do you remember asking for a title

18 change as well in May of 2004?

19     A.  Yes.

20     Q.  Okay.  What was your title at the

21 time that you requested the change?

22     A.  I'm not sure what it was at the

23 time.

24     Q.  What title did you want?

Page 39

1    A.  I'm not sure what that was at the
2    time either.
3         Q.  Why did you want a change in
4    title?
5         A.  Just as everyone would want more.
6    I had more responsibilities and, you know,
7    requested a title change to show that.
8         Q.  What were the additional
9    responsibilities that you took that you
10   thought justified a title change?
11        A.  I'd have to look at the paperwork.
12        Q.  So sitting here today, you don't
13   recall?
14        A.  I don't recall.  It was some time
15   ago.
16        Q.  Did you get the title change?
17        A.  The title change, no, I did not
18   get the title change.  It was given to the
19   person that took over my position.
20        Q.  And who was that?
21        A.  I don't -- I don't know who that
22   was.  I don't remember who that was.
23        Q.  Who did you submit your request
24   for a title change to?

Page 40

1    A.  I believe it had to go to Human

2  Resources.

3    Q.  Is it your recollection that

4  that's where you sent it?

5    A.  I don't recall.  I know Human

6  Resources was involved.

7    Q.  Okay.  Do you recall being

8  reprimanded by Carol Ann Stowe for the

9  schedule that you were keeping in that

10  department?

11    A.  Yes.

12    Q.  Okay.  Can you tell me what the

13  reprimand was for?  What's your

14  recollection of the -- of the reprimand?

15    A.  She had hoped that I came back

16  from a meeting instead of going to another

17  building that she had logged me to go to,

18  and it was raining.  You know, she didn't

19  express that -- I did call her that, you

20  know, I needed to come back immediately.

21  So I went on to that meeting and gave her

22  a call, and she was -- you know, let me

23  know that in the future, please, do not

24  continue to do that.

Page 41

1    Q.  Okay.  And did she tell you that

2  you were expected to work 9-to-5 hours,

3  not necessarily the same hours that she

4  was working?

5    A.  I often worked until 7:00 p.m.,

6  8:30 to 7:00 p.m.

7    Q.  But my question was:  Did she tell

8  you that yours was a 9-to-5 job?

9    A.  I don't recall.  I mean, there's

10  events that were, you know, taking place

11  after 5:00 o'clock that I was required to

12  work.

13    Q.  Okay.

14    A.  Things like that.

15    Q.  Do you recall any additional

16  reprimands from Carol Ann Stowe other than

17  this one?

18    A.  I do not.

19    Q.  In March of 2005, you asked again

20  for a title change.  Do you recall that?

21    A.  I do not recall that.

22    Q.  Okay.  Do you recall asking for

23  more money in March of 2005 also?

24    A.  I don't recall that.

Page 42

1     Q.  Did you create talking points,

2  suggestions, for Ms. Stowe to use in

3  trying get the increase in money for you?

4     A.  I would have had to provide her

5  some information, so, likely, I did

6  provide talking points.

7     Q.  Okay.  Why did you -- why do you

8  say you would have had to provide her some

9  information?

10     A.  To justify the position.

11     Q.  What were you told to provide?

12     A.  I don't know that I was told to

13  provide anything.

14     Q.  Okay.  And did you give those

15  talking points to Ms. Stowe?

16     A.  Did you just now say that -- did I

17  testify that she had them?

18     Q.  I'm asking if you created talking

19  points to give to Carol Ann Stowe in an

20  attempt to get an increase in your

21  compensation in March 2005?

22     A.  I -- I may have given her talking

23  points, yes.

24     Q.  Okay.  Did you get the increase?

Page 43

1     A.  I did receive an increase.

2     Q.  And how much of an increase did

3  you receive?

4     A.  I don't recall.

5     Q.  I've got some documents to show

6  you.

7          Did your title change at all

8  during the time that you worked in the

9  Early Childhood Education department?

10    A.  I don't recall if it did.

11    Q.  Why did you leave that department?

12    A.  I was offered a position in the

13  Dean's department.

14    Q.  And that was at the School of Fine

15  and Performing Arts; is that correct?

16    A.  (Indicating.)

17    Q.  Is that yes?

18    A.  Yes.

19    Q.  Did you apply for that position?

20    A.  I did apply for that position.

21    Q.  How did you find out that it was

22  available?

23    A.  Someone at work had told me it was

24  available.

Page 44

1      Q.  Who told you that?

2      A.  Several people told me.  I don't

3  remember exactly who.

4      Q.  Okay.  Did you submit a written

5  application?

6      A.  Yes, I did.  I believe I must have

7  had to, yes.

8      Q.  Do you know how many other people

9  applied for that position?

10      A.  I do not know how many people

11  applied for that position.

12      Q.  Did you interview for the

13  position?

14      A.  Yes, I did interview for the

15  position.

16      Q.  And who interviewed you?

17      A.  Leonard Lehrer, Deanna Evans, and

18  Mr. MacDonald.

19      Q.  Is that Jim MacDonald?

20      A.  Yes.

21      Q.  What was Leonard Lehrer's position

22  at the time that he interviewed you?

23      A.  He was the dean for the School of

24  Fine and Performing Arts.

Page 45

1    Q.  And what was Jim MacDonald's

2  position at that time?

3    A.  I don't recall.  Perhaps associate

4  dean.

5    Q.  And who else interviewed you?  I'm

6  sorry.  I forgot what you said.

7    A.  Deanna Evans.

8    Q.  What was her position?

9    A.  She was the assistant to the dean.

10    Q.  And who else interviewed you?

11    A.  Actually, prior to that, there was

12  a Human Resources woman that interviewed

13  me before I met with Mr. MacDonald,

14  Leonard, and Deanna.

15    Q.  Who was that?

16    A.  She was the director of Human

17  Resources.  I don't recall the name.

18    Q.  Was it Stephanie Griffin or

19  Patricia Olalde?

20    A.  It was neither of those two women.

21    Q.  Okay.  What position did you

22  eventually get when you moved from the

23  Early Childhood Education department?

24    A.  The Assistant to the Dean

Page 46

1    position.

2        Q.  That's the position that Deanna

3    Evans held at the time she interviewed

4    you?

5        A.  I believe so.

6        Q.  Did you have any understanding

7    regarding where Deanna Evans was going to

8    go if you took the position of Assistant

9    to the Dean?

10       A.  I was not made aware of that.

11       Q.  Do you know --

12       A.  I don't recall.

13       Q.  Do you know why she was leaving?

14       A.  I do not know why she was leaving.

15       Q.  Okay.  And do you know how long

16   she had been there?

17       A.  I don't recall how long she was

18   there.

19       Q.  You started work as assistant to

20   the Dean in May of 2005, correct?

21       A.  Yes.

22       Q.  Okay.  And your direct supervisor

23   was Leonard Lehrer, correct?

24       A.  Correct.

1    Q.  What did you do in that job?  What

2  were your functions in that job?

3    A.  Many functions.  I'd have to

4  recall the position description, but to

5  help coordinate information to and from

6  the Provost's office, the Human Resources

7  department, budgeting, calendars, events,

8  among other things.

9    Q.  What did you do -- when you say

10  budgeting, what -- what did you do for

11  budgeting?

12    A.  I was asked to review the budget

13  and see where we could move money or take

14  money away.

15    Q.  Anything else on budgeting?

16    A.  Input data for budgeting.

17    Q.  What type of data did you input?

18    A.  Amounts for different supplies,

19  different line numbers.

20    Q.  Who gave you direction with regard

21  to what data was to be input into the

22  budget?

23    A.  Leonard Lehrer.

24    Q.  Anyone else?

Page 48

1      A.   No.

2      Q.   And was Dean Lehrer the one who

3    asked you to look at the budget, as you

4    testified to a moment ago?

5      A.   Yes.

6      Q.   Okay.  What was the -- any other

7    functions that you can recall with regard

8    to the school's budget?

9      A.   No.  I mean, I don't recall.

10   Basic budgeting information, so that we

11   could get it to the Provost's office.

12     Q.   Okay.  Did -- did Dean Lehrer

13   review your budget, your work with regard

14   to the budget?

15     A.   Yes.

16     Q.   Okay.  Was anyone else -- well,

17   let's back up.

18            Who else worked in the office

19   with you and Dean Lehrer when you started

20   in May of 2005?

21     A.   James MacDonald.

22     Q.   He was actually -- strike that.

23            Why don't you describe for me

24   what the offices were like?  Where you

Page 49

1    sat?  Where Dean Lehrer sat?  Where Jim

2    MacDonald was?

3        A.  There were three offices, and we

4    were each provided an office.  There was a

5    receptionist, a student worker, that sat

6    out in the reception area.

7        Q.  Okay.

8        A.  There was a second student worker

9    that would relieve that student worker.

10       Q.  Okay.  So you had your own office

11   in Dean -- strike that -- when working for

12   Dean Lehrer?

13       A.  I had my own office also for Carol

14   Ann Stowe, yes.

15       Q.  Okay.  And you had your office the

16   entire time that you worked for Dean

17   Lehrer, correct?

18       A.  I believe so, yes.

19       Q.  Jim MacDonald worked in that group

20   of offices as well, correct?

21       A.  Yes.

22       Q.  Okay.  How often -- strike that.

23           Was anyone else working in

24   those offices besides you, Dean Lehrer,

Page 50

1   and Jim MacDonald?

2       A.   The student workers were also

3   working in the reception area.

4       Q.   Okay.  In addition to them, was

5   there anyone else who regularly worked in

6   those offices?

7       A.   They didn't work in the office,

8   but there was a communal sort of coffee

9   pot, and there were people that would come

10  through and have coffee and use our

11  refrigerator.

12      Q.   Okay.  What -- were your hours and

13  workdays generally consistent while you

14  worked in the Dean's office?

15      A.   Yes.

16      Q.   What hours and days did you work?

17      A.   I worked Monday through Friday and

18  occasionally Saturdays, like 8:30 to 5:30.

19      Q.   Did you set your own hours?

20      A.   No, not necessarily.

21      Q.   Okay.  How did you know when to

22  come and when to go?

23      A.   Deanna worked from 8:30 to 5:30,

24  and I also worked 8:30 to 5:30.

Page 51

1    Q.  Did Deanna tell you that those

2    were the hours you were to work?

3    A.  I asked her what hours she worked,

4    and she let me know she worked 8:30 to

5    5:30.

6    Q.  Okay.  Did you -- did you keep

7    track of your hours on any sort of a

8    timesheet or through any other method?

9    A.  It was a salaried position.  We

10   did log our vacation time in a computer.

11   Q.  So the answer would be, no, to my

12   question about keeping track on some sort

13   of a timesheet or through any other

14   method?

15   A.  I would suspect e-mail trails

16   would provide times.

17   Q.  Okay.  Did you input the times

18   that you came in and left -- came in in

19   the morning and left in the evening in any

20   sort of a system?

21   A.  There was no system required.

22   Q.  So your answer's, no?

23   A.  My answer is that it wasn't

24   required, so.

Page 52

1   Q. So you -- so, no?

2   A. No.

3   Q. With regard to calendaring, I

4 think you mentioned that that was one of

5 your job functions, what did you do with

6 -- for calendaring?  Whose calendar were

7 you talking about when you made that

8 reference?

9   A. Leonard would have meetings that

10 needed to be scheduled, and I could put

11 them on his calendar.

12   Q. Were you in charge of Dean

13 Lehrer's calendar?

14   A. To a degree.  I mean, it's his

15 calendar.  What he wanted to do, he could

16 do, of course, but I was asked to check

17 availability for his calendar, and then I

18 would check with him if he would like to

19 schedule it, and we'd schedule it.

20   Q. Did you put appointments on his

21 calendar yourself or did he do it?

22   A. He could do it, and he often did

23 put his own appointments on his calendar.

24   Q. And did you as well?

Page 53

1       A.  I did as well, yes.

2       Q.  Was his calendar kept in the

3  computer system or was it an actual

4  hard-copy calendar?

5       A.  Originally, he had a hard-copy

6  calendar, and then he also had a computer

7  calendar.

8       Q.  Did he stop using his hard-copy

9  calendar after he started using the

10  computer calendar?

11      A.  I don't know what he did.  I often

12  kept his computer calendar.  I believe he

13  had a paper calendar he carried with him.

14      Q.  Okay.  Did you put entries into

15  his paper calendar ever?

16      A.  Probably the first month or so

17  that I worked there.

18      Q.  Okay.

19      A.  But I think he phased out that

20  particular calendar in hopes of

21  streamlining.

22      Q.  Okay.  And so from that point on

23  after the first month there when you

24  needed to consult his calendar, you would

Page 54

1    do so on the computer system?

2        A.  I would speak with him and, yes,

3    check on the computer system.

4        Q.  Okay.  So you had the ability to

5    go into his computer -- computerized

6    calendar and make entries on that

7    calendar, correct?

8        A.  Yes, he authorized me to do that.

9        Q.  Okay.  And did you have to -- I

10   assume you didn't have to check with him

11   to get authorization each time you put an

12   entry into his calendar.  Is that fair to

13   say?

14       A.  That's -- I would have to check

15   with him to remove it if it wasn't going

16   to work for him, but, originally, I would

17   put it in his calendar.

18       Q.  Okay.  In terms of the mechanics

19   of actually getting -- accessing the

20   calendar and putting an entry onto a

21   particular day, did you have some sort of

22   a pass code or other information you had

23   to provide to access a particular day?

24       A.  No.

Page 55

1      Q.  Okay.  So you could just go on and

2    -- and do it when you were ready to do it,

3    correct?

4      A.  I think so.

5      Q.  Okay.  And would your answer be

6    the same with regard to removing any

7    entries on his computerized calendar?

8      A.  Yes, I believe so.

9      Q.  Okay.  Did you keep anybody else's

10   calendar while you worked at the -- in the

11   Dean's office?

12     A.  On occasion, I would schedule

13   things for Jim MacDonald, but not very

14   often.

15     Q.  Was his calendar kept on the

16   computer as well?

17     A.  Yes.

18     Q.  Did you keep a calendar of your

19   own?

20     A.  Yes, I did.

21     Q.  Was that kept on the computer or

22   in hard copy?

23     A.  I kept a calendar on the computer.

24     Q.  Did you also keep one in hard

1    copy?

2        A.  I kept notes, in a book, of

3    requests.

4        Q.  Okay.  Was that, though -- did

5    that contain a personal calendar for you?

6        A.  No.

7        Q.  So your entire personal calendar

8    -- I shouldn't say personal.  The calendar

9    that you kept for your job as assistant to

10   the dean was kept all on the computer?

11       A.  Yes.

12       Q.  Yes.  What was your job function

13   with regard to events?  I think when I

14   asked you what your job functions were,

15   you said events.  If you can be more

16   specific for me about what you did?

17       A.  In the Dean's office?

18       Q.  Yes.

19       A.  We had faculty retreats that

20   needed to be scheduled and Human Resources

21   staff retreats as well that needed to be

22   organized and coordinated.

23       Q.  Faculty retreats, staff retreats,

24   you say you organized those events?

Page 57

1        A.  Yes.

2        Q.  Okay.  And what did you do to

3    organize those events?

4        A.  We invited the faculty to display

5    work to artists who came to the events, to

6    be sure that we had name tags and food,

7    and, you know, a location, things like

8    that.

9        Q.  Were those faculty -- what faculty

10   did you draw from for those events?

11       A.  We had around that time 146

12   faculty that reported to the Dean's office

13   and around 100 staff members.

14       Q.  Okay.  Did you contact faculty

15   members directly regarding coordination of

16   these events?

17       A.  I believe that we contacted the

18   chairs, and the chairs would request

19   submissions or substitutions or you know.

20       Q.  Okay.  When you say we -- who do

21   you mean when you say, We contacted the

22   chairs?

23       A.  Well, the Dean's office.

24       Q.  And so that contact came through

Page 58

1    you, correct?

2        A.  Yes.

3        Q.  Okay.  So you were the person from

4    the Dean's office who communicated with

5    the individual chairs regarding faculty

6    retreats?

7        A.  No.  Leonard would usually send a

8    memo saying, you know, we will be doing

9    this.

10       Q.  Okay.

11       A.  Lisa will be in contact with you

12   about coordinating it.

13       Q.  Okay.

14       A.  And then I would follow up.

15       Q.  Okay.  And was that the same

16   procedure you followed with regard to

17   staff retreats?

18       A.  I don't recall.

19       Q.  Okay.  Any other functions that

20   you performed while working for Dean

21   Lehrer besides coordinating faculty and

22   staff retreats, keeping Dean Lehrer's

23   calendar, and sometimes Jim MacDonald's

24   calendar, and the budgeting functions that

Page 59

1   you've testified about?

2       A.  Anything that was asked, I would

3   do.

4       Q.  Okay.  And do you recall

5   specifically anything that you were asked

6   to do that you did?

7       A.  I was asked to -- we had faculty

8   initiatives for like creative encounters,

9   things like this.  It was fellowships

10  through the Provost's office.  So we would

11  coordinate that.  Or we would have HR

12  events, not events, but requirements.  So

13  we'd have to be sure that people attended

14  those things.

15      Q.  Okay.  And you were in charge of

16  coordinating those?

17      A.  Well, Leonard had asked that I do,

18  you know, that.

19      Q.  But after he asked that you take

20  charge of it, were you in charge of

21  representing the Dean's office with regard

22  to the Dean's office's involvement in

23  those events?

24      A.  No.  The Dean is always the person

Page 60

1    who is responsible for things.  I mean, I

2    would coordinate what's happening,

3    communicate to him.

4         Q.  Okay.

5         A.  But --

6         Q.  Would it be fair to say you worked

7    with a fair amount of autonomy when you

8    were in the Dean's office?

9         A.  On occasion -- due to the fact

10   that the dean was out and that Jim

11   MacDonald would be out, on occasion, I

12   would have to collect information and

13   deliver it back to the dean.

14        Q.  Okay.  So would your answer be,

15   yes?

16        A.  No.  My answer would not be yes.

17   My answer would be, on occasion.

18        Q.  Okay.  So you sometimes worked

19   with autonomy and others -- other times

20   you did not.  Is that your testimony?

21        A.  I would be the only person in the

22   office, but I would always have to

23   communicate to others regarding what was

24   happening.

1    Q.  Okay.  You worked in the Dean's

2  office from May of 2005 until October

3  of 2006, correct?

4    A.  I'm sorry.  Could you repeat the

5  question?

6    Q.  Sure.  You worked in the Dean's

7  office from May of 2005 until October

8  of 2006; is that correct?

9    A.  Till October of 2006?

10    Q.  Yes.

11    A.  Yes, that's correct.

12    Q.  How often during that time -- and

13  you can tell me if that changed at all

14  during that window of time.  How often

15  while you were in the Dean's office, did

16  you actually see the dean in the office?

17  Would it be on a daily basis?

18    A.  Yes, on a daily basis.

19    Q.  Okay.  Was Jim MacDonald in the

20  office on a daily basis?

21    A.  I don't recall how often he was in

22  the office.

23    Q.  Okay.  Do you recall whether it

24  was on -- whether Jim MacDonald was in the

Page 62

1    office more than once a week?

2        A.   I believe that Jim MacDonald was

3    in the office more than once a week.

4        Q.   Beyond that, can you be any more

5    specific?

6        A.   No.

7        Q.   Okay.  There were student worker

8    receptionists in the office, correct?

9        A.   Correct.

10       Q.   And what were their hours during

11   the time you worked in the office?

12       A.   We often would have them there

13   between 9:00 and 5:00.

14       Q.   Okay.  That's Monday through

15   Friday?

16       A.   Yes, Monday through Friday.

17       Q.   And, typically, that's when they

18   worked, correct?  Monday through Friday,

19   9:00 to 5:00?

20       A.   Typically, yes.

21       Q.   Who supervised them?

22       A.   I supervised them.

23       Q.   Okay.  Did you give them

24   performance reviews?

Page 63

1      A.  We were not required to give them

2    performance reviews.

3      Q.  Okay.  So what was your

4    supervision then?

5      A.  Well, actually, we did give them

6    performance reviews, but they were

7    different than full-time faculty.

8      Q.  And were you the person giving

9    them their reviews?

10      A.  Yes.

11      Q.  Did you -- what else did you do to

12    supervise those student worker

13    receptionists?

14      A.  What else did we do?

15      Q.  What else did do you?

16      A.  To supervise them?

17      Q.  Yes, if anything.

18      A.  Provide them work and see that it

19    got done.

20      Q.  Okay.  Do you recall in April 2006

21    you submitted a document where you

22    outlined your idea for a new position that

23    was to be called something like "Director

24    of Budgets and Projects"?

Page 64

1     A.  Yes, I do.

2     Q.  Okay.  And why did you submit that

3  document?

4     A.  I believe I was asked to submit

5  that document to Leonard.

6     Q.  Who asked you to submit it to

7  Leonard?

8     A.  I believe Leonard asked me to

9  submit it.

10     Q.  Okay.  So it's your testimony that

11  it was his idea for you to submit a

12  proposal for a new position?

13     A.  I believe the conversation was

14  that another office was creating that

15  position, and he thought that if they were

16  going to do that, then perhaps I should.

17     Q.  Which office was that?

18     A.  I don't recall what the other --

19  another Dean's office.

20     Q.  When did you have this

21  conversation with Dean Lehrer?

22     A.  I don't recall.

23     Q.  Did he tell you what to put in

24  your proposal?

1      A.  I don't recall that he told me.

2      Q.  You don't remember either way?

3      A.  No.  It's a pretty

4  specific question.

5      Q.  I'm sorry?

6      A.  No, I don't recall.  It's a pretty

7  specific question.

8      Q.  Okay.  Well, I'm just wondering

9  how you decided what -- what -- strike

10  that.

11              How did you know what to put

12  in your proposal?

13      A.  I would keep track of my duties,

14  as much as I could --

15      Q.  Okay.

16      A.  -- and I would just recall that

17  information.

18      Q.  Did you write the proposal

19  yourself?

20      A.  I believe I definitely drafted the

21  proposal, and I don't recall if Leonard

22  had rewritten it or anything like that.  I

23  don't know.  I had written the draft for

24  the proposal.

Page 66

1      Q.  Okay.  Did you -- did you show it

2    to anyone besides -- strike that.

3                Did you eventually show the

4    proposal to Dean Lehrer?

5      A.  I believe I would have.

6      Q.  Okay.  Is he the one you submitted

7    it to?

8      A.  I don't recall if it was he.

9    Yeah.  I don't recall.

10     Q.  Did you show the proposal to

11   anyone else besides Dean Lehrer?

12     A.  I don't recall.

13     Q.  You argued in that proposal that

14   you should be entitled to a minimal or a

15   minimum salary increase of $10,500,

16   correct?

17     A.  That's what it says.

18     Q.  Okay.  And who decided what figure

19   to make as the minimum request?  Who

20   picked $10,500?

21     A.  I believe that information was

22   what Leonard had suggested.  I don't --

23   maybe based on the other position

24   description from the other department.

Page 67

1    I'm not really sure.

2        Q.  So it's your testimony that this

3    idea for the $10,000 -- $10,500 increase

4    came from Dean Lehrer and not from you?

5        A.  I -- no, that is not my testimony.

6    I don't recall.

7        Q.  Okay.  Was anyone else present

8    when you had this meeting with Dean Lehrer

9    to discuss the creation of the new

10   position?

11       A.  I don't recall.

12       Q.  How many meetings did you have

13   with him to discuss this topic?

14       A.  I don't recall.

15       Q.  Do you remember whether this

16   position had existed at some other time in

17   the school which Dean Lehrer was dean, the

18   School of Fine and Performing Arts?

19       A.  Pardon me?

20       Q.  That was a bad question.  Let me

21   ask it this way.

22            Do you recall whether any

23   such position, Director of Budgets and

24   Projects, had previously existed at any

Page 68

1    time in the School of Fine and Performing

2    Arts?

3         A.  I don't recall.

4         Q.  And you don't remember -- strike

5    that.

6              It's your testimony that Dean

7    Lehrer had told you that this position

8    existed in other departments -- I'm

9    sorry -- in other -- well, what did he

10   tell you?

11        A.  I don't recall exactly what was

12   said, but there was discussion that

13   they're considering this particular title

14   in other areas of the school.

15        Q.  Okay.  And that's all you recall

16   about what he said?

17        A.  Yes.

18        Q.  Did -- strike that.

19              Who initiated the idea of

20   this position, you or Dean Lehrer?

21        A.  I don't recall.

22        Q.  Did you feel you were qualified

23   for the position?

24        A.  Yes.

1      Q.  What -- strike that.

2              How did you know what the

3      position's functions were supposed to be?

4      A.  I believe that Dean Lehrer

5      provided a position description to me.

6      Q.  Do you know where he -- strike

7      that.

8              Do you know where that came

9      from?

10     A.  I do not know where that came from

11     or I don't remember where it came from at

12     this point.

13     Q.  You reviewed the position

14     description?

15     A.  Yes.

16     Q.  And you believed you were

17     qualified for this proposed position?

18     A.  Yes.

19     Q.  Why did you believe you were

20     qualified for it?

21     A.  Because I had performed the duties

22     on the position description.

23     Q.  Okay.  Do you recall what any of

24     those duties were as you sit here today?

Page 70

1    A.  I don't recall specifically what

2    they were.

3        Q.  Do you recall generally?

4        A.  Generally, no, I don't recall.

5        Q.  Okay.  And I'm sorry, you might

6    have answered this question.  Did you

7    submit the proposal to Dean Lehrer?

8        A.  I do not recall where I submitted

9    it or if it was submitted to a finance

10   department or -- I'm not sure what the

11   cycle is.

12       Q.  Were you eventually given an

13   increase in pay?

14       A.  Eventually, I was given stipends.

15       Q.  In June 2006, your pay went from

16   $42,000 to $61,260, correct?

17       A.  In June, no.  In September is the

18   new budget year.

19       Q.  I'm sorry.  But you were notified

20   in the summer of 2006 that you would be

21   getting that increase, correct?

22       A.  It was submitted.  I don't know

23   that it was approved.

24       Q.  Okay.

1     A.  And prior to that, I did receive

2  stipends, additional sums of money, as did

3  James MacDonald.

4     Q.  Okay.  When you say stipends, what

5  do you mean?

6     A.  Additional amounts of money.

7     Q.  Beyond your regular paycheck?

8     A.  Yes.

9     Q.  When was the first time you

10  received a stipend while working in the

11  Dean's office?

12     A.  I don't recall.  I'd have

13  to check.

14     Q.  What was the amount of the

15  stipend?

16     A.  I don't recall that either.

17     Q.  How many stipends did you receive?

18     A.  I don't recall.

19     Q.  How did you get the stipends?  I

20  mean, did they come in a separate check or

21  was it included in your paycheck?

22     A.  I don't recall how they were

23  given.  I mean, they were in a check.

24     Q.  And were you ever told why you

Page 72

1    were getting additional money?

2        A.  I believe that the dean had to

3    fill out information on a form in order to

4    get that amount approved.

5        Q.  Okay.  And it was approved, I

6    assume?

7        A.  Yes.

8        Q.  Okay.  You have no idea sitting

9    here today how much additional money you

10   received while working in the Dean's

11   office?

12       A.  I do not recall.

13       Q.  Okay.  While working in the Dean's

14   office, did you travel to Europe with Dean

15   Lehrer?

16       A.  I did travel with Dean Lehrer,

17   Chris Greiner, and Jillian Moore to

18   Europe.

19       Q.  I'm sorry.  Jillian Moore was one

20   of the people you mentioned?

21       A.  Yes.

22       Q.  Okay.  And who else?  Chris?

23       A.  Greiner.

24       Q.  Can you spell that?

Page 73

1      A.  G-r-i-e-n-i-e-r, perhaps.  I'm not

2   precisely sure.

3      Q.  Who else was on that trip?

4      A.  Leonard, Leonard's stepdaughter,

5   the two children to the stepdaughter, and

6   his wife.

7      Q.  Anyone else on the trip?

8      A.  Yes.  I believe the chair of the

9   Arts Entertainment Media Management

10  department.  I think it was Dennis Rich.

11     Q.  Anyone else on the trip?

12     A.  I can't recall anyone else on the

13  trip.

14     Q.  When was this trip taken?

15     A.  Maybe May of '06.  I'm not exactly

16  sure.

17     Q.  And how long were you in Europe

18  with Dean Lehrer and these other people?

19     A.  I believe it was around 10 to 14

20  days, something like that.

21     Q.  Where did you go?

22     A.  We went to Italy and Austria.

23     Q.  Anywhere else?

24     A.  I don't believe so.

Page 74

1      Q.  Who paid for the trip?

2      A.  The -- Columbia College paid for

3   the trip.

4      Q.  And were -- what was -- what's

5   Jillian Moore's -- strike that.  What was

6   Jillian Moore's position at that time?

7      A.  I don't recall what her position

8   was.  She worked with the International

9   Programming.

10     Q.  Whose office was she in?

11     A.  I don't recall if she reported to

12  the Dean's office or the Provost's office.

13  I'm not sure.

14     Q.  What about Chris Greiner?

15     A.  Chris was a report to Jillian

16  Moore.

17     Q.  How did you find out about this

18  trip?  How did you learn that it was to

19  take place?

20     A.  Leonard let me know that it was

21  going to take place.

22     Q.  And what did he say to you?

23     A.  I don't recall what he said.

24     Q.  When did he tell you that the trip

Page 75

1    was going to take place?

2        A.  I don't recall when he told me.

3        Q.  Was anyone present to hear this

4    conversation between you and Leonard

5    Lehrer?

6        A.  I don't recall if anyone was.

7        Q.  What was your understanding as to

8    why you would be on this trip?

9        A.  To document the trip.

10       Q.  To document?

11       A.  To document the school

12   surroundings.  They were going to look at

13   a program, and also he had talked about

14   transcripts coordination.

15       Q.  Okay.  What was your job then

16   while you were there?

17       A.  I documented the -- what the

18   school looked like, and sat at dinner

19   meetings with people.

20       Q.  What school are you talking about?

21       A.  There was a school in Florence,

22   and there was a school in Austria.  I

23   don't remember what the name of the

24   schools are.

Page 76

1    Q.  Okay.  And how did you document

2  what they looked like?

3    A.  Through video.

4    Q.  Did you document it in any other

5  way besides video?

6    A.  Primarily, video.  There also were

7  some notes in Austria of the business

8  meeting.

9    Q.  Were you -- strike that.

10          Who made arrangements -- the

11  travel arrangements for this trip?

12    A.  I believe Allison Ratliff made the

13  travel arrangements.

14    Q.  And who's Allison Ratliff?

15    A.  She worked in the Dean's office as

16  an administrative assistant, I believe.

17    Q.  When did she start working in the

18  Dean's office?

19    A.  She had been a student worker and

20  then given a position as an administrative

21  assistant.

22    Q.  So she was one -- strike that.

23          Do you know when she was

24  given the title of administrative

Page 77

1    assistant?

2        A.  I don't recall.

3        Q.  Was she one of the student workers

4    you testified that you supervised?

5        A.  Yes.

6        Q.  Okay.  And she was the one who

7    made the travel arrangements for this

8    trip?

9        A.  Yes.

10       Q.  Did that include air travel?

11       A.  Yes.

12       Q.  Did she make arrangements for

13   accommodations, for hotels?

14       A.  Yes.

15       Q.  And was everyone at the same

16   hotel?

17       A.  I don't believe so.

18       Q.  How many different hotels -- let's

19   say when you were -- strike that.

20              How many different cities did

21   you visit?

22       A.  I believe we only went to two

23   cities.

24       Q.  Florence and?

1      A.   Salzburg, Austria.

2      Q.   And in Florence, did you -- where

3   did you stay while you were in Florence?

4      A.   In Florence, at the same hotel

5   that Chris Greiner stayed at.  I don't

6   recall the name of that.

7      Q.   Were you -- strike that.

8           And did everyone besides you

9   and Chris Greiner stay at a separate

10  hotel?

11     A.   I don't recall where people

12  stayed.

13     Q.   Do you recall where Dean Lehrer

14  stayed?

15     A.   I don't believe he stayed in the

16  same hotel we stayed at.

17     Q.   Okay.  Would that be your answer

18  for Salzburg as well?

19     A.   No.  Everyone, I believe, stayed

20  at -- well, I believe everyone stayed at

21  the same hotel in Salzburg.

22     Q.   How many nights total were spent

23  in hotels while in Europe on this trip?

24     A.   I don't recall.

1      Q.  Was your trip evenly divided

2   approximately between the Florence portion

3   and the Salzburg portion?

4      A.  I don't recall.

5      Q.  Were you paid for your time in

6   Europe?

7      A.  Yes.

8      Q.  And were you given time to

9   sightsee and do nonwork-related

10  sightseeing?

11     A.  I -- I did sightsee.

12     Q.  Okay.  Do you recall whether you

13  sightsee -- did sightseeing every day

14  while you were traveling?

15     A.  No, I did not sightsee every day.

16     Q.  Of the time that you spent on this

17  trip, how many days did you spend

18  sightseeing?

19     A.  I would say three hours for the

20  whole trip.

21     Q.  Okay.  Your meals were paid for,

22  correct?

23     A.  Correct.

24     Q.  And your hotel?

1     A.  Yes.

2     Q.  And your airfare, correct?

3     A.  Yes.

4     Q.  Aside from documenting what the

5  schools looked like through video and

6  taking notes, were there any other job

7  functions that you performed while on this

8  Europe trip?

9     A.  I was asked to attend the meal

10  meetings.

11     Q.  Okay.  Who went to these meal

12  meetings?

13     A.  Everyone that attended from

14  Columbia.

15     Q.  Okay.  Did they attend just with

16  themselves or were there people from the

17  schools who were there as well?

18     A.  Oh, of course, there were people

19  from the schools that were there.

20     Q.  Okay.  And did you have a function

21  to perform at these meetings?

22     A.  Did I have a function?

23     Q.  Were you asked to do anything at

24  these meetings?

Page 81

1     A.  I was -- no.  I was asked just to

2  attend the meetings.

3     Q.  Okay.  Did you take notes or

4  record them in any way or did you just sit

5  and listen?

6     A.  I sat and listened.

7     Q.  Okay.  And were there any other

8  trips that you took to Europe or anywhere

9  else with Dean Lehrer while you worked in

10  the Dean's office?

11     A.  I don't believe so.

12        MS. KAY:  Do you want to take a

13  break?

14            (Whereupon a short recess

15             was had.)

16        MS. KAY:  Back on the record.

17  BY MS. KAY:

18     Q.  You were -- strike that.

19          Do you remember in October

20  of 2006 who Paul Chiaravaile is or was at

21  that time?

22     A.  Yes.

23     Q.  What was his position?

24     A.  He worked with Dr. Carter with the

Page 82

1    staff.

2         Q.  Okay.  Was he chief of

3    Dr. Carter's staff?

4         A.  Yes.

5         Q.  Okay.  And you received a

6    reprimand from him on October 17th of

7    2006, correct?

8         A.  From Dr. Carter.

9         Q.  Okay.  Do you remember receiving a

10   reprimand from his chief of staff, Paul

11   Chiaravaile?

12        A.  I do not.

13        Q.  What was the reprimand for, that

14   you recall?

15        A.  The board of trustees -- a

16   gentleman who was going to become a board

17   trustee -- they were negotiating a

18   contract with the River Arts Gallery, and

19   the gallery did not want to provide the

20   documentation that was needed, and they

21   would require us to call one office to

22   another office and were not producing the

23   documentation.  So I called one of the

24   offices after several phone calls and had

Page 83

1    asked the upper person to give a call to

2    Dr. Carter.

3         Q.  Okay.  And was it your

4    understanding that Dr. Carter was upset

5    with you by the -- your conduct during the

6    telephone call that you had with this

7    member of the board of trustees?

8         A.  I found out later that Dr. Carter

9    had wished I did not -- asked that person

10   to call him.

11        Q.  So he was not happy with what you

12   had done, correct?

13        A.  He had said that he did not want

14   me to do that, yes.

15        Q.  Okay.  In fact, you wrote a letter

16   of apology to Dr. Carter?

17        A.  Yes.

18        Q.  Correct?

19        A.  Yes, I did.

20        Q.  Okay.  And why did you write that

21   letter of apology?

22        A.  To explain that his office had

23   asked me to get this contract, that wasn't

24   going to happen, and multiple phone calls

Page 84

1   was not getting us anywhere.

2       Q.  Okay.  Did he respond to your

3   letter?

4       A.  He did respond to my letter.

5       Q.  And, in fact, in his response, he

6   told you that you were not to speak for

7   him unless you were directed to do that,

8   correct?

9       A.  Correct.

10      Q.  Okay.  The phone call -- do you

11  recall the name of the board of trustees

12  member whom you called that generated this

13  response from Dr. Carter?

14      A.  I do not recall.  I don't believe

15  he was a board member at the time.

16      Q.  Okay.  Why do you not believe he

17  was a board member?

18      A.  Because I don't believe he was a

19  board member at the time.  I think he was

20  looking to become a board member.

21      Q.  And where did you get your

22  information regarding this individual and

23  their status as either a board member or

24  not?

Page 85

1    A.  I believe that information is

2    available online.  It's common knowledge.

3    Q.  Okay.  Did you check online to

4    check this person's status before you made

5    the call to him?

6    A.  I spoke with his assistant.  I

7    never spoke with this person.

8    Q.  Okay.  Before speaking to his

9    assistant, did you check his status

10   online?

11   A.  I did not check his status online.

12   Q.  The call that you made to this

13   gentleman's assistant was the week of

14   October 9th, 2006.  Does that sound right?

15   A.  I don't recall, but, yes.

16   Q.  Okay.  When did you first learn

17   that anybody at Columbia was displeased

18   with your conduct in this telephone call?

19   A.  Mr. Lehrer had -- Leonard had told

20   me.

21   Q.  And when did he tell you that?

22   A.  Within a day of when that

23   happened.

24   Q.  Okay.  Within a day of the call?

1     A.  Yes.

2     Q.  Do you know how he found out that

3  anyone at the college was displeased with

4  your conduct?

5     A.  I don't recall how he found out.

6     Q.  What did he say to you?

7     A.  He -- I don't recall the

8  conversation exactly, but that he had -- I

9  should not have had -- asked that board

10  member or the person who was going to be

11  the board member to call Dr. Carter's

12  office to resolve the contract that we

13  were supposed to be getting.

14     Q.  Anything else that Dean Lehrer

15  said to you in this conversation?

16     A.  I don't recall.

17     Q.  How long did the conversation take

18  place?

19     A.  I don't recall.

20     Q.  And when did it occur?

21     A.  I don't recall.

22     Q.  Was anyone else there to hear the

23  conversation?

24     A.  I don't think so.

Page 87

1      Q.  And did he identify Dr. Carter as

2   -- as the person who was displeased with

3   your conduct?

4      A.  I don't recall.

5      Q.  Okay.  Do you recall who he

6   disclosed as the person who was displeased

7   or the people who were displeased with

8   your conduct?

9      A.  I think it was the President's

10  office.

11     Q.  Okay.  Did you have any further

12  conversations with Dean Lehrer regarding

13  the President's office reprimand of your

14  conduct?

15     A.  What do you mean?  I'm sorry.

16     MS. KAY:  Would you read the

17  question back?

18          (Record read as requested.)

19     THE WITNESS:  Dean Lehrer

20  suggested that I write an apology note to

21  Dr. Carter.

22  BY MS. KAY:

23     Q.  Okay.  Did he tell you why he was

24  making that suggestion?

Page 88

1      A.  He did not.

2      Q.  You took his advice, correct?

3      A.  Yes.

4      Q.  Did you write the letter to

5  Dr. Carter yourself?

6      A.  I drafted the letter, and Leonard

7  said he would review the letter.

8      Q.  Okay.  And is that what happened?

9  You drafted it, and he reviewed it?

10      A.  Yes.

11      Q.  Did anyone else review it?

12      A.  I don't recall.

13      Q.  Did Dean Lehrer make any changes

14  after reviewing your letter?

15      A.  I don't recall.

16      Q.  You eventually did send the letter

17  to Dr. Carter, correct?

18      A.  Correct.

19      Q.  Did you send a copy of the letter

20  to anyone else?

21      A.  I don't recall.  I may have.

22      Q.  If -- strike that.

23          And it's your testimony that

24  you -- your phone call was to the

Page 89

1    assistant to this board member and not to

2    the board member himself?

3        A.  I don't recall.

4        Q.  So, it could have been directly to

5    the board member, correct?

6        A.  I do not recall.

7        Q.  As part of the basis of your claim

8    against Columbia College, you're alleging

9    sexual harassment, correct?

10       A.  Correct.

11       Q.  Okay.  Why don't we start talking

12   about that then?  Can you tell me when was

13   the first incident of conduct that you

14   recall that you're alleging was sexual

15   harassment?

16       A.  Dean Lehrer at some point in

17   October had asked me to, you know, have an

18   affair with him, have his children, wake

19   up in my bed, extract his semen to have

20   his children, he couldn't control himself

21   around me.  I don't recall everything.

22       Q.  So these are statements you're

23   alleging that Dean Lehrer made to you?

24       A.  Those are statements that Dean

Page 90

1   Lehrer admitted to making to me, yes.

2       Q.  Okay.  Did he make them to you?

3       A.  Yes.

4       Q.  So it's your testimony under oath

5   that he told you he wanted to have an

6   affair with you?

7       A.  Correct.

8       Q.  Okay.  And that he wanted you to

9   bear his children?

10      A.  Correct.

11      Q.  That he wanted his semen extracted

12  so that he could impregnate you?

13      A.  Yes.

14      Q.  And what about his bed?  What was

15  the statement?

16      A.  I don't know verbatim, but

17  something about waking up in my bed with

18  him every morning.

19      Q.  You said this was in October,

20  correct?

21      A.  Yes.

22      Q.  October of what year?

23      A.  2006.

24      Q.  Were there any statements made by

Page 91

1    -- strike that.

2              Were these statements made

3    all on the same occasion or at different

4    times in October of 2006?

5        A.  I believe it was on different

6    occasions in October.

7        Q.  Okay.

8        A.  Mr. Lehrer also recited a poem to

9    me and made me cards and had asked me to

10   have -- meet him for dinner of which I

11   kept denying and saying, I didn't have

12   time for, things like that.

13       Q.  How many times did he tell you he

14   wanted to have an affair with you?

15       A.  Once.

16       Q.  How many times did he tell you

17   that he wanted you to bear his children?

18       A.  Once.

19       Q.  And how many times did he say he

20   wanted his semen extracted so he could

21   impregnate you?

22       A.  That was all said over a course of

23   a few occasions where he had clearly

24   stated he had thought about it for a very

1    long time and he needed to say this to me.

2        Q.  But how many times did he make the

3    statement regarding his semen?

4        A.  Once.

5        Q.  Okay.  And how many times did he

6    say that he wanted -- did he make the

7    comment regarding his bed or your bed?

8        A.  I don't recall that.  Possibly

9    more than once because --

10       Q.  Okay.

11       A.  -- in the poem he had alluded to

12    this as well.

13       Q.  Okay.  Aside from the poem, how

14    many times did he actually say this to

15    you, though, the comment about the bed?

16       A.  Once.

17       Q.  What did the poem say?

18       A.  I don't recall exactly, but

19    something about wanting to wake up with

20    you in my arms.

21       Q.  How many poems?

22       A.  There was one poem he read aloud

23    to me at work.

24       Q.  When did he read it to you?

Page 93

1      A.  I don't recall.  Sometime in

2   October of 2006.

3      Q.  Was anyone present to hear him

4   read it to you?

5      A.  No one was present.

6      Q.  Where did he read it to you?

7      A.  He had called me into his office

8   and asked me to sit down.

9      Q.  And what did he say?

10     A.  I don't recall exactly.  It was

11  along the lines of I found something that

12  captures my feelings or here's a poem that

13  represents how I feel or I can't believe I

14  have found this poem that incorporates,

15  you know, encapsulates my feelings and

16  here it is, and he proceeded to read the

17  poem.

18     Q.  Aside from what you've just said

19  about something to the effect of wanting

20  to wake up with you in my arms, what else

21  do you recall about the contents of the

22  poem?

23     A.  I don't recall.

24     Q.  How long did it take him to read

1    it?

2        A.  I don't recall, maybe three

3    minutes.

4        Q.  What did you say after he

5    finished?

6        A.  I said nothing, and I excused

7    myself.

8        Q.  Did he ever read you any other

9    poem?

10        A.  I don't believe so.

11        Q.  Did he give you any poems?

12        A.  His daughter had poems she had

13    written, and he had given us poems, other

14    people in the office.

15        Q.  Okay.  So you were not the only

16    person that received a collection of poems

17    written by his daughter?

18        A.  Correct.

19        Q.  He had given them to other people

20    in his office as well?

21        A.  Correct.

22        Q.  When did you get the collection of

23    poems by Dean Lehrer's daughter?

24        A.  I don't recall.

Page 95

1       Q.  Were you given yours at the same

2  time that the other staff -- or strike

3  that -- that the other members of the

4  office were given theirs?

5       A.  I don't believe so.

6       Q.  Why do you say that?

7       A.  I just don't believe it was around

8  the same time period.

9       Q.  Did you see Dean Lehrer give the

10  other members of the office their copy of

11  the poems by his daughter?

12       A.  I did not.

13       Q.  So how do you know they received

14  theirs at a time other than when you

15  received yours?

16       A.  They showed me they had received

17  them.

18       Q.  When did -- who is they?

19       A.  Allison received a poem from Dean

20  Lehrer.

21       Q.  When did she show you her copy?

22       A.  I don't recall.

23       Q.  Who else showed you theirs?

24       A.  I don't know -- I don't recall if

Page 96

1    it was Chris Greiner in the Academic

2    Initiatives office.

3        Q.  Okay.  Anybody else that you

4    recall showing you their copy of poems

5    written by Dean Lehrer's daughter?

6        A.  I don't recall.

7        Q.  When did Allison show you her

8    copy?

9        A.  I don't recall.

10       Q.  When she showed you hers, had you

11   received yours at that point?

12       A.  I don't recall.  I actually never

13   opened it and read it.  I didn't have time

14   for it really.

15       Q.  Did he hand it to you or was it

16   given to you in some other way?

17       A.  I believe he handed it to me.

18       Q.  Did he say something to you when

19   he gave it to you?

20       A.  I don't recall.  Probably

21   something like, I'd like you to have this.

22       Q.  Did you say anything back to him?

23       A.  I asked what it was, and he said

24   it was a collection of poems, I believe,

1    from his daughter.

2        Q.  Anything else that either one of

3    you said?

4        A.  I don't recall.

5        Q.  Where were you when he gave you

6    the poems written by his daughter?

7        A.  I believe I was in his office.

8        Q.  Okay.  Did he give you these

9    poems, this collection of poems, before or

10   after the time that he made these

11   statements that you allege are sexual

12   harassment?

13       A.  I believe it was before.

14       Q.  Do you recall how long before?

15       A.  I do not.

16       Q.  Were there any statements made by

17   Dean Lehrer before October 2006 that you

18   allege to be sexual harassment?

19       A.  He would ask me to come over and

20   -- close to him, and then he would hug me.

21       Q.  When did he ask you to come closer

22   to him and then hug you?

23       A.  I don't recall exactly.  I started

24   working in May -- well, I don't recall to

1    tell you the truth.

2        Q.  So you don't recall when that was

3    first said by him?

4        A.  I don't recall.

5        Q.  Okay.  And how many times did he

6    ask you to come close to him?

7        A.  Several times.

8        Q.  How many?

9        A.  I don't know how many.

10       Q.  Okay.  Can you give me an

11   estimate?

12       A.  More than five.

13       Q.  Okay.  Was it more than ten?

14       A.  I don't recall.

15       Q.  And when was the first time that

16   he asked you to come close to him?

17       A.  I don't recall.

18       Q.  How many times did he hug you?

19       A.  More than five.

20       Q.  Okay.  Was it more than ten?

21       A.  I don't recall.

22       Q.  When was the first time that he

23   hugged you?

24       A.  I don't recall.

Page 99

1  Q. Where were you when he hugged you

2 the first time?

3  A. I don't recall.

4  Q. Do you recall where you were at

5 any of the times that he hugged you?

6  A. I recall one time he asked me to

7 come into his office, and he asked me to

8 step over to him; and he said, Step over

9 here behind the door, and he said, I think

10 that you are terrific.  He gave me a big

11 smile and hugged me.

12  Q. Did he put both arms around you?

13  A. Yes.

14  Q. How long did the hug last?

15  A. I don't recall.

16  Q. Was anyone in the office when he

17 did this?  In his office?

18  A. No.

19  Q. Was anyone in any other part of

20 the Dean's office when this occurred?

21  A. I don't recall.

22  Q. And what did you do after he

23 hugged you?

24  A. I stepped back and felt

1    uncomfortable, and I don't remember really

2    what exactly I did.  I didn't do any

3    particular thing.

4        Q.  Did you allow him to hug you?

5        A.  I -- he kind of caught me off

6    guard.  I didn't really expect him to hug

7    me.

8        Q.  That didn't answer my question.

9    Did you allow him to hug you?

10       A.  I did not allow him to hug me.

11       Q.  Okay.

12       A.  I didn't know he was going to hug

13   me.

14       Q.  Did you pull his arms off of you

15   the moment that they touched your body?

16       A.  I don't recall.

17       Q.  Okay.  Did he say anything else to

18   you during that encounter?

19       A.  I don't recall.

20       Q.  Where was he when he asked you to

21   come into his office during this instance

22   that you've just testified to?  Was he at

23   his desk?  Was he someplace else?

24       A.  He was standing near the door.

1    Q.  Okay.  And where were you?

2    A.  I was in my office.

3    Q.  How far is your office from his

4  office?

5    A.  A good 20 yards, 10, 20 yards.

6    Q.  Okay.  How did he get your

7  attention to -- to come to his office?

8  How -- I'm sorry.  Did you hear my

9  question?

10    A.  Yes.  I don't remember if he

11  called me or if there was someone else in

12  the office that he asked to call me into

13  the office.  I don't remember.

14    Q.  But you did come to his office,

15  correct?

16    A.  Yes.

17    Q.  And when you arrived at his

18  office, you said that he was standing up,

19  correct?

20    A.  I believe he was standing up, yes.

21    Q.  Where was he in relation to the

22  door?

23    A.  He was in front of the opening of

24  the door.

Page 102

1      Q.  Okay.  So was he right in the

2   threshold of the doorway?

3      A.  He was a little off to the side,

4   on the -- on the right, I believe.

5      Q.  Okay.  And was he -- but was he in

6   the threshold or was he in front of it or

7   behind it?  And when I say threshold, do

8   you know what I mean?

9      A.  Directly underneath the door?

10     Q.  Correct.

11     A.  He was definitely within his

12  office confines.

13     Q.  All right.  And he asked you to

14  step behind the door?

15     A.  Yes.

16     Q.  Which way does the door to his

17  office open?

18     A.  It opens into his office.

19     Q.  Okay.  And if you are standing in

20  his office looking out of his office,

21  which side is the door hinged to?  If you

22  understand my question.

23     A.  I believe it's -- the door would

24  open to the left.

1    Q.  So you believe that the hinges on

2    the door are on the left side of the

3    doorway?

4    A.  The door would open coming inward

5    into the office.  I don't know about the

6    hinges.

7    Q.  Into his office?

8    A.  Yes, I believe so.

9    Q.  And would open to the left, you

10   said?

11   A.  Yes.

12   Q.  Did he shut the door after you

13   walked in or did it remain open?

14   A.  I believe it remained open.

15   Q.  Did he move the door at all when

16   you came in?

17   A.  I believe that he closed the door

18   as much as possible, but he did not close

19   the door completely.

20   Q.  Okay.  How much space remained

21   before the door would be closed

22   completely?

23   A.  I don't recall.

24   Q.  Okay.  And is it your testimony

Page 104

1    that -- strike that.

2              Was Dean Lehrer using his two

3    canes at the time that this occurred?

4        A.  I don't recall that he had two

5    canes at that time.

6        Q.  Okay.  Do you remember him ever

7    having two canes or using two canes?

8        A.  Yes, I do.

9        Q.  Okay.  Do you remember when --

10   strike that.

11             Has he used two canes, to

12   your knowledge, since the time you first

13   started working in his office?

14       A.  He did use two canes after I began

15   working in his office.

16       Q.  How long after?

17       A.  I believe he fell in October

18   of '05, so sometime in January or so of

19   '06.

20       Q.  Okay.  And from January of '06

21   until you left his office, he used two

22   canes to walk, correct?

23       A.  I don't know about that.  I don't

24   know how long he used those canes.

1    Q.  Okay.  Was he holding the canes

2  when he -- as you approached the office

3  that day that he gave you the hug?

4    A.  He was not using two canes, no.

5    Q.  Okay.  Was he using one cane?

6    A.  I believe he did have one cane.

7    Q.  Okay.  And is it your testimony --

8  strike that.

9           What happened to that cane

10  when he hugged you?

11    A.  He leaned it up against the wall

12  between the wall and the bookcase, behind

13  the door.

14    Q.  Did you say anything -- and I may

15  have asked you this question, I apologize.

16  After he hugged you, did you say anything?

17    A.  I don't recall what I said.  It

18  was uncomfortable and odd.

19    Q.  Did you say anything at all?

20    A.  I don't recall.

21    Q.  How long did you remain in his

22  office after the hug?

23    A.  I don't recall.

24    Q.  Were there other hugs from Dean

Page 106

1    Lehrer?

2        A.  Yes.

3        Q.  Okay.  And when did the next one

4    occur?

5        A.  I don't recall if there was one

6    before that or when after that.

7        Q.  How long after this hug that you

8    testified to was it before the next hug

9    occurred?

10       A.  I don't recall.

11       Q.  Do you recall where any of the

12   other hugs took place besides this one

13   that you testified to?

14       A.  He did hug me or he tried to hug

15   me after dinner one evening.

16       Q.  Okay.  When was that?

17       A.  In October of '06.

18       Q.  Where was the dinner?

19       A.  A steak house off of Rush.  I'm

20   not sure.

21       Q.  Did this dinner occur after Dean

22   Lehrer told you he wanted to have an

23   affair with you, he wanted to have your --

24   you to have his children, he wanted to

1    impregnate you, and he wanted to wake up

2    in your bed?

3        A.  No.

4        Q.  It occurred before then?  This

5    dinner occurred before those statements

6    were made?

7        A.  Yes, yes, yes.

8        Q.  Okay.  Who was at the steak house

9    with you and Dean Lehrer?

10       A.  No one besides Dean Lehrer and

11   myself.

12       Q.  What was the date of the dinner?

13       A.  October, second week of October.

14   I'm not sure.

15       Q.  How was it that you came to have

16   dinner with Dean Lehrer --

17       A.  He --

18       Q.  -- in October 2006?

19       A.  Excuse me.  He insisted that I

20   have dinner with him.

21       Q.  Okay.  What did he say to you?

22       A.  He stated that he wanted to

23   schedule some time together to have

24   dinner, and this was beginning toward the

1   end of September.  And I kept insisting

2   that I didn't have time, would it be

3   possible..., things like that, and he

4   said, I'm putting it on the calendar on

5   this date, you know, and I said, I can't

6   do that particular date.  He said, Well,

7   you know, then this date, or something.

8   So he insisted that I have dinner, so I

9   had dinner with him.  He also had dinner

10  with James MacDonald many times.  So I

11  didn't note it as anything unusual.

12      Q.  When you say insisted, what do you

13  mean that he insisted?

14      A.  I was saying I was too busy to

15  have dinner, and he was very persistent

16  that we would, in fact, have dinner.

17      Q.  Did he tell you what he wanted you

18  to have dinner with him for?

19      A.  He did not.

20      Q.  And why did you go to dinner with

21  him?

22      A.  Because he insisted that I have

23  dinner with him, and he was my boss.

24      Q.  Okay.  What did you think would

Page 109

1  happen if you told him you just couldn't

2  go to dinner, if you declined his

3  invitation?

4      A.  I did decline his invitation, and

5  he insisted that I went to dinner.

6      Q.  Did he threaten you in any way if

7  you didn't go to dinner with him?

8      A.  He did not threaten me.  He did

9  insist that I have dinner with him.

10      Q.  All right.  Did he threaten to

11  penalize you in any way at work if you did

12  not go to dinner with him?

13      A.  I believe his words were, I insist

14  that you have dinner with me.

15      Q.  Okay.  My question was whether he

16  said he would penalize you in any way at

17  work if he did not -- if you did not join

18  him for dinner?

19      A.  I don't believe he said that.

20      Q.  Okay.  What restaurant did you go

21  to?

22      A.  Pardon me?

23      Q.  What restaurant did you go to?

24      A.  We went to a steak house off of

1   Rush Street.

2        Q.  Okay.  Do you recall the name?

3        A.  I don't recall.

4        Q.  Did you meet Dean Lehrer there?

5        A.  No.  We went together in a cab.

6        Q.  Okay.  Where did you leave -- from

7   where did you leave?

8        A.  The school, I believe.

9        Q.  Had you ever been to dinner with

10  Dean Lehrer before then?

11       A.  I did have dinner with Dean Lehrer

12  at his home.

13       Q.  When?

14       A.  I don't recall when.

15       Q.  Can you give a year?

16       A.  Probably 2005.

17       Q.  What time of the year was it?

18       A.  Probably fall.

19       Q.  Who else was at that dinner?

20       A.  Jim MacDonald, Jim MacDonald's

21  wife, Allison Ratliff, Dean Lehrer's wife.

22  There were some guests that were also

23  there.

24       Q.  And what was the occasion of that

1    dinner?

2        A.  They were honoring or inviting a

3    resident artist to have dinner with them.

4        Q.  And who was that artist?

5        A.  I don't recall.

6        Q.  Other than that dinner at Dean

7    Lehrer's home, before this dinner at the

8    steak house on Rush Street, were there any

9    other occasions when you went to dinner

10   with Dean Lehrer?

11       A.  I don't recall if I -- I don't

12   recall.  I don't believe I had dinner with

13   Dean Lehrer any other time.

14       Q.  Other than the occasion you talked

15   about in which an artist-in-residence was

16   present or had been invited, were there

17   any other occasions when you were at Dean

18   Lehrer's home?

19       A.  I don't believe so.

20       Q.  Were there any occasions before

21   this dinner at the steak house when you

22   had lunch with Dean Lehrer?

23       A.  Yes.

24       Q.  Okay.  And I'm not talking about

1    meeting -- lunch meetings.  Let's exclude

2    any lunch meetings within the school or

3    with different faculty or staff.  My

4    question is with regard to -- well, let's

5    start with any meetings out of the

6    office -- I'm sorry -- any lunches out of

7    the office?

8        A.  Yes, there were meetings out of

9    the office.

10       Q.  Okay.

11       A.  In which we had meals.

12       Q.  Okay.  And it was just you and

13   Dean Lehrer?

14       A.  No.  It was myself and other

15   Columbia employees.

16       Q.  Were there any occasions when only

17   you and Dean Lehrer had lunch together?

18       A.  I don't believe so.

19       Q.  Any occasions when you socialized

20   with Dean Lehrer aside from what -- aside

21   from the dinner at his home and the steak

22   house -- and before the steak house

23   dinner?

24       A.  I don't believe so, no.

1    Q.  Let's go back to the -- the dinner

2  in October 2006 at the steak house on Rush

3  Street.  You said that the two of you

4  shared a cab to the restaurant?

5    A.  Yes.

6    Q.  Okay.  Did he say anything to you

7  in the cab?

8    A.  He did make remarks in the cab.  I

9  think he was showing me a book with a

10  drawing in it, and something about this

11  person has a long neck and is graceful,

12  very much like you, et cetera.  I believe

13  that was that evening.

14    Q.  Anything else that he said to you

15  in the cab?

16    A.  I don't recall what he said.  I

17  was shocked.

18    Q.  Did you say anything in response

19  to what he said?

20    A.  I don't recall what I said.  I'm

21  sure I said something.

22    Q.  But you have no idea what it was?

23    A.  I don't recall what it was.

24    Q.  What was discussed at the

1    restaurant?

2        A.  At the restaurant, I think he --

3    after we had ordered something to eat, he

4    came right out and said, I have to tell

5    you that I have strong feelings for you,

6    and he followed up with some other things

7    of that sort.  I don't remember exactly

8    what he said.

9        Q.  Do you remember generally what he

10   said besides, I have strong feelings for

11   you?

12       A.  I don't remember.

13       Q.  Okay.  What did you say when he

14   said, I have strong feelings for you?

15       A.  I don't remember what I said.  I

16   think I had asked something about was he

17   having problems at home or things like

18   this.

19       Q.  And what did he say?

20       A.  I don't remember.

21       Q.  So other than what you've just

22   testified to, is it your testimony that

23   you don't recall anything else that was

24   said during that dinner?

1      A.  At this time, I do not recall

2  specifically what was said at that dinner.

3      Q.  Or generally, you don't recall

4  even generally what was said, correct?

5      A.  Generally, Dean Lehrer was

6  professing that he had feelings for me.

7  That's what I can recall.

8      Q.  Okay.  How long did that dinner

9  last?

10      A.  I don't recall.

11      Q.  Did you have dessert?

12      A.  I don't recall.

13      Q.  Did you have wine?

14      A.  I don't recall.

15      Q.  Did you have any kind of cocktail?

16      A.  I don't recall.

17      Q.  Or any alcohol at all?

18      A.  I don't recall.

19      Q.  Did Dean Lehrer have any kind of

20  alcohol during that dinner?

21      A.  I don't recall.

22      Q.  Okay.  How did you leave the

23  restaurant?

24      A.  I was -- we were leaving the

Page 116

1    restaurant together, and I was going to

2    get a cab; and he said that we lived close

3    and that he would give me a ride, and I

4    said, Okay, and then we left the

5    restaurant.

6         Q.  So, he gave you a ride in a cab?

7         A.  Yes.

8         Q.  Why did you go in the cab with

9    him?

10        A.  Because he was my boss and

11   insisted that I take a cab ride from him.

12        Q.  So, it's your testimony that he

13   insisted you share a cab with him home?

14        A.  Yes.

15        Q.  What did he say?

16        A.  I insist.

17        Q.  I insist what?

18        A.  I insist that you take a cab home

19   with me.  I mean, not verbatim, but he

20   insisted.

21        Q.  Okay.  What was your concern if

22   you did not share a cab ride with him?

23        A.  It was just an entirely awkward

24   evening.  I had never been in a position

1    like that, and I don't know.  I didn't

2    really give it a whole lot of thought

3    other than trying to just get, you know,

4    get home.

5         Q.  Did Dean Lehrer threaten you in

6    any way if you didn't take a cab home with

7    -- share a cab with him?

8         A.  No.  No, he did not threaten me.

9         Q.  The cab -- did you go home first

10   or did the cab drop you off first or him?

11        A.  Me first.

12        Q.  And how long was that ride from

13   the time you left the restaurant until the

14   cab dropped you at your home?

15        A.  Perhaps, six minutes.

16        Q.  And was there conversation during

17   that time?

18        A.  Yes, there was conversation during

19   that time.

20        Q.  What was said?

21        A.  I don't recall exactly.  Something

22   about he thought I was terrific and

23   wonderful and things of that nature.

24        Q.  Anything else that you can

Page 118

1    remember?

2        A.  No.

3        Q.  Did he touch you at all at any

4    point during that evening?

5        A.  Yes, he did touch me.

6        Q.  When did he touch you?

7        A.  After that cab ride.

8        Q.  The cab ride home?

9        A.  Yes.

10       Q.  Okay.  And what was the physical

11   contact?

12       A.  He embraced me and told me that he

13   wanted to have an affair with me.

14       Q.  Okay.  He embraced you in the cab

15   or did he get out of the cab?

16       A.  He got out of the cab and said he

17   wanted to see my apartment.

18       Q.  Okay.  When was the embrace?

19       A.  In my apartment.

20       Q.  So you let him into your

21   apartment?

22       A.  I had just purchased a new

23   apartment, and he said he wanted to see

24   the new apartment.  And I said, I would be

Page 119

1    watching the baseball game, the World

2    Series, Detroit, and he said that he -- I

3    don't remember what he said, but, yes, I

4    allowed him in my apartment.

5        Q.  When was the embrace?

6        A.  When was the embrace?  Later that

7    evening.  I'm not sure.

8        Q.  So, did he hug you when you got

9    out of the cab at your apartment?

10       A.  I don't recall.

11       Q.  He was using his two canes at the

12   time?

13       A.  I don't think he was, no.

14       Q.  Was he using one cane at the time?

15       A.  I believe he was using one cane.

16       Q.  Okay.  If the testimony indicated

17   that he was using two canes that night,

18   would you have any basis to dispute it?

19       A.  I can't recall.  I don't remember.

20   I don't know.

21       Q.  So your answer would be, no?

22       A.  I don't recall.  Yeah, I don't

23   know.

24       Q.  Is your apartment on the first --

Page 120

1    street level?

2        A.  No.

3        Q.  Okay.  How many stories up is your

4    apartment?

5        A.  Ten stories.

6        Q.  And there's an elevator, I assume?

7        A.  Yes.

8        Q.  How many who -- -- strike that.

9             Did you have a boyfriend at

10   the time -- as of the night that you had

11   this dinner at the steak house with Dean

12   Lehrer?

13       A.  What would that have to do with

14   it?

15       Q.  I'm just asking the question.

16       A.  I don't recall.

17       Q.  You don't remember if you were

18   dating anyone at that time?

19       A.  I don't recall if I was dating

20   anyone at that time.

21       Q.  So, you might have been.  You just

22   don't remember?

23       A.  I don't recall if I had a

24   boyfriend at that time.

Page 121

1     Q.  Did you have a boyfriend at any

2  time while you were working in the Dean's

3  office?

4     A.  I don't recall.

5     Q.  So for the period from May 2005

6  until October of 2006, it's your testimony

7  that you don't recall whether you had a

8  boyfriend at any point during that time?

9     A.  I do not recall if I had a

10  boyfriend at any point during that time.

11     Q.  What happened when you -- after

12  you let Dean Lehrer into your apartment

13  that night?

14     A.  I believe I turned on the baseball

15  game and watched the baseball game, took

16  off my coat, sat on the couch.

17     Q.  The baseball game was on T.V., I

18  assume, correct?

19     A.  Yes.

20     Q.  Okay.  Where was the television

21  that you were watching it on?

22     A.  In my living area.

23     Q.  Okay.  And that's -- where did you

24  sit while you were watching the game?

Page 122

1      A.  On the couch.

2      Q.  Where was Dean Lehrer during this

3  time?

4      A.  I believe -- I believe he sat on

5  the couch as well.

6      Q.  What time did you get to your

7  apartment?

8      A.  I don't recall.

9      Q.  Do you remember at what point the

10  baseball game was at the time that you

11  turned on the television?

12      A.  I don't recall.

13      Q.  And who was playing?

14      A.  The Detroit Tigers were playing.

15      Q.  And who were they playing?  Do you

16  remember who their opponent was?

17      A.  I don't remember who it was.

18      Q.  Where did Dean Lehrer -- strike

19  that.

20          Did Dean Lehrer sit down

21  while you were in his -- he was in your

22  apartment?

23      A.  Yes.  He did sit down on the

24  couch.

Page 123

1    Q.  On the same couch that you were

2  sitting on?

3    A.  Yes.  I have one couch.

4    Q.  And was there any conversation

5  between the two of you while you were in

6  your apartment with him?

7    A.  Conversation about the baseball

8  game for sure, and then Leonard talked

9  about there was something he must tell me.

10  And I think he went on to say that he had

11  given it some thought and that he had felt

12  it was unbelievable, but that he had

13  feelings for me and that he wanted to have

14  an affair and that he can't control

15  himself and he went on about wanting to

16  wake up in my bed, extracting semen from

17  himself, wanting me to bear his children,

18  and then -- whatever else, things like

19  that.

20    Q.  Was there anything else that --

21  that he said?

22    A.  He said he'd like me to model for

23  him.  He wanted to draw me in the nude.

24  He also said that if I would work with

Page 124

1  him, he could really get my work up to

2  par.  I think that was a lot of it.

3      Q.  And so this was the occasion, you

4  testified a little while ago, this was the

5  occasion in October 2006 when he made

6  these statements, correct?

7      A.  I believe so, yes.

8      Q.  Okay.  Was anyone else in the

9  apartment at the time?

10     A.  No, no one was in the apartment at

11  the time.

12     Q.  What did you say after he said all

13  these things?

14     A.  I said, Well, that's not going to

15  happen, and I think he -- I don't remember

16  the sequence of events, but he tried to

17  hug me and kiss me, and then I pushed him

18  away and said something about that wasn't

19  going to happen.  And he sat there for a

20  few minutes, and I think he excused

21  himself and went home.

22     Q.  Was he able to hug you?

23     A.  He put his arms around me and held

24  me, trying to kiss me, and I pushed him

1    away.

2         Q.  Did you -- go ahead.  You were

3    going to say something?

4         A.  I believe also that evening he had

5    said that his wife would be going away and

6    -- for the holidays and could we schedule

7    some time together and some other forward

8    planning he had wanted to put down.

9         Q.  Okay.  Have you seen the contents

10   of your personnel file?

11        A.  Yes, I have.

12        Q.  When was the last time that you

13   looked at anything that came out of your

14   -- had been in your personnel file?

15        A.  Sometime after I was terminated.

16        Q.  Okay.  Have you reviewed any

17   documents -- you testified a moment ago

18   that you reviewed your complaint before

19   coming here, correct?

20        A.  Yes.

21        Q.  And when did you review your

22   complaint?

23        A.  Yesterday.

24        Q.  And have you reviewed any

Page 126

1    documents besides that complaint?

2        A.  No.

3        Q.  Since leaving -- strike that.

4              You testified that you

5    reviewed some documents from your

6    personnel file after leaving Columbia

7    College?

8        A.  Yes.  I was instructed to get my

9    documents, from my attorney, from

10   Columbia.

11       Q.  When was the last time that you

12   looked -- strike that.

13              Aside from the complaint that

14   was filed in this case, when is the last

15   time that you looked at any document that

16   pertained to this case?

17       A.  Any document that pertained to

18   this case or any document that was in my

19   personnel file?

20       Q.  Let's include all because -- I'll

21   include your personnel documents as

22   documents that pertain to this case.

23   What's the most recent occasion when you

24   looked at either documents generated for

Page 127

1   this case or documents from your personnel

2   file?

3        A.  Yesterday I looked at the

4   complaint for this case.

5        Q.  Aside from that, when was the most

6   recent occasion you looked at either

7   documents from your personnel file or

8   documents generated for this case?

9        A.  Each and every time I was given

10  documents to review for this case.  I

11  don't recall exactly.

12       Q.  Would it have been within the last

13  couple of weeks?

14       A.  I don't recall.  It could be a

15  month ago.

16       Q.  Okay.  And what was -- what was or

17  were those documents that you reviewed?

18       A.  The document to have this

19  deposition.

20       Q.  Okay.  Anything else?

21       A.  I don't recall.  That's all I

22  remember.

23       Q.  So, there may have been other

24  documents you reviewed at that time, you

Page 128

1    just don't remember?

2        A.  I believe that that was the most

3    recent document I reviewed, was the

4    deposition.

5        Q.  The deposition notice?

6        A.  Yes.

7        Q.  Okay.  But were there other

8    documents you reviewed at that time as

9    well?  You just don't recall which ones

10   they were?

11       A.  No.  I believe that was the most

12   recent document.

13       Q.  Okay.  Have you seen notes that

14   Patricia Olalde made regarding her

15   discussions with you about your

16   allegations?

17       A.  If they were in my personnel file,

18   I would have reviewed them.

19       Q.  When was the last time you

20   reviewed those notes?

21       A.  It would have been immediately

22   after I received those documents.

23       Q.  Which was when?

24       A.  I believe it was in November

Page 129

1   of '07.

2       Q.  Is that the only time you reviewed

3   them?

4       A.  I don't recall.

5       Q.  All right.  Let's go back.  You

6   said that Dean Lehrer left your apartment,

7   correct?

8       A.  Yes.

9       Q.  Okay.  Do you know where -- you've

10  been to Dean Lehrer's home, correct?

11      A.  Yes.  I testified that I had been

12  to his home prior to that.

13      Q.  Okay.  And where -- when you were

14  at his home, where was he living at that

15  time?

16      A.  He was living on Belmont and

17  Melrose, I believe.

18      Q.  Okay.  To your knowledge, was he

19  living at the same location the night that

20  you went to dinner with him at the steak

21  house?

22      A.  Yes.

23      Q.  Do you know how he got home the

24  night he left your apartment?

Page 130

1      A.  I do not know how he got home.

2      Q.  Let's back up a minute.  You said

3  -- let me ask you.  You said that Dean

4  Lehrer tried to -- that he hugged you.  He

5  actually did hug you on the couch,

6  correct?

7      A.  He put his arms around me and

8  tried to kiss me.

9      Q.  And where were you each in

10  relation to each other on the couch at the

11  time that that happened?

12      A.  We were sitting beside each other,

13  but not touching each other.

14      Q.  How much space was between you and

15  Dean Lehrer on the couch?

16      A.  I don't recall.  There was space

17  between us.  There was less than 2 feet of

18  space between us.

19      Q.  Does this couch have cushions?

20      A.  Yes, it has cushions on the couch.

21      Q.  Okay.  And I know some couches --

22  because I was shopping awhile back -- but

23  some have seat cushions -- two seat

24  cushions, some have three seat cushions,

Page 131

1    some are just like a bench.  What was the

2    cushion configuration on that couch?

3        A.  I don't recall.  I no longer have

4    the couch.

5        Q.  Which direction were you facing

6    when he hugged you?

7        A.  I was facing forward (indicating),

8    toward the television.

9        Q.  Could you see him out of your

10   peripheral vision?

11       A.  Yes.

12       Q.  Your back wasn't toward him,

13   correct?

14       A.  No, my back was not toward him.

15       Q.  Okay.  Which -- as you were facing

16   the television, which side of your body

17   was he seated on?

18       A.  The right side of my body.

19       Q.  Okay.  So you were able to see him

20   coming towards you, I assume, as he

21   approached you to hug you, if there was

22   space between you on the couch, correct?

23       A.  I could see him.  I did not see

24   him and know that he was going to hug me.

Page 132

1    Q.  Okay.  Why didn't you stop him

2    before he got his arms all the way around

3    your body?

4    A.  I don't recall.  Probably, because

5    I was engaged with the baseball game.

6    Q.  Okay.  And is it your testimony

7    that he got both arms around your body?

8    A.  I don't recall.

9    Q.  Where were -- let's assume if --

10   if it was both arms, which part of your

11   body were they around?  Was it the upper

12   part of your body?  Was it around your

13   waist or someplace else?

14   A.  I don't recall.

15   Q.  How long did he have his arms

16   around your body, or arm?

17   A.  I pushed him off fairly quickly,

18   so not that long.

19   Q.  Can you -- was it a matter of

20   seconds?

21   A.  It was probably ten seconds.  I'm

22   guessing.

23   Q.  So it's your testimony that he had

24   at least one arm around you for ten full

1    seconds?

2        A.  No.  I would say it was less than

3    ten seconds.

4        Q.  Okay.  And he kissed you?

5        A.  He tried to kiss me.

6        Q.  But he was unsuccessful?

7        A.  I don't recall.

8        Q.  Well, did he kiss you?

9        A.  I don't recall.

10       Q.  All right.  How do you know he was

11   trying to kiss you?

12       A.  Because he had puckered his lips

13   and put them toward my face.

14       Q.  And what stopped him from making

15   contact?

16       A.  I pushed him away with both my

17   hands.

18       Q.  When you pushed him, how hard did

19   you push?  Did he fall backwards?

20       A.  He did not fall backwards.

21       Q.  How soon after you pushed him away

22   did he stand up?

23       A.  I don't recall exactly.  It was

24   probably five minutes or less.

Page 134

1    Q.  Where were his canes at the time

2    that he was sitting next to you on the

3    couch?

4    A.  Near the couch.  I don't know

5    exactly where they were.

6    Q.  And did he take them with him when

7    he left?

8    A.  I believe he would have taken them

9    with him, yes.  They were not in my

10   apartment.

11   Q.  You never found any of his canes

12   in your apartment, correct?

13   A.  I did not find a cane in my

14   apartment.

15   Q.  Okay.  You referenced this --

16        MS. KAY:  It's about 12:45.  Is it

17   all right with you if I go maybe another

18   15, 20 minutes, and then let's take a

19   break for lunch?

20        MR. LEE: Sure.

21   BY MS. KAY:

22   Q.  You referenced this dinner as one

23   of the occasions when Dean Lehrer hugged

24   you, correct?

Page 135

1        A.  Yes.

2        Q.  Okay.  Are there any other

3    occasions that you remember, sitting here

4    today, when he hugged you?

5        A.  There are occasions that he hugged

6    me.  I don't recall when they were

7    exactly.

8        Q.  Where were they?  Where did they

9    occur?

10        A.  I don't recall.

11        Q.  So aside from the hug that took

12    place in his office and the hug that took

13    place in your apartment, you can't tell me

14    anything about any other hugs that

15    occurred between you and Dean Lehrer,

16    correct?

17        A.  He did hug me, and I don't recall

18    exactly when and where.

19        Q.  Did you ever ask Dean Lehrer not

20    to hug you?

21        A.  I don't recall if I did or not.

22        Q.  Did you ever tell him you did not

23    want to be -- did you ever tell him not to

24    hug you?

Page 136

1      A.  I did tell him that we should not

2   be sitting in the office with the door

3   closed, together, alone.

4      Q.  But did you ever tell him not to

5   hug you?

6      A.  I don't recall.  I don't think I

7   did, no.

8      Q.  What brought about your comment to

9   him that you shouldn't be sitting in the

10  office alone with him?

11     A.  There was a sexual harassment

12  information meeting, and that was one of

13  the things.  He asked me how the meeting

14  went, and I said, Well, actually, you

15  know, it's suggested that we don't sit in

16  the office with the door closed.

17     Q.  When was the -- was this the

18  sexual harassment training that you

19  attended?

20     A.  Yes.

21     Q.  When was that training?

22     A.  I believe it was February of '06

23  or something.

24     Q.  Okay.  And Dean Lehrer asked you

1    how it went?

2         A.  Yes.

3         Q.  How long after the training did he

4    ask you this question?

5         A.  Probably upon my return to the

6    office.

7         Q.  Were there any other discussions

8    you had with him regarding the sexual

9    harassment training?

10        A.  There were discussions that we

11   were all expected to attend the sexual

12   harassment training; meaning, all the

13   employees of Columbia, and that, you know,

14   the Human Resources office had asked the

15   Dean's office to coordinate, to have

16   people attend, and schedule them, and be

17   sure that it happens.  So we had

18   conversations about that.

19        Q.  Okay.  But, substantively, were

20   there any conversations you had with him

21   regarding the training other than what you

22   just told me about your comment to him?

23        A.  No.

24        Q.  Okay.  Did you ever initiate a hug

Page 138

1    with Dean Lehrer yourself?

2        A.  Yes.

3        Q.  Okay.  On how many occasions did

4    you initiate a hug with him?

5        A.  I don't recall.

6        Q.  Was it more than once?

7        A.  Yes.

8        Q.  Was it more than five times?

9        A.  I don't recall.

10       Q.  So it's possible it was more than

11   five times.  You just don't remember?

12       A.  I don't recall.

13       Q.  Okay.  Where were you when you

14   initiated these hugs?  And you can tell me

15   if it was more than one location.

16       A.  I did hug him goodbye after I

17   walked him downstairs when his wife was

18   picking him up.

19       Q.  Downstairs at the college?

20       A.  Yes.

21       Q.  Any other locations that you

22   recall?

23       A.  I don't recall.

24       Q.  Did you ever initiate a kiss with

Page 139

1     Dean Lehrer, as in a kiss hello or

2     goodbye?

3        A.  Yes.

4        Q.  Okay.  And on -- were those kisses

5     -- well, let me ask you this:  Was it more

6     than one occasion when you initiated a

7     kiss?

8        A.  A kiss on the cheek to say

9     goodbye, feel better at the hospital, yes.

10        Q.  How many occasions were there when

11     you kissed him on the cheek?

12        A.  Probably more than -- more than

13     three times.

14        Q.  Okay.  More than ten times over

15     the course of your entire work in the

16     department?

17        A.  I don't know.  I have no idea.

18        Q.  Did you ever kiss him on the

19     mouth?

20        A.  I don't know.  I don't recall.

21        Q.  Did he make any statement --

22     before October 2006, was there any

23     statement made by Dean Lehrer to you which

24     you found to be offensive?

Page 140

1      A.  I'm sorry.  Could you repeat that?

2      Q.  Sure.  You testified about these

3   comments that Dean Lehrer made in October

4   of 2006, and what I'm asking is whether

5   there were any other comments made by Dean

6   Lehrer that predate this collection of

7   comments you've testified to from

8   October 2006?

9      A.  I felt he was excessively

10  complimentary saying, I was terrific, I

11  think you're just wonderful, I enjoy

12  seeing you every day.  Those are the only

13  things that come to mind.

14     Q.  Okay.  Were there any attempts at

15  physical contact by Dean Lehrer other than

16  what you've testified to?

17     A.  There were -- there were occasions

18  that he would ask me to come into his

19  office that were not necessarily he was

20  trying to hug me, but he often had me come

21  into his office to be there, and it didn't

22  seem like it was very important, sort of

23  spending time in his office.

24     Q.  But was there physical contact

Page 141

1    aside from what you've already testified

2    to?

3        A.  There may have been.  I don't

4    recall.

5        Q.  Did you ever hear him compliment

6    any other members of his staff?

7        A.  I believe so, yes.

8        Q.  Okay.  Who else did he compliment?

9        A.  I believe Allison.

10       Q.  Okay.  Anyone else?

11       A.  I don't think so.  Not that I can

12   recall.

13       Q.  What did he say to Allison?

14       A.  That he thought she was terrific.

15       Q.  Anything else?

16       A.  I don't think so.

17        MS. KAY:  All right.  Why don't we

18   take a break now, if that works for

19   everybody?

20        MR. LEE: Sure.

21            (A luncheon recess was

22             taken.)

23        MS. KAY:  Back on the record.

24

Page 142

1    BY MS. KAY:

2        Q.  Ms. Lewandowski, you understand

3    you're still under oath, correct?

4        A.  Correct.

5        Q.  Okay.  You first complained to

6    Patricia Olalde in the Human Resources

7    department about Dean Lehrer's conduct on

8    October 11, 2006, correct?

9        A.  Yes.

10       Q.  Okay.  Were -- had you reported

11   his conduct to anyone at Columbia before

12   that date?

13       A.  No.

14       Q.  Tell me what you did on

15   October 11th.

16       A.  I went to the Human Resources

17   department, asked if Patricia had a

18   moment, and let her know that -- along the

19   lines of I had an issue or I believe that

20   Leonard had crossed the line and --

21       Q.  Okay.  You told -- I'm sorry.  Go

22   ahead.

23       A.  And she asked me to sit down real

24   quick and talk about it, I believe, and

Page 143

1  upon leaving that meeting, she suggested

2  that I tell him to stop as soon as

3  possible.

4      Q.  You told her he was being -- you

5  wanted her advice on his being too

6  friendly; is that right?

7      A.  I -- I told him -- I believe I

8  told her that he was, you know, being

9  overly friendly or something like that.

10     Q.  Okay.

11     A.  I believe she asked me what

12  happened.  I gave her some examples, and

13  then she told me to tell him to stop.

14     Q.  Was there anything that you told

15  her that he did in addition to what you've

16  already told us that he did?

17     A.  There may have been.  I don't

18  recall.

19     Q.  Okay.  And she -- her advice to

20  you was to -- what she said to you was

21  that you should tell him to stop?

22     A.  Yes.

23     Q.  Okay.  How did you know to go to

24  see Patricia Olalde with this problem?

Page 144

1      A.  It was harassment, sexual

2   harassment, and we were instructed to go

3   to HR with any complaints.

4      Q.  Why -- you told Patricia Olalde

5   that you hadn't yet told Dean Lehrer to --

6   that his conduct was unwelcome; is that

7   correct?

8      A.  I had told him that evening prior,

9   the hopes that he had weren't going to

10  happen.

11     Q.  Okay.  But you did not tell him to

12  stop talking that way, correct?

13     A.  I did not say those words to him.

14     Q.  Okay.  You told him that these

15  things he suggested were not going to

16  happen?

17     A.  Yes.

18     Q.  Okay.  The meeting you had with

19  her on October 11th, during that meeting,

20  the conduct that you reported was the

21  conduct from the day before, correct, on

22  October 10th?

23     A.  Correct.

24     Q.  Okay.  And was that the night that

Page 145

1    you went out to dinner with Dean Lehrer

2    and then he came to your apartment?

3        A.  I don't remember to tell you the

4    truth.

5        Q.  Okay.  Do you recall how much time

6    passed -- but the -- strike that.

7            Do you recall how much time

8    passed between that night when you had

9    dinner at the steak house and he was at

10   your house, between then and your report

11   to Patricia Olalde on October 11th?

12       A.  It all occurred within a matter of

13   a couple days.

14       Q.  Okay.  So if I told you that the

15   records indicate that you had dinner with

16   Dean Lehrer on October 10th and then made

17   your first report to Patricia Olalde on

18   October 11th, would you have any reason to

19   disagree with that?

20       A.  No.

21       Q.  The fact that -- the night of

22   October 11th you went out to dinner with

23   Dean Lehrer again; isn't that correct?

24       A.  Dean Lehrer wanted to have dinner

Page 146

1    two nights, definitely.  He wanted to have

2    dinner prior to that.  I believe what

3    happened was he had -- one night he -- we

4    had gone to dinner, and on another night

5    he had brought dinner to my apartment.

6         Q.  So the dinner the night of the

7    11th was the night that he brought dinner

8    to your apartment?

9         A.  I don't remember which -- the

10   sequence of events.

11        Q.  This dinner when he brought the

12   food to your apartment, that occurred

13   after your first discussion with Patricia

14   Olalde, though, correct?

15        A.  I don't know.  I mean, it was one

16   of the two nights.  They're either

17   reversed or --

18        Q.  Okay.

19        A.  They were sequential.

20        Q.  So there was a dinner before your

21   first report to her and then a dinner

22   after your first report to her, correct?

23        A.  There was -- Leonard had brought

24   me -- myself something to eat.  He did not

Page 147

1    eat one night, and then one night we had

2    gone to dinner.

3        Q.  Okay.  My question would still be

4    the same.  I'll --

5        A.  Yes.

6        Q.  Since you qualified it a little

7    bit, one of those nights he didn't eat.

8    He just brought you food?

9        A.  Right.

10       Q.  So one of -- let's call those the

11   two meal nights.

12       A.  Yeah, right.

13       Q.  One meal night took place before

14   your report on October 11th, and one meal

15   night took place --

16       A.  After.

17       Q.  -- after you reported to Patricia

18   Olalde?

19       A.  Yes.

20       Q.  Why -- why don't you explain the

21   circumstances of how it was that Dean

22   Lehrer brought you dinner?

23       A.  He had wanted to have dinner.

24       Q.  When did he tell you he wanted to

Page 148

1    have dinner?

2        A.  In September, he was planning to

3    try and have dinner at the time -- later I

4    found out that his wife was away at a

5    particular time in October, which he was

6    trying to schedule.

7        Q.  So you had just had dinner with

8    him on October 10th, correct?

9        A.  I don't know if he had brought

10   dinner on that night or it was the

11   following night.

12       Q.  Okay.  All right.  But you had had

13   this -- there was a dinner meal on

14   October 10th, correct?

15       A.  Yes.

16       Q.  Did you know which days his wife

17   was out of town?

18       A.  I did not know that she was out of

19   town whatsoever.

20       Q.  Okay.  So I interrupted you.  You

21   said that he had wanted to have dinner.

22   How was it that he came to bring you

23   dinner?

24       A.  He had another meeting scheduled

Page 149

1    with the Provost and some other people,

2    and I had other things going, either a

3    class or a lab work or something.  I was

4    in graduate school at the same time, and I

5    said, It wasn't possible.  You know, he

6    said, Well, I would leave early and bring

7    you something from the restaurant.  I

8    said, Well, I'm going to be watching the

9    baseball game, likely if it was that day,

10   and, you know, those are my plans.  And so

11   I agreed to it, and then he -- he may have

12   -- he may have called me.  I may have been

13   working in the office later, and he

14   suggested that, if I remember correctly,

15   that he pick me up in a cab and bring

16   dinner and then we'd go to my apartment.

17   I believe that's how it went.

18       Q.  And is that how it actually went?

19       A.  I believe that's how it went.

20       Q.  So where were you when he picked

21   you up in the cab?

22       A.  I believe I was at work in the

23   office.

24       Q.  And he was coming from a

Page 150

1    restaurant?

2        A.  Yes.

3        Q.  Where he was at a work function?

4        A.  Yes.

5        Q.  And what time of the night did he

6    pick you up?

7        A.  Maybe 8:00 o'clock.

8        Q.  You had already at this point,

9    though, complained to Patricia Olalde

10   about what he said to you the previous

11   night at dinner, correct?

12       A.  Correct.

13       Q.  And so why did you agree and she

14   told -- strike that.

15              Her advice to you or her

16   question to you was whether you had told

17   him --

18       A.  Right.

19       Q.  -- that you didn't want that

20   conduct, correct?

21       A.  Correct.

22       Q.  So why did you, in spite of that,

23   agree to let him come pick you up and

24   bring you dinner and take you to your

1    apartment?

2        A.  So that I could let him know that,

3    you know, I didn't want that conduct and

4    he would have to stop.  I didn't have an

5    opportunity that entire day to myself.

6        Q.  Would it not have been possible

7    for you to see him and communicate that

8    message somewhere on campus at any point?

9        A.  It wasn't possible.

10       Q.  The following day even?

11       A.  It wasn't possible.

12       Q.  Why couldn't you have seen him the

13   day of October 12th to communicate that

14   message?

15       A.  I don't -- I wanted, you know, to

16   tell him the first opportunity that I

17   could.

18       Q.  And why was it necessary to tell

19   him that in your apartment?

20       A.  I don't think I told him that in

21   my apartment.  I believe that he brought

22   me dinner the night before, and that we

23   had dinner at the steak house the

24   following day; and in the public steak

Page 152

1    house is where I told him that I didn't

2    want -- or he had to stop acting or saying

3    these things.

4        Q.  How many times was he at your

5    apartment?

6        A.  I believe twice, once or twice.

7        Q.  And after meeting with Patricia

8    Olalde the first time to report Dean

9    Lehrer's conduct, did one of his -- strike

10   that -- one of Dean Lehrer's apartment

11   visits occur after that report to Patricia

12   on October 11th?  If the records indicate

13   that that was the case, would you have any

14   reason to dispute the records?

15       A.  If the records -- I'd have to

16   check the records.  I don't know.  I'd

17   have to check my notes as far as sequence

18   of times.

19       Q.  Do you have notes that have not

20   been produced to your attorney?

21       A.  No.

22       Q.  Okay.  So all of your notes

23   regarding -- strike that.

24              What notes are you referring

Page 153

1   to?

2       A.  The notes that I provided my

3   attorney.

4       Q.  Okay.  And what is in those notes?

5       A.  The sequence of events that had

6   happened in October.

7       Q.  Okay.  When did you generate those

8   notes?

9       A.  Right away, after things had

10  happened.

11      Q.  You generated -- you wrote them in

12  October 2006?

13      A.  I believe shortly after that, yes.

14      Q.  Are they handwritten?

15      A.  No.

16      Q.  Are they typed?

17      A.  Yes.

18      Q.  Where did you type them?

19      A.  On a computer.  I don't recall.

20  At home, perhaps.

21      Q.  How many pages are there?

22      A.  I'm not sure.

23      Q.  Do you have any reason to believe

24  that your notes would contradict Patricia

Page 154

1    Olalde's notes which indicate that you

2    spoke to her during the day on

3    October 11th, and then later that evening

4    on October 11th accepted a dinner

5    invitation from Dean Lehrer?

6        A.  I would not -- I -- I agree to

7    that.

8        Q.  Okay.  I'm still going back,

9    though.  So your intention in agreeing to

10   dinner again -- strike that.

11           Did you attempt to schedule

12   an appointment with Dean Lehrer during the

13   day on October 12th or 13th or at any

14   point after that to communicate to him

15   that you did not welcome his conduct?

16       A.  Dean Lehrer -- I did not attempt

17   an appointment for a meeting that day, no.

18       Q.  So he picked you up at the school,

19   correct?

20       A.  Yes.

21       Q.  In a cab?

22       A.  Yes.

23       Q.  And you traveled together to your

24   apartment?

1    A.  Yes, I believe so.  I -- I don't

2    remember, but I believe that's what

3    happened, yes.

4    Q.  How long was the ride from school

5    to your apartment?

6    A.  12 minutes.

7    Q.  Okay.  And what was said during

8    that ride?

9    A.  I don't remember.

10    Q.  What happened -- the cab took you,

11    I assume, to your apartment, correct?

12    A.  Yes.

13    Q.  Okay.  And did both of you go into

14    your apartment?

15    A.  Yes.

16    Q.  Was anyone there at the time?

17    A.  No.

18    Q.  Okay.  What happened in your

19    apartment?

20    A.  I ate the food that he brought,

21    and I don't remember much else.

22    Q.  Do you remember anything that --

23    strike that.

24              Did you say anything to Dean

Page 156

1    Lehrer in your apartment?

2        A.   I don't remember.

3        Q.   Did he say anything to you?

4        A.   I don't remember.  It really seems

5    like he brought dinner the night before,

6    and then we went to dinner the second

7    night, is what seems to be in my memory.

8        Q.   Okay.

9        A.   You know what I'm saying?

10       Q.   So when was it -- you gave a lot

11   of testimony.  We talked a long time about

12   your watching T.V. and being on the couch

13   with him and that he hugged you.  When did

14   that happen -- that happened in your

15   apartment, correct?

16       A.   Yes, that did happen in my

17   apartment.

18       Q.   Okay.  So, is it your testimony

19   now that that encounter happened after you

20   spoke to Patricia Olalde during the day on

21   October 11th?

22       A.   No.  That happened before, I

23   believe --

24       Q.   Okay.

Page 157

1      A.  -- I spoke to Patricia Olalde.

2      Q.  When was it -- you testified a

3   moment ago that there were two times that

4   Dean Lehrer was in your apartment,

5   correct?

6      A.  Yes.

7      Q.  Okay.  What was the second

8   occasion then?

9      A.  He had brought food in one

10  evening, and the second evening he came up

11  to my apartment to watch the baseball game

12  after we had eaten at the steak house.

13     Q.  Okay.  And the time when he came

14  to watch the game after dinner at the

15  steak house, was that before or after your

16  first report to Patricia?

17     A.  That's what I'm not clear about.

18     Q.  Okay.  Did you ever communicate to

19  Dean Lehrer that his conduct was

20  unwelcome?

21     A.  Yes.

22     Q.  When?

23     A.  I believe at dinner we -- he -- he

24  was talking about how he had wanted to be

Page 158

1    with me or something, and I said that he

2    would have to stop because he could get us

3    both in trouble, which is what Patricia

4    had suggested I say to him.

5        Q.  Okay.  Did he respond in any way?

6        A.  He did respond saying that he

7    couldn't control himself, he couldn't help

8    himself, and that he, you know, would

9    continue to make advances.

10       Q.  And then you went to your

11   apartment with him?

12       A.  I did not intend to go to my

13   apartment with him.

14       Q.  You got into a cab with him,

15   correct?

16       A.  He insisted that I get into the

17   cab with him.

18       Q.  Right.  We already talked about

19   that.

20       A.  Yes.

21       Q.  So, he told you that he couldn't

22   control himself and that the advances

23   would continue and you voluntarily got

24   into a cab with him after dinner, correct?

1     A.  The advances continued.

2     Q.  Okay.  But he told you during that

3  dinner that he could not control himself,

4  and this was after you asked him or --

5  strike that -- after you told him his

6  conduct was unwelcome, correct?

7     A.  Correct.

8     Q.  He said he could not control

9  himself, correct?

10     A.  Yes.

11     Q.  And then after dinner, you got

12  into a cab with the man, correct?

13     A.  Yes.

14     Q.  With the understanding that he

15  would take you in the cab to your house,

16  correct?

17     A.  That he would drop me off at my

18  house, yes.

19     Q.  But then you permitted him to go

20  into your house, correct?

21     A.  Yes.

22     Q.  When you -- after your meeting

23  with Patricia on October 11th, she

24  e-mailed you the next day to follow up,

Page 160

1    correct?

2        A.  Correct.

3        Q.  And she was checking in with you

4    to find out how things were going?

5        A.  Yes.

6        Q.  She was aware that you were going

7    to have dinner with Dean Lehrer that night

8    before?

9        A.  Yes.

10       Q.  What did you tell Patricia about

11   how things were going or how things went?

12       A.  I just said that it didn't go

13   well.

14       Q.  Anything else?

15       A.  And that he did not stop.

16       Q.  Okay.  Anything else?

17       A.  I don't recall anything else.

18       Q.  You -- do you recall talking to

19   Jim MacDonald on October 14th telling him

20   that Dean Lehrer had been too friendly?

21       A.  Yes.

22       Q.  What did you say, if anything, in

23   addition to that?

24       A.  I said that I had been not feeling

Page 161

1   well due to Dean Lehrer being what I

2   thought was, you know, friendly, and then

3   he said, Sit down, and, you know, what's

4   going on and tell me what happened; and I

5   said that I had already talked with HR

6   about it, and, you know, I was talking to

7   them about it.  And then he asked me what

8   had happened, and I told him some things.

9   Then he went on to tell me a story about

10  something similar in another department,

11  and then he suggested that I call his wife

12  who was an attorney if I needed someone to

13  talk to and gave me her number.

14      Q.  The suggestion that you talk to

15  his wife was his?

16      A.  Yes.

17      Q.  Where was this meeting that you

18  had with Mr. MacDonald?

19      A.  It was in our offices.  It's in

20  the Dean's office suite.

21      Q.  And what day of the week did that

22  take place?

23      A.  It was a Saturday.

24      Q.  Was anyone else in the office?

Page 162

1        A.  No.

2        Q.  How long did your meeting last

3    with him?

4        A.  I don't know, 20 minutes maybe.

5        Q.  Did he tell you -- strike that.

6             Your testimony is that he

7    offered his wife's phone number to you,

8    correct?

9        A.  Yes.

10       Q.  And did you take it?

11       A.  Yes.

12       Q.  Did you ever call him or call her?

13       A.  Yes.

14       Q.  What's her name?

15       A.  I can't recall what her name is.

16       Q.  When did you call her?

17       A.  I think I tried her within a few

18   days.

19       Q.  And did you actually speak to her?

20       A.  I finally did speak with her.

21       Q.  What did you tell her?

22       MR. LEE:  Objection,

23   attorney-client privilege.  Don't answer

24   that.

Page 163

```
 1   BY MS. KAY:

 2       Q.  Did you retain her as your

 3   attorney?

 4       A.  No, I did not.

 5           MR. LEE:  You can answer that.

 6           THE WITNESS:  No.

 7   BY MS. KAY:

 8       Q.  How many conversations did you

 9   have with her?

10       A.  I believe one conversation.

11       Q.  Just over the telephone?

12       A.  Yes.

13       Q.  Did you ever meet with her in

14   person?

15       A.  No.

16       Q.  I'm sorry.  I might have asked

17   this before.  How long was your

18   conversation with Jim MacDonald on that

19   Saturday?

20       A.  I believe it was around 20

21   minutes.

22       Q.  Is it -- you told Jim MacDonald

23   that you did not want to embarrass the

24   Dean and did not want to move forward,
```

Page 164

1    correct?

2        A.  I told Jim MacDonald I wasn't sure

3    what I was going to do.

4        Q.  So you deny telling him that you

5    did not want to move forward because you

6    did not want to embarrass Dean Lehrer?

7        A.  I told him I wasn't sure what I

8    was going to do.  I may have -- I don't

9    know that I -- I don't recall that.

10       Q.  Okay.  Patricia Olalde told you on

11   October 17th that Jim MacDonald had

12   notified her of your complaint, correct?

13       A.  Yes.

14       Q.  Okay.  And did you know Jim

15   MacDonald was going to report what you had

16   told him?

17       A.  I was told by Jim MacDonald after

18   he and I spoke after that meeting that he

19   told me he was going to report it to

20   Patricia Olalde in Human Resources.

21       Q.  Okay.  When did Jim tell you that?

22       A.  That same day, on Saturday.

23       Q.  Okay.  And Patricia confirmed that

24   Jim MacDonald had reported what you told

Page 165

1    him to her?

2        A.  Yes.

3        Q.  And she confirmed that on

4    October 17th, correct?

5        A.  It was like Monday, yes.

6        Q.  Did you meet with Patricia on

7    October 17th or was this communication by

8    e-mail or telephone?

9        A.  I believe it was by telephone.

10       Q.  Patricia told you that she would

11   speak to Dean Lehrer that week, correct?

12       A.  Correct.

13       Q.  And she asked you if you would

14   like to be out of the office when he came

15   in for their discussion, correct?

16       A.  She suggested that I not be in the

17   office for their discussion.

18       Q.  Okay.  And did you accept her

19   recommendation?

20       A.  Yes.

21       Q.  So you were not present in the

22   office when Patricia met with Dean Lehrer?

23       A.  Correct.

24       Q.  As far as you know, Ms. Olalde did

Page 166

1    speak with Dean Lehrer, correct?

2       A.  Yes.

3       Q.  And then she reported back to you

4    on October 18th what their conversation

5    had been?

6       A.  She simply reported that they had

7    investigated the information.

8       Q.  What else, if anything, did she

9    say?

10      A.  I don't recall what she said.

11   Something about they were going to inform

12   the provost and they would let me know

13   what was happening after that, something

14   along that line.

15      Q.  They being who?

16      A.  Human Resources.

17      Q.  This information that you got from

18   Patricia Olalde on October 18th, did she

19   communicate this to you by telephone or

20   e-mail or in person?

21      A.  I don't recall.  I think it was by

22   telephone.

23      Q.  Did she also tell you that you

24   would be permitted, if you wanted to, to

Page 167

1  take time away from the office on days

2  when Dean Lehrer was going to be in the

3  office working?

4      A.  I believe it was Stephanie Griffin

5  that had made that suggestion.

6      Q.  Okay.  And you accepted that

7  suggestion, correct?

8      A.  Yes.

9      Q.  Okay.  So after your dinner with

10  Dean Lehrer on October 11th, did you have

11  any occasion -- strike that -- did you

12  work in the office with him on any day

13  after that?

14      A.  Yes, I worked with him on the next

15  couple days.

16      Q.  Okay.  So it's your testimony that

17  you worked with him on October 12th and

18  13th?

19      A.  I believe so, yes.

20      Q.  After that, were there any other

21  days that you worked at the same time he

22  worked?

23      A.  Yes, I believe there were days.

24      Q.  Okay.  How many, if you recall?

Page 168

1      A.  I don't recall.

2      Q.  When did you take your first day

3  away from the office in order to, for lack

4  of a better way of saying it, to be not

5  there when he was in the office working?

6      A.  Human Resources had allowed me to

7  not be in the office when they

8  investigated.  It was the 14th, I suppose.

9  And they may have given me the weekend

10  off, Thursday, Friday.  I'm not sure.  And

11  they were also letting me know that they

12  were working on putting me in another

13  office, and they hadn't, you know,

14  resolved that, but they would get to it

15  right away.

16          So there were e-mails between

17  us and phone conversations of, you know,

18  what's happening, what's going on, I'm

19  still here, he's still here, it's not

20  comfortable, and by around about November

21  4th, I called in sick.  And I also before

22  that, e-mailed them saying that if it

23  hadn't been resolved, then I'd like to

24  take a paid leave of absence until they

Page 169

1    resolve it.

2        Q.  So how many -- how many days did

3    you work in the office with Dean Lehrer in

4    October?

5        A.  I do not know.

6        Q.  Okay.  And Stephanie Griffin told

7    you you did not have to be in the office

8    when Dean Lehrer was in the office during

9    October, correct?

10       A.  Correct.

11       Q.  And was that same offer made to

12   you for November?

13       A.  She did allow for me to take time

14   from the office in November.

15       Q.  Okay.  You say that you were in

16   the office for some days when Dean Lehrer

17   was there in October?

18       A.  Yes.

19       Q.  After your report of his conduct

20   to Patricia Olalde or anyone else at HR,

21   did you -- strike that -- did Dean Lehrer

22   say anything to you that you found to be

23   offensive?

24       A.  I don't believe so, no.

1    Q.  Did he conduct himself in any way

2    that you found to be offensive?

3    A.  We were never left alone after

4    that.  Someone had requested that we not

5    be left alone, but I did not -- I wasn't

6    informed of it.  Someone was always in the

7    office while we were together, listening

8    in.

9    Q.  How did -- how did you come to

10    know that fact if you weren't informed of

11    it?

12    A.  Because there was always someone

13    in the room each time we spoke.

14    Q.  Okay.  Did Dean Lehrer on any of

15    those days that you were in the office

16    when he was there after you made report to

17    HR, did he say anything to you regarding

18    your report to HR?

19    A.  He did apologize and asked me to

20    not get him fired.

21    Q.  When did he say that?

22    A.  Sometime before November 4th.

23    Q.  Where were you when he said that?

24    A.  I was in his office.

Page 171

1    Q.  Was anyone else there?

2    A.  No one was there.

3    Q.  Okay.  How was it that you were

4  alone in his office if someone was always

5  with you?

6    A.  It may have not been instructed at

7  that point.  That may have come from the

8  Provost slightly after he was informed.

9  He was out of the town at the time.

10    Q.  What date did Dean Lehrer say this

11  to you?

12    A.  I'm not sure.

13    Q.  How was it that you came to be in

14  his office?  Did he call you in?

15    A.  Likely, yes.

16    Q.  Okay.  What did he say to get you

17  into the office?

18    A.  I don't remember.

19    Q.  And when you went into his office,

20  where was he?  Was he standing or sitting?

21    A.  At his desk.

22    Q.  Yes.  And what was said?

23    A.  I don't know exactly what was

24  said.  I just remember that he had

1  apologized and just said that he didn't

2  want to lose his job and could I forgive

3  him, and I said I didn't want to see him

4  fired and I could forgive him.

5      Q.  Okay.  Why didn't you want to see

6  him fired?

7      A.  Because I think that's a terrible

8  thing to happen to people.  Period.  But

9  the longer that I stayed and worked in

10  that office, you know, it would have been

11  okay with me had he -- if one of the two

12  of us were to be fired, of course, I would

13  prefer it to have been him since the

14  trouble started because of some of his

15  actions.

16      Q.  But there was no further conduct

17  or statement made -- conduct on his part

18  or statement made by Dean Lehrer after

19  your report to HR which you found to be

20  offensive, correct?

21      A.  Correct.

22      Q.  Or in which he propositioned you

23  in any way, correct?

24      A.  Correct.

Page 173

1    Q.  After -- what -- what was the last

2    date, if you recall, that you saw Dean

3    Lehrer in the office?

4    A.  I don't remember.

5    Q.  The Dean's office, I should say.

6    A.  I don't remember.  I know that he

7    had scheduled a trip and was going on a

8    trip.

9    Q.  After that last day, whenever it

10   was, did you have any further contact with

11   him?

12   A.  I don't know.  I don't recall.

13   Q.  Okay.  Did you call him at any

14   point after that?

15   A.  I don't recall if I had.

16   Q.  Did you go to see him?

17   A.  I don't believe I went to see him.

18   Q.  Did he call you?

19   A.  I don't believe so.

20   Q.  Did he come to see you?

21   A.  I don't believe so.

22   Q.  And then you left for medical

23   leave in December of 2006, correct?

24   A.  Yes.

1     Q.  Do you remember when in December

2  you took your leave?

3     A.  Sometime in mid-December.

4     Q.  That was FMLA leave, correct?

5     A.  Yes.

6     Q.  And then you returned from your

7  medical leave in February of 2007,

8  correct?

9     A.  Yes.

10     Q.  Aside from the statements that

11  you've testified to that Dean Lehrer made

12  and the conduct that you allege he

13  exhibited, do you allege that anyone else

14  at Columbia College Chicago subjected you

15  to sexual harassment of any kind?

16     A.  No.

17     Q.  Now, in December of 2006, you were

18  offered a transfer to the Associate

19  Provost's office, correct?

20     A.  Yes.

21     Q.  And who communicated that offer to

22  you?

23     A.  Stephanie Griffin and Ann Foley.

24     Q.  When was that communicated to you?

Page 175

1      A.   Around mid-December.

2      Q.   Was that before you took your

3  leave?

4      A.   Yes.

5      Q.   What did they say to you?

6      A.   They said that they had a position

7  description where it would be a full-time

8  position.  I would move into Ann Foley's

9  office, and I would have an assistant.  We

10  sat down and we talked about it.  I

11  explained that I would be going on leave,

12  and they said, You know, would you accept

13  the position?  And I said, I would -- i

14  would like to think about it, and

15  Stephanie let me know that I could think

16  about it, you know, until after the

17  holidays or what have you, and that was

18  it.  And they gave me the position

19  description.

20      Q.   Where did you meet with them?

21      A.   I first met with Stephanie in her

22  Human Resources office, and then we walked

23  over to Ann Foley's office.

24      Q.   So you and Stephanie and Ann Foley

Page 176

1    met together in Ann Foley's office?

2         A.  Yes.

3         Q.  After first meeting in Stephanie's

4    office?

5         A.  Yes.

6         Q.  You eventually accepted that

7    position, correct?

8         A.  Yes.

9         Q.  And -- but you accepted in January

10   the following year, right, the next month?

11        A.  Yes.

12        Q.  Why -- why did you wait until

13   January to accept?

14        A.  It was the holidays, and I was

15   working with my attorney at the time to be

16   sure that it was something acceptable.

17        Q.  And who was your attorney at the

18   time?

19        A.  Candace Gorman.

20        Q.  Your pay -- strike that.

21             The position you were

22   transferred to was Assistant to the

23   Associate Provost, correct?

24        A.  Yes.

1      Q.  And your pay was the same as when

2    you were assistant to Dean Lehrer,

3    correct?

4      A.  Yes.

5      Q.  Your benefits were the same?

6      A.  Yes.

7      Q.  Would you agree that the position

8    of Associate Provost is a position of

9    greater authority than the position of --

10   that Dean Lehrer held?

11     A.  Yes.

12     Q.  While working in the Associate

13   Provost's office, you were not required to

14   interact with Dean Lehrer, correct?

15     A.  Correct.

16     Q.  And, in fact, did you have any

17   contact with Dean Lehrer while you worked

18   in the Associate Provost's office?

19     A.  I don't believe so, no.

20     Q.  Your supervisor in that office was

21   who?

22     A.  Ann Foley.

23     Q.  And were your hours in that office

24   the same basically as the hours that you

Page 178

1    worked for Dean Lehrer?

2        A.  Yes.

3        Q.  Were your job duties the same?

4        A.  They were lessened.

5        Q.  Okay.  You have alleged in this

6    lawsuit that the position -- the transfer

7    to the Associate Provost's office was a

8    permanent transfer; is that correct?

9        A.  Yes.

10       Q.  Okay.  And on what basis do you

11   make that allegation that it was a

12   permanent switch?

13       A.  That was the information presented

14   to me by Ann Foley and by Stephanie

15   Griffin in December, and when I arrived to

16   that position in February, Ann Foley

17   informed me that things had changed and

18   this was no longer a permanent position as

19   such and that I would be not getting an

20   assistant and I would be moved back into

21   the Dean's office after a new dean had

22   been found and had I anything to talk

23   about, I should go directly to Human

24   Resources.

Page 179

1    Q.  When you testified about how the
2  transfer was communicated to you by
3  Stephanie and -- Stephanie Griffin and Ann
4  Foley, you said it was a full-time
5  position, but you did not testify that
6  they told you it was permanent.  When did
7  they communicate to you that it was to be
8  a permanent position?
9    A.  Stephanie that day that she had
10  met with me prior to Ann Foley, she said
11  that I would not be returning to the
12  Dean's office and not to worry about any
13  of the work that was there and that I
14  would be finished with the Dean's office
15  and I would take the position here and it
16  would be done.
17    Q.  Okay.  Do you have any
18  documentation of that statement by
19  Stephanie?
20    A.  I only have the job description
21  that she gave to me.
22    Q.  And that job description does not
23  say it was to be a permanent transfer,
24  correct?

Page 180

1    A.  She said that she would call the

2  Dean's office while I was there and that

3  she would tell Dean Lehrer directly that I

4  would not be returning to that office.  I

5  believe she made that phone call while I

6  was there.

7    Q.  My question, though, was whether

8  the position description that you say she

9  gave you, whether that document said

10  anywhere on it that it was to be a

11  permanent transfer to the Associate

12  Provost's office?

13    A.  I do not recall if it said that or

14  not.

15    Q.  Okay.  So, you based your

16  understanding of the permanency of the

17  position on what you allege Stephanie

18  Griffin told you?

19    A.  Additionally, the fact that Ann

20  Foley told me things had changed and this

21  was no longer a permanent position.  They

22  had said things had changed from our

23  initial discussion.

24    Q.  So, those two statements, correct?

1    A.  Yes.

2    Q.  You were happy in the Dean's

3  office, though, weren't you?

4    A.  Yes.

5    Q.  Okay.  And if Dean Lehrer was to

6  -- was to leave, there would have been no

7  reason for you not to want to return,

8  correct?

9    A.  Not necessarily, no.  I mean, once

10  I was told by Stephanie that I wouldn't be

11  returning, I didn't expect to return.  I

12  mean, I had lapsed an enormous amount of

13  time of what was happening there.  So, you

14  know, I didn't expect to return to that

15  office to be quite honest.

16    Q.  Right.  You didn't expect it, but

17  as you had been happy there for more than

18  a year, can you tell me any reason why you

19  would not have wanted to return?

20    A.  I can tell you that people would

21  have and had asked, you know, what was I

22  doing leaving the Dean's office, and had I

23  moved back, it would, you know, promote

24  other questions.  So it would have been

1    uncomfortable trying to explain what and

2    why.

3        Q.  Any other reason?

4        A.  No.

5        Q.  Who asked you why you were leaving

6    the Dean's office?

7        A.  Who asked me?

8        Q.  Uh-huh.

9        A.  It was -- several people in the

10   fifth floor had asked me how I had ended

11   up in Ann Foley's office and

12   congratulations on my promotion or what

13   have you.

14       Q.  Who are those several people?  Can

15   you identify any of them?

16       A.  Alicia Berg had asked.

17       Q.  Okay.

18       A.  I don't recall who else.

19       Q.  What did you tell Alicia?

20       A.  I just smiled and said, Yes, it's

21   very nice here, and that was it.

22       Q.  The fifth floor was -- was what

23   office?  When you refer to the fifth

24   floor, what do you mean?

Page 183

1     A.  The first floor has the

2    President's office, the Provost's office,

3    I believe, and the Finance department's

4    office.

5     Q.  Okay.  So the office that you were

6    transferred to, you said that this woman

7    from that office, Alicia Berg, questioned

8    -- asked you why you were leaving the

9    Dean's office?

10     A.  She didn't ask me why, but she had

11    asked, you know, how I ended up there, and

12    she didn't know a position was open,

13    et cetera.

14     Q.  Okay.  You eventually did return

15    back to the Dean's office, correct?

16     A.  Yes.

17     Q.  And that was after a new dean,

18    Eliza Nichols, had come into the position,

19    correct?

20     A.  Yes.

21     Q.  Your salary was unchanged during

22    this period of transfer from the Associate

23    Provost's office back to the Dean's

24    office, correct?

Page 184

1       A.  Yes.

2       Q.  And your benefits remained the

3  same?

4       A.  Yes.

5       Q.  Okay.  When you were -- who

6  performed your -- back -- backing up to

7  your first period of work in the Dean's

8  office.

9              Who took on your

10  responsibilities when you were on FMLA

11  leave?

12      A.  That would have been Allison,

13  likely.

14      Q.  Allison Ratliff?

15      A.  (Indicating.)

16      Q.  Is that a yes?

17      A.  Yes.

18      Q.  Okay.  When you were -- during the

19  days that you were not in the office in

20  October, when you stayed away because you

21  knew that Dean Lehrer would be there, to

22  your knowledge, who -- who performed your

23  job function, if anyone?

24      A.  I imagine Allison Ratliff.

Page 185

1    Q.  Were you happy in the Associate

2  Provost's office?

3    A.  I didn't have a lot of assignments

4  there.  It was awkward.  I felt, you know,

5  pushed into that office.  I originally was

6  offered a position into the President's

7  office by Stephanie Griffin, of which I

8  told her I didn't believe it would be a

9  good idea, and then she came up with the

10  Ann Foley position.  It was -- it was very

11  unclear as to what I was -- how long I

12  would be there and what was happening, but

13  it was a fine working environment.  I had

14  no problems working there.

15    Q.  Did you complain to anybody about

16  the fact that you learned that you were

17  not actually going to be permanently

18  transferred to the Associate Provost's

19  office?

20    A.  No, I did not.

21    Q.  Why not?

22    A.  Why not?  Because the Human

23  Resources department had proved to me that

24  they weren't trustworthy, and that they

1    had lied to me.  So what point would it

2    have been for me to continue?

3        Q.  How were they untrustworthy?

4        A.  They had told me they would have

5    me in a permanent position, and then they

6    did not have me in a permanent position.

7        Q.  Any other way in which you allege

8    the HR department was untrustworthy?

9        A.  That would be my primary reason.

10       Q.  Are there any secondary reasons?

11       A.  I can't recall right now.

12       Q.  Okay.  Did it occur to you to

13   complain to someone other than a person in

14   the HR department about this plan to

15   transfer you back to the Dean's office?

16       A.  The only statement I made was to

17   Ann Foley saying that isn't what we agreed

18   to, and she simply said take it to HR if

19   you have things to discuss.

20       Q.  Okay.  But you never did tell HR

21   that you were displeased with the plan to

22   transfer you back, correct?

23       A.  The conversation was that I would

24   be moved once there was a new dean,

Page 187

1   according to Ann Foley, and the dean

2   search had failed as of June, and then a

3   week later we were informed that

4   Ms. Nichols would be the new dean.

5       Q.  Okay.

6       A.  So at some point, there really was

7   no point in making noise about nothing

8   that was -- nothing seemed to be happening

9   as well.

10      Q.  You moved to the Associate

11  Provost's office in -- was it

12  February 2007?

13      A.  It was February, yes, 2007.

14      Q.  How soon after you arrived was it

15  that Ann Foley told you that the job was

16  going to be temporary?

17      A.  Immediately, the very first day.

18      Q.  And so you're saying, though, that

19  in June it -- it looked like the dean

20  search was unsuccessful, and so there was

21  no point in complaining, but why didn't

22  you complain from February to June to

23  anyone?

24      A.  For the same reason I just

Page 188

1    testified, that HR had already told me

2    this would be a permanent position;

3    wherein once I arrived to the position, it

4    wasn't.  So, it didn't seem as though

5    things were being held on their end.  So,

6    if I were to complain, it wasn't getting

7    me anywhere.

8        Q.  And you -- it did not occur to you

9    to complain to anybody else besides HR?

10       A.  I had no reason to think to

11   complain to anyone else other than HR.

12       Q.  You were unhappy with the

13   decision, correct?

14       A.  Yes.

15       Q.  And in the past, you had not

16   hesitated to assert yourself in seeking

17   pay raises, correct?

18       A.  Excuse me?

19       Q.  And in the past, you had not

20   hesitated to assert yourself in seeking

21   pay raises, correct?

22       A.  With Human Resources.

23       Q.  Okay.  Nor had you hesitated to

24   seek title changes, correct?

Page 189

1    A.  At this time, I had acquired an

2   attorney, and I was allowing my attorney

3   to facilitate what was happening.

4    Q.  Okay.

5    A.  So, you know.

6    Q.  But you just said that the reason

7   you didn't complain to HR was because HR

8   was untrustworthy?

9    A.  Yes, they were untrustworthy.

10    Q.  And my question was whether it

11   occurred to you to complain or raise this

12   issue with anyone outside of HR, in the

13   college administration?

14    A.  I was working for the college

15   administration, though, with Ann Foley

16   and --

17    Q.  So why didn't you complain to

18   anyone besides -- why didn't you complain

19   to anyone?

20    A.  I don't understand who I would

21   have complained to.

22    Q.  Okay.  Did Ann Foley ever tell you

23   that she knew anything about the

24   circumstances of your transfer; in other

Page 190

1    words, why you were not working in the

2    Dean's office anymore?

3        A.  She did not tell me that.

4        Q.  Do you have any reason to believe

5    that she had any knowledge regarding the

6    circumstances of your departure from the

7    Dean's office?

8        A.  I believe that -- I was told

9    either from Human Resources or Steve

10   Kapelke that she was aware of the

11   circumstances.

12       Q.  What did Human Resources tell you?

13       A.  One of the -- either Human

14   Resources or Steven Kapelke did let me

15   know that Ann Foley was aware of the

16   circumstances.

17       Q.  When did they tell you that?

18       A.  I don't recall.

19       Q.  If it were Human Resources, who --

20   who was it who conveyed this to you?

21       A.  I believe it would have been

22   Stephanie Griffin.

23       Q.  Were you told anything any more

24   specific than that she was aware of

Page 191

1    circumstances?

2         A.  I don't believe so.

3         Q.  Who attended -- strike that.

4              You attended a mediation at

5    the EEOC, correct?

6         A.  Yes.

7         Q.  And who was there on behalf of

8    Columbia College?

9         A.  Annice Kelly.  Annice Kelly is a

10   legal person.  Susan someone, I forget her

11   name.  I don't recall who else was there.

12        Q.  Was Stephanie Griffin there?

13        A.  I believe she was, yes.

14        Q.  And was there a discussion about a

15   transfer to the Associate Provost's office

16   during that meeting?

17             MR. LEE:  Hold on.  I'm sorry.

18   Objection.  Parties to the EEOC mediation

19   signed papers saying that it was

20   confidential.  So don't answer that.

21   BY MS. KAY:

22        Q.  Are you following your attorney's

23   advice and not answering the question?

24        A.  Yes.

1    Q.  Did you -- you agreed to the

2  transfer to the Associate Provost's

3  office, correct?

4    A.  My attorney had accepted the

5  position in the Provost's office.

6    Q.  With your authority, correct?

7    A.  Yes.

8    Q.  Okay.  And that agreement was made

9  after the mediation, correct?

10    A.  That agreement was made at the

11  mediation.

12    Q.  Your decision to accept the

13  transfer to the Associate Provost's office

14  was made at the mediation?

15    A.  Yes.

16    Q.  Okay.  Did you communicate it

17  then?

18    A.  Excuse me?

19    Q.  Did you communicate that decision

20  at that time?

21    A.  My attorney communicated it.

22    Q.  On your behalf?

23    A.  Yes.

24    Q.  Did you tell Ann Foley you were

Page 193

1  moving from the Dean's office?

2       A.  I do not believe so.

3       Q.  And then in August of 2007, you

4  returned to the Dean's office as Assistant

5  to the Dean, correct?

6       A.  Yes.

7       Q.  And Dean Lehrer was no longer

8  there at that point?

9       A.  Yes.

10       Q.  A new dean was in place, correct?

11       A.  Yes.

12       Q.  And that's Dean Eliza Nichols,

13  correct?

14       A.  Yes.

15       Q.  Dean Nichols was new to the

16  college -- to Columbia College Chicago,

17  correct?

18       A.  Yes.

19       Q.  Okay.  She had never held a

20  position in the college before coming to

21  take the Dean's position, correct?

22       A.  I don't recall that she had, no.

23       Q.  In your complaint, you allege that

24  you suffered retaliation while employed at

1     Columbia College, correct?

2          A.  Yes.

3          Q.  Okay.  One of the items that you

4     allege is that you were denied your own

5     computer, correct?

6          A.  I was denied the computer that I

7     was working with as the Assistant to the

8     Dean in the Dean's office.

9          Q.  Why don't you explain what

10    happened?

11         A.  Allison had been working in that

12    office, and I did not -- when I was

13    transferring, I was asking if I would have

14    a computer from the finance office brought

15    up or would I be using Allison's computer.

16         Q.  Okay.

17         A.  And no one had an answer and

18    then --

19         Q.  Who did you ask this question?

20         A.  I asked Allison, and I also asked

21    -- I think it was Andre Foise (phonetic).

22         Q.  Okay.  Who is Andre Foise?

23         A.  He is an assistant to Ann Foley.

24         Q.  Okay.  And what were you told?

1     A.  Andre said that I would not be

2  taking a computer from their office.  That

3  I should order another computer.

4     Q.  What had happened to the computer

5  that you used when working for Dean

6  Lehrer?

7     A.  I -- the computer that I had with

8  Dean Lehrer was the computer that Allison

9  was using.

10     Q.  Because she stepped in after you

11  left the Dean's office to be Assistant to

12  the Dean, correct?  She assumed your

13  duties?

14     A.  I assume so.  I don't actually

15  know.

16     Q.  Okay.  So when you returned to the

17  Dean's office, it's your testimony that

18  you were unable to use that computer,

19  again, because Allison was using it?

20     A.  I was able to use her computer

21  only for when she went to lunch.

22     Q.  Okay.  And when she was not at

23  lunch, what computer did you use?

24     A.  There was an old computer in the

1     office that I was allowed to use.

2         Q.  Okay.  Did you have any problems

3     with that computer?

4         A.  Yes.

5         Q.  What types of problems did you

6     have?

7         A.  Networking problems in that it was

8     slow.  I would have to log in and out to

9     access calendars.

10        Q.  Did you complain to anyone that

11    you were having trouble with that

12    computer?

13        A.  Yes.

14        Q.  Who did you complain to?

15        A.  I complained to, I believe,

16    Allison, and I don't recall if I had let

17    Dean Nichols know or not.

18        Q.  What did you say to Allison?

19        A.  Well, she had asked if the

20    computer -- if I was getting another

21    computer, and I said that Andrew or Andre

22    was not allowing me to take a computer.

23    That I would have to order another

24    computer.  So she'd been in the process of

1    ordering another computer for me, and I

2    was waiting on it.

3        Q.  Allison ordered another computer

4    for you?

5        A.  Allison had suggested that -- she

6    had ordered, yes, a PC computer.

7        Q.  Okay.  Did that computer arrive?

8        A.  We discussed getting a MacIntosh

9    computer as well, and she said that the PC

10   computer then could be used for the

11   assistant dean's position that was to come

12   on and that she didn't see a problem if I

13   were to get a MacIntosh computer.  And she

14   told me to go ahead and order a MacIntosh

15   computer, I believe.  I believe I ordered

16   the MacIntosh.  She ordered the PC.

17       Q.  Did both the MacIntosh and the PC

18   arrive in the Dean's office?

19       A.  The MacIntosh arrived.  I don't

20   know about the PC.  I don't know if it was

21   put on hold until later, is what I believe

22   happened.

23       Q.  Were you given the MacIntosh to

24   use when it arrived?

1      A.  Yes.

2      Q.  So how long was it after your

3  arrival at the Dean's office in which --

4  how long was it before the Mac arrived for

5  -- for your use?

6      A.  Maybe three weeks.

7      Q.  Okay.  And during that three

8  weeks, you had access to another computer

9  in the office, correct?

10      A.  Yes.

11      Q.  Okay.  That was operational,

12  correct?

13      A.  Yes.

14      Q.  And when you complained about

15  problems you were having with it to

16  Allison, she ordered a new computer for

17  you, correct?

18      A.  No.  We -- she had canceled the

19  order for the PC, and we just waited for

20  the second computer.  There wasn't much we

21  could do.  We were in a holding pattern.

22      Q.  But a new computer was on its way

23  at the time that you complained to her,

24  correct?

Page 199

1      A.  Correct.

2      Q.  Was the Mac that you used the

3  computer -- strike that.

4            When the Mac arrived, that

5  became your computer?

6      A.  Yes.

7      Q.  And was that the computer you

8  continued to use until you left the Dean's

9  office in October 2007?

10     A.  Yes.

11     Q.  When you left the Dean's office,

12  Allison Ratliff, I think you said you

13  assumed -- it's your understanding that

14  she took the position of Acting Assistant

15  to the Dean, correct?

16     A.  Yes.

17     Q.  And when you returned to the

18  Dean's office, you resumed that position,

19  correct?

20     A.  I was told I was the Assistant to

21  the Dean.

22     Q.  Okay.  Who told you that?

23     A.  It was on the paperwork.

24     Q.  So your title was Assistant to the

Page 200

1    Dean, correct?

2        A.  I believe so, yes.

3        Q.  And you assisted the dean,

4    correct?

5        A.  Yes.

6        Q.  Okay.  You allege in this lawsuit

7    that your office space was taken away and

8    that that was in retaliation.  Why don't

9    you explain the circumstances of that

10   allegation?

11       A.  The Assistant to the Dean had sat

12   in the office Allison was sitting in.

13   Once I had left that position, she had

14   moved into that office, and when I

15   arrived, I was not given that office nor

16   the computer that the Assistant to the

17   Dean had historically used and was moved

18   across the hall to another office.  And

19   then shortly after, I was moved back

20   into the reception area office and given

21   the desk of Dean Lehrer to work on.  And I

22   had --

23              Ms. Nichols and Mr. MacDonald

24   and Allison and I went to a lunch meeting,

Page 201

1    and we had talked about the office space

2    and who thought -- Eliza had asked who

3    thinks they should be in, you know, which

4    office or where would you like to be, and

5    I said I would like to be back in my

6    office, and Mr. MacDonald and Allison said

7    nothing, and that was the end of the

8    conversation.

9        Q.  Did Dean Nichols say anything in

10   response to your response to her question?

11       A.  I don't believe so.

12       Q.  You testified that historically

13   this office of Assistant to the Dean had

14   been across the hall, I think.  Is that

15   your testimony?

16       A.  It was in the office that I had

17   left.

18       Q.  Okay.

19       A.  And that Allison was currently in.

20       Q.  So that was the office that you as

21   Assistant to the Dean occupied when Dean

22   Lehrer was dean of -- of that school,

23   correct?

24       A.  Yes.

Page 202

1    Q.  Okay.  And so do you have any

2    information regarding whether any other

3    assistants to the dean had occupied that

4    office before you?

5    A.  Deanna Evans had occupied that

6    office.

7    Q.  And Dean Lehrer was dean at that

8    time?

9    A.  Yes.

10    Q.  Anyone else?

11    A.  I do not know.

12    Q.  Okay.  To get -- to get from Dean

13    Nichols' office to where you had

14    previously sat as Assistant to the Dean,

15    how many doorways do you have to walk

16    through to get from one office -- from her

17    office to yours?

18    A.  Two doorways.

19    Q.  Okay.  And isn't it true that

20    during the meeting that you just testified

21    about that Dean Nichols said that it was

22    not your office because no one actually

23    owned office space in the Dean's office?

24    A.  She may have said that.

Page 203

1    Q.  Okay.  It was her decision to

2    place you -- strike that.

3              Were you eventually placed

4    outside of Dean Nichols' office?

5    A.  I was initially placed outside of

6    Dean Nichols' office.

7    Q.  Okay.  And is that where you

8    worked until the time you left the Dean's

9    office in October 2007?

10   A.  No.  I was initially placed

11   outside of the Dean's -- the Dean's office

12   suite, across the hall initially, and then

13   I was brought into the reception area --

14   Q.  Okay.

15   A.  -- outside of Dean Nichols' door.

16   Q.  Okay.  And is that where you

17   remained until you left in October 2007?

18   A.  Yes.

19   Q.  And it was Dean Nichols' decision

20   to move you where you -- where you were

21   moved, correct?

22   A.  There was discussion, yes, that

23   she was interested in moving spaces

24   around, and she hadn't decided what she

Page 204

1    was going to do.  She had thought that the

2    Assistant to the Dean may end up in the

3    office that Allison was in.

4         Q.  I'm sorry.  Can you say that

5    again?

6         A.  There was a position coming on,

7    and that new position would perhaps take

8    over the office that Allison had been

9    working out of.

10        Q.  Okay.  And that new position was

11   Assistant Dean, correct?

12        A.  Yes.

13        Q.  So you were not the only person

14   who was being moved around that time,

15   correct?

16        A.  At that time, no one else was

17   moved except for myself.

18        Q.  Okay.  And you chose to occupy --

19   when you returned to the Dean's office, it

20   was your choice to occupy the office

21   across the hall, correct?

22        A.  I don't recall.

23        Q.  Did you -- were you told by anyone

24   to go to that office and work there?

Page 205

1      A.  I don't recall.

2      Q.  Okay.  What's the basis for your

3   allegation that this move in your working

4   location was in retaliation for anything

5   that you had done?

6      A.  The move was not permanent, as it

7   had been stated it would be.  I was not

8   allowed to use the computer that the

9   information from the Assistant to the Dean

10  held, although I was the new Assistant to

11  the Dean or the returning Assistant to the

12  Dean.  I was placed in an office area that

13  was a reception area.  That was an area

14  that was quite loud and had a lot of

15  reception.  My assistants were removed

16  from me, Allison and another assistant.  I

17  was told that our responsibilities would

18  be updated, and we would be apprised of

19  that, and we had not been.  Things were

20  very vague and not very clear as to my

21  duties, and shortly thereafter, I had put

22  in for a medical leave.  It was approved,

23  and before I was going to leave, I was

24  terminated because I couldn't be trusted.

1      Q.  All right.  Let's back up a bit.

2   My question was actually about -- when I

3   said location, maybe it's my fault for not

4   being clear enough in my question.

5              You're alleging that one of

6   the things that happened to you that was

7   retaliatory was moving from the office

8   that you occupied as Assistant to the Dean

9   and being moved into the reception area,

10  correct?  You're claiming that that was --

11  that change was made in retaliation

12  against you, correct?

13     A.  There were other things such as

14  position responsibilities, reports, in

15  addition to the location of where I was

16  sitting, in addition to the fact that I

17  was sitting at Dean Lehrer's desk, which I

18  clearly stated I did not care to sit at.

19     Q.  Okay.

20     A.  That I felt was retaliatory.

21     Q.  You identify in your complaint

22  that, Defendant denied Ms. Lewandowski her

23  own computer, which she needed to do her

24  work, took Ms. Lewandowski's former office

Page 207

1   space away.  And I'm asking you whether

2   your allegation is that the taking away of

3   your former office space -- and I'm

4   reading from Paragraph 23 of your First

5   Amended Complaint -- was that change taken

6   in retaliation against you?

7       A.  I'm saying that the computer to

8   allow me to do my job, which was Assistant

9   to the Dean, was not allowed -- given to

10  me, and it was also in the office that I

11  resided in.  So, I was not given the same

12  duties and responsibilities upon my return

13  as Assistant to the Dean.

14      Q.  I'm still asking, though, about

15  the change in your office space.  That's

16  listed in your complaint as an element of

17  retaliation against you, and I'm asking

18  you what is the basis for your claim that

19  that switch in your office was

20  retaliatory?  Why do you believe that was

21  retaliatory?

22      A.  For one, I was given a desk that

23  belonged to Leonard Lehrer, which I didn't

24  want to sit at, which I had to sit at

Page 208

1   because I was no longer in my previous

2   office.

3      Q.  That still doesn't answer my

4   question.  Who made the decision to -- to

5   put you at that desk?

6      A.  Ms. Nichols.

7      Q.  And is it your allegation that

8   Dean Nichols was doing that in retaliation

9   against you for something you had done?

10      A.  I can't comment on what Dean

11   Nichols was doing.

12      Q.  Okay.  So it would be speculation

13   for you to assume that she moved you to

14   another office space in retaliation,

15   correct?

16         MR. LEE:  Object to the form of

17   the question.  Calls for speculation.

18         MS. KAY:  No, I'm asking.

19   BY MS. KAY:

20      Q.  Go ahead.  You can answer the

21   question.

22      A.  I felt that not being in that same

23   space was retaliation, yes.

24         MS. KAY:  Would you go back to the

1    last question and answer?

2                        (Record read as requested.)

3                        (Whereupon a short recess

4                        was had.)

5    BY MS. KAY:

6        Q.  Did you ever tell Dean Nichols

7    that you had made a complaint against Dean

8    Lehrer for being too friendly?

9        A.  No.

10       Q.  Okay.  Are you aware of anyone

11   else informing Dean Nichols that you had

12   made that report to the Human Resources

13   department?

14       A.  I do not know of anything like

15   that.

16       Q.  Okay.  Do you know anything --

17   strike that.

18                   What was her knowledge as far

19   as you know regarding the circumstances of

20   your transfer from the Associate Provost's

21   office?

22       A.  I do not know what her knowledge

23   was.

24       Q.  Okay.  Now, in September of --

Page 210

1    strike that.  Let me back up just for a

2    minute.

3                You had testified that --

4    that you did not want to sit at Dean

5    Lehrer's old desk, correct?

6        A.  Yes.

7        Q.  Did you tell anyone that you did

8    not want to sit at his desk?

9        A.  Yes.

10       Q.  Who did you tell?

11       A.  I let Dean Nichols know.

12       Q.  When -- how did you let her know?

13       A.  We were moving desks around, and I

14   was asked did I want to use this desk, and

15   I said, No, I didn't.  I didn't get into

16   reasons as to why I did not.  I just --

17   that I did not.

18       Q.  So, you did not tell her that the

19   reason you didn't want to sit at that desk

20   was because it had been Dean Lehrer's; is

21   that correct?

22       A.  Correct.

23       Q.  Did you tell anyone else the

24   reason why you did not want to sit at that

1    desk?

2        A.   I don't recall that.

3        Q.   In September 2007, while working

4    for Dean Nichols, she asked you to format

5    a memo to the chairs regarding their

6    third-year evaluation, correct?

7        A.   Correct.

8        Q.   And she asked you to follow the

9    format that other deans had used, correct?

10       A.   Correct.

11       Q.   And instead of following that

12   format, you used a format that Dean Lehrer

13   had used, correct?

14       A.   Correct.

15       Q.   This was something that Dean

16   Nichols was not happy about, correct?

17       A.   I'm not sure if Dean Nichols

18   understood that there were timelines that

19   we used in the School of Fine and

20   Performing Arts, and I was trying to

21   explain that to her, and she just had

22   asked me to do it as the other deans had

23   done it, so.

24       Q.   Did it appear to you in your

Page 212

1    discussion with Dean Nichols regarding

2    this instruction that she was displeased

3    with what you had done?

4        A.  I don't recall.

5        Q.  Okay.  She asked you to follow one

6    format, and you did not follow those

7    instructions, correct?

8        A.  I provided the format we typically

9    used and also was going to provide the

10   format she wanted me to use, showing her

11   that we had two formats.

12       Q.  But her instruction to you was to

13   use the format she gave you, correct?

14       A.  Yes.

15       Q.  Okay.  In September of 2007, Dean

16   Nichols also told you that she was to

17   communicate with the chairs directly and

18   that she did not want you communicating

19   directly with them unless she asked you

20   specifically to do that, correct?

21       A.  Yes.

22       Q.  She wanted communications to be

23   directly between her and the chairs unless

24   you were instructed otherwise, correct?

Page 213

1      A.  Correct.

2      Q.  In fact, she told you this on more

3  than one occasion, correct?

4      A.  I don't recall.

5      Q.  You did contact them, however, the

6  chairs, regarding budgeting for new

7  faculty lines, correct?

8      A.  I don't recall.

9      Q.  And you told her that the chairs

10  had initiated that contact; did you not?

11      A.  I do not recall.

12      Q.  Do you recall anything about Dean

13  Nichols' response to you when she found

14  out that you had contacted the chairs or

15  initiated contact with the chairs on your

16  own?

17      A.  I do not recall.

18      Q.  Are you aware that she spoke

19  personally to the chairs and found out

20  that you had initiated those

21  communications?

22      A.  I do not remember.

23      Q.  Are you also aware that your

24  communications with the chair resulted in

Page 214

1    incorrect information being provided to

2    the chairs regarding faculty lines?

3        A.  I do not recall that.

4        Q.  In October 2007, on October 10th

5    in particular, you told Dean Nichols that

6    her expectations of you were unclear,

7    correct?

8        A.  Yes.

9        Q.  And you told her that she was not

10   meeting with you enough?

11       A.  That she was not keeping with the

12   meetings that she had requested that we

13   keep.

14       Q.  Okay.  And you advised her or you

15   told her that you would not do any work

16   without direct instruction from her; is

17   that true?

18       A.  Correct.

19       Q.  In fact, at that time, you had

20   actually met with Dean Nichols several

21   times each week to discuss your job

22   functions, correct?

23       A.  I disagree, no.

24       Q.  Okay.  On what basis do you

Page 215

1    disagree?

2         A.  We did not meet several times a

3    week to discuss my job responsibilities.

4         Q.  How many times a week did you meet

5    in September and October 2007?

6         A.  We did not meet more than maybe

7    one time to say that I no longer had

8    assistants and that I would be keeping

9    track of her calendar and that she would

10   get back to Allison or myself and Jim

11   about our new responsibilities.  So she

12   had not gotten back to us so much so that

13   Allison had made a comment to me about she

14   wondered if and when that had happened

15   because she was unclear as well.

16        Q.  So it's your testimony that you --

17   how many times did you meet with Dean

18   Nichols in September and October?

19        A.  I can't recall that.  I don't

20   recall.

21        Q.  Okay.  Did you meet with Dean

22   Nichols regarding day-to-day

23   responsibilities and assignments?

24        A.  Day-to-day responsibilities and

1    assignments?

2        Q.   Uh-huh.

3        A.   Each day is what you're asking me,

4    my assignments?

5        Q.   No.  Let's put it this way.  Did

6    she communicate with you regarding what

7    your assignments were to be?

8        A.   Ms. Nichols asked me to keep her

9    calendar.

10       Q.   Anything else that she instructed

11   you to do?

12       A.   She let me know that we were going

13   to work on a syllabus project and that I

14   should speak with Allison about the

15   syllabus project and to carry out that

16   project.

17       Q.   How did you learn from Dean

18   Nichols that you were to keep her

19   calendar?  Did she tell you that face to

20   face?

21       A.   Yes, she did.

22       Q.   Okay.  And how did you learn from

23   Dean Nichols that you would be working on

24   a syllabus?  Did she tell you that in a

1  face-to-face meeting?

2      A.  Yes.

3      Q.  Did she give you instruction each

4  week with regard to what was to be put on

5  the calendar, for example?

6      A.  She had made requests to schedule

7  certain meetings, yes.

8      Q.  And she communicated that to you,

9  correct?

10      A.  Yes.

11      Q.  Did she communicate that in a

12  face-to-face conversation?

13      A.  Yes.

14      Q.  Besides keeping the calendar, what

15  other responsibilities did you have as

16  assistant to Dean Nichols?

17      A.  To take messages.  That was my

18  primary responsibility.

19      Q.  How did you know you were supposed

20  to take messages?

21      A.  If someone would call and ask for

22  Dean Nichols, I would just take messages

23  and give them to Dean Nichols.

24      Q.  Okay.  And how did you give them

Page 218

1   to Dean Nichols?

2        A.   Handwritten, usually.

3        Q.   Did you hand her the piece of

4   paper that you wrote your message on?

5        A.   I did not always hand them to her.

6   I did not see her always.

7        Q.   Did you sometimes hand them to her

8   in person?

9        A.   If she passed my desk on her way

10  to her office, I would hand them to her.

11       Q.   And on occasions when you gave

12  them to her personally, did she ever give

13  you any instruction with regard to those

14  messages?  Next steps?

15       A.   Not generally, no.

16       Q.   For the occasions when you took

17  messages and you did not give them to her

18  personally, face-to-face, how did you get

19  them to her?

20       A.   I don't recall.  I would imagine I

21  would e-mail them to her.

22       Q.   Aside from taking messages and

23  what you've already testified to, is there

24  any other job function you performed as

Page 219

1  assistant to Dean Nichols?

2      A.  If there were random requests, she

3  would give me an assignment.  I don't

4  recall what they were, but --

5      Q.  And did she give those assignments

6  to you in a face-to-face instruction?

7      A.  Not always.  Sometimes over the

8  phone.

9      Q.  But sometimes face-to-face

10  instruction?

11      A.  Sometimes.

12      Q.  Okay.  Isn't it true that Dean

13  Nichols relied on you to keep her on

14  schedule with regard to the meetings she

15  had throughout the day?

16      A.  Dean Nichols often changed her

17  schedule without informing me that her

18  schedule had changed.  I don't believe

19  that I was the person to end meetings.  I

20  would let her know when she would go over,

21  and she would say thank you and she'd ask

22  me to exit, and I would enter again, let

23  her know when -- she was well aware of her

24  time frames.

Page 220

1    Q.  How do you know she was aware of

2  -- well aware of her time frames?

3    A.  She would say thank you, we're

4  almost done, we're just finishing up, or

5  whatever her comments were.

6    Q.  Did you come into meetings to give

7  her a ten-minute warning when it was time

8  to wrap things up because another

9  appointment was waiting?

10    A.  Yes, I did on occasion.  Yes.

11    Q.  Okay.  On how many occasions did

12  you do that?

13    A.  I don't recall.

14    Q.  Would you say that was part of

15  your job?

16    A.  Yes.

17    Q.  That was part of what she expected

18  you to do?

19    A.  I'd only worked with Dean Nichols

20  for a few weeks, you know.  So it wasn't

21  completely understood what her working

22  format was, and she traveled a bit as

23  well.  So we weren't always in the office

24  together, but she would say, Please give

Page 221

1    me a 10-minute warning before this meeting

2    ends so I can prepare for my next meeting.

3    And when she would make a request, I would

4    follow through.

5        Q.  And you sat in front of her

6    office, correct?

7        A.  Yes.

8        Q.  So you were aware -- strike that.

9             When she had visitors who

10   were waiting for a meeting with her, where

11   did they generally sit?

12       A.  They sat in the same area.

13       Q.  So you could see them when they

14   came into the office, correct?

15       A.  Yes.

16       Q.  Did they check in when they walked

17   into the Dean's suite?  Did they check in

18   with you to tell you that they were there

19   and waiting for a meeting with Dean

20   Nichols?

21       A.  They would often just speak to

22   Abbie, who was our -- used to be

23   receptionist.  That's the way it was done.

24   I don't know that everyone checked in with

Page 222

1    me.

2        Q.  If someone came into the office

3    for a meeting with Dean Nichols, how did

4    you know that they were there?

5        A.  You mean -- I would hear them

6    speak.

7        Q.  Okay.  So, when they walked in,

8    you were close enough to hear them speak

9    to the receptionist?

10       A.  Yes.

11       Q.  And if Dean Nichols had someone in

12   her office or it wasn't yet time for her

13   to meet with that person, did you tell the

14   person who was coming in where to go or

15   what to do?

16       A.  If she wasn't ready, you know, I

17   would just let them know she would be with

18   them in a few minutes.

19       Q.  How did Dean Nichols know when

20   these people arrived?  Were you the one

21   who notified her that she had a person

22   waiting?

23       A.  I wasn't always the person.

24   Sometimes Abbie would do that.

Page 223

1      Q.  Were you often the person who did

2   that function?

3      A.  It depended on who saw the person

4   coming in.

5      Q.  Would it be fair to say that when

6   you performed that function, you would

7   notify her when someone was coming in more

8   than once a week during the months you

9   worked for her?

10      A.  If she would be speaking to

11   another person and I would knock and

12   interrupt and say, There's another -- your

13   next meeting is here.  She would say,

14   Okay, thank you, and I'll be a few

15   minutes, or what have you.

16      Q.  And did you do that more than once

17   a week for Dean Nichols when you worked in

18   the Dean's office?

19      A.  Yes, I would do that more than

20   once a week.

21      Q.  Would it -- strike that.

22          You told Dean Nichols that

23   you were interested in applying -- that

24   you intended to apply for the assistant

Page 224

1   dean's position, correct?

2      A.  I'm not sure how the conversation

3   went, but yes, we did discuss the

4   assistant dean's position.

5      Q.  Did you tell her that that was a

6   position that you intended to apply for?

7      A.  I did intend to apply for that

8   position.

9      Q.  I'm sorry?

10     A.  I did intend to apply for that

11  position.

12     Q.  Are you saying you did intend?

13     A.  I did intend on applying for that

14  position.  I don't know if I had initiated

15  the conversation about applying for that

16  position.

17     Q.  Okay.  Whether you initiated it or

18  not, though, did you communicate at any

19  point in any way to Dean Nichols that it

20  was your intention to apply for the

21  assistant dean's position?

22     A.  Yes.

23     Q.  When did you tell her that or when

24  did she learn that from you?

Page 225

1      A.  Upon our first meeting.  I believe

2   it was our first or second meeting, early

3   in July or maybe August.  I'm not sure.

4      Q.  Okay.  And she had told you that

5   you were to have no involvement in the

6   search for the assistant dean because you

7   intended to apply, correct?

8      A.  I don't recall.

9      Q.  In October of 2007, you told Dean

10  Nichols that you had been ordered to make

11  arrangements for the new assistant dean,

12  to set up that office, the new assistant

13  dean's office, correct?

14      A.  It was something about a computer,

15  to order a computer for the assistant to

16  the dean.

17      Q.  And you told Dean Nichols that you

18  had been instructed to set up that

19  computer or get it ready for the new

20  assistant dean, correct?

21      A.  Just to order the computer.

22  Allison and I spoke about ordering

23  computers, and I had asked if she had

24  ordered it or if I'm going to order it or

Page 226

1    what's happening.  I believe that she said

2    for me to go ahead and order it.

3        Q.  Okay.  And you conveyed that to

4    Dean Nichols, correct?

5        A.  Something came up where it was

6    questioned, yes.

7        Q.  Dean Nichols questioned what you

8    had told her, correct?

9        A.  Yeah.  I don't recall what

10   happened.  Yes.

11       Q.  Because you then later told Dean

12   Nichols that you had not been told to set

13   up the computer, but that another staff

14   member had implied that it would be your

15   responsibility, correct?

16       A.  Again, Allison and I had discussed

17   that I would order that computer, and I

18   checked with Allison to see if it had been

19   ordered.  And I believe Allison told me

20   she did not know; where, in fact, I

21   believe that she had ordered it or

22   something, and I had asked Eliza had it

23   been ordered or what was happening with

24   it, and Eliza seem offended that I had

1   even inquired about preparing that office

2   and that position.

3       Q.  In fact, she was displeased

4   because she had instructed you not to have

5   anything to do with the search for

6   assistant dean, correct?

7       A.  Yes.

8       Q.  And she had also instructed you

9   not to be involved in the making of

10  arrangements for the new assistant dean's

11  office, correct?

12      A.  I do not recall that specific

13  request.

14      Q.  Okay.

15      A.  I was informed that I would not be

16  getting the position and that she was

17  going to go with an outside person.

18      Q.  You initially told her that a

19  staff member had instructed you to set up

20  the computer for the new assistant dean,

21  correct?

22      A.  To order the computer, I believe

23  is how it went.  I had asked if it had

24  been ordered, and they said I didn't know,

Page 228

1    and then I went and asked if it had been

2    requested.

3        Q.  My question was whether you told

4    Dean Nichols that you had been instructed

5    to set up the computer for the new

6    assistant dean?

7        A.  The -- the discussion early on

8    with Allison was that I would order that

9    computer awhile ago, prior to this.  So I

10   had asked had it been ordered.

11       Q.  Asked who?

12       A.  I asked Allison, and Allison said

13   she had not known.  And so I had asked

14   Eliza Nichols so that that office would be

15   prepared and ready to go.  I was simply

16   trying to make sure that things were done.

17       Q.  In fact, though -- I still don't

18   have an answer to my question -- you told

19   Dean Nichols that you had been instructed

20   to set up that computer, correct?

21       A.  Well, Allison and I had discussed

22   that I would order the computer.  It was,

23   are you going to do it or am I going to do

24   it?  You do it.  I don't know that that's

Page 229

1    an instruction.

2        Q.  You told Dean Nichols, however,

3    that you had been instructed by Allison to

4    order the computer -- to set it up,

5    rather, correct?

6        A.  Not to set it up.  To be sure that

7    it was ordered.  I asked if it was

8    ordered.  It had been set up.

9            MS. KAY:  Would you read back my

10   question?

11               (Record read as requested.)

12           THE WITNESS:  I don't recall what

13   happened.

14   BY MS. KAY:

15       Q.  And you later told Dean Nichols

16   that, in fact, you had not been instructed

17   by the staff member, but the staff member,

18   Allison, had implied that you should set

19   up the computer, correct?

20       A.  I don't recall.

21       Q.  Do you recall Dean Nichols'

22   response when you gave her this

23   contradicting information?

24           MR. LEE:  Object to the form of

Page 230

1   the question.  There's no -- assumes facts

2   not in evidence.

3   BY MS. KAY:

4       Q.  Go ahead.

5           MR. LEE: Go ahead.

6   BY MS. KAY:

7       Q.  Go ahead.  You can answer.

8       A.  I don't recall.

9       Q.  On October 15th, 2007, Dean

10  Nichols asked you to make sure that

11  Allison and Abbie knew what work had to be

12  done in your absence before you left for

13  knee surgery, correct?

14      A.  Yes.

15      Q.  And Abbie is Abbie who?  What's

16  Abbie's last name?

17      A.  Kelley.

18      Q.  Okay.  And what was Abbie's

19  position in the office?

20      A.  I don't recall at that time what

21  her position was.

22      Q.  So, she had told you to meet with

23  Allison and Abbie, correct?

24      A.  Correct.

1     Q.  And you told Dean Nichols that you

2    tried to meet with them, but that you

3    could not, correct?

4     A.  I had asked Allison what would be

5    a good time to meet with her, and she said

6    later, after lunch, and so then right

7    after they returned from lunch -- they

8    took lunch an hour after I did -- that we

9    would meet.  And Dean Nichols came in

10   shortly thereafter, and just prior to Dean

11   Nichols' return, Jim MacDonald had stepped

12   into Allison's office.  And Eliza had

13   asked me did I meet with Allison and

14   Abbie, and I said, No, not yet, Jim just

15   stepped into the office.

16    Q.  You told Dean Nichols that Jim

17   had, Jim MacDonald, had called Allison

18   away and that that's why you were unable

19   to meet, correct?  If you remember.

20    A.  I may have said that without

21   explaining that Allison had requested the

22   meeting to be after lunch; wherein, Jim

23   did not know that that was already set up.

24    Q.  And are you aware that Dean

Page 232

1  Nichols came to find out that Jim had not,

2  in fact, called Allison away?

3      A.  I did not say that Jim had called

4  Allison away.  Jim had stepped in to meet

5  with Allison briefly, and then Dean

6  Nichols had arrived into the office

7  inquiring about had we met.  I said that

8  we hadn't met and that I had information

9  typed up, and she asked me for it and I

10  gave it to her.

11          MS. KAY:  Would you go back, not

12  this answer, but the last question and

13  answer before that?

14              (Record read as requested.)

15  BY MS. KAY:

16      Q.  So you did tell Jim -- I'm sorry

17  -- Dean Nichols that Allison had called --

18  I'm sorry.  Strike that.

19              So you did tell Dean Nichols

20  that Jim had called Allison away?

21      A.  No, I did not.  I told Dean

22  Nichols that Allison was busy with Jim.

23      Q.  Do you have any knowledge

24  regarding information that Dean Nichols

1  got from Jim regarding the circumstances

2  of this meeting?

3      A.  I have no information about that.

4      Q.  Are you aware that Dean Nichols

5  believed that you were being less than

6  truthful with her with regard to this

7  meeting?

8          MR. LEE:  Object to the form.

9  Assumes facts not in evidence.

10          THE WITNESS:  Dean Nichols in the

11  morning before she left, did let Jim know

12  that we did need to meet, and he said,

13  Okay.  So that Allison would make time.

14  As Dean Nichols left, I asked Allison what

15  would be a good time for her to meet, and

16  she told me after lunch.  Jim may have

17  gone off.  I don't recall where Jim went.

18  I know Dean Nichols was gone, and the

19  first opportunity to meet was when they

20  returned from lunch, and Jim also

21  returned.

22  BY MS. KAY:

23      Q.  My question was whether Dean

24  Nichols believed that you had not been

Page 234

1    truthful with her regarding circumstances

2    surrounding this meeting that she asked --

3    asked you to have?

4         MR. LEE:  Object to the form of

5    the question.  You're asking this witness

6    to read somebody else's mind.  Calls for

7    speculation.

8    BY MS. KAY:

9         Q.  I'm still waiting for an answer.

10        MR. LEE:  Still calls for

11   speculation.

12        THE WITNESS:  I don't know what

13   Dean Nichols was thinking.

14   BY MS. KAY:

15        Q.  Okay.  And did you observe from

16   her conduct that she believed that you had

17   been untruthful?

18        A.  I do not know.

19        Q.  Did she tell you that she thought

20   you had been less than truthful?

21        A.  I do not recall her saying that.

22        Q.  In fact, she suggested that you

23   have a formal meeting to discuss your job

24   performance, correct?

Page 235

1      A.  I also had requested a formal

2   meeting for job duties and performance,

3   yes.

4      Q.  My question was whether Dean

5   Nichols suggested that you have a formal

6   meeting to discuss your job performance.

7   Is that yes?

8      A.  When are you saying that she

9   requested that?  Immediately after this

10  had happened?

11     Q.  At any time, did she suggest that

12  on October 17th, 2007, you should have a

13  formal meeting to discuss your job

14  performance?

15     A.  She agreed to meet with me on

16  October 17th to have a formal meeting upon

17  my request, yes.

18     Q.  So it's your testimony that it was

19  your request and that she did not request

20  that meeting?

21     A.  I believe so, yes.

22     Q.  You were -- strike that.

23          In this litigation, you're

24  alleging that Dean Nichols terminated you

Page 236

1    because you were about to take FMLA leave;

2    is that correct?

3         A.  I'm sorry.  Can you read the

4    question?

5              MS. KAY:  Can you read it back?

6                   (Record read as requested.)

7              THE WITNESS:  I feel I was

8    terminated in retaliation for filing the

9    EEOC charges.

10   BY MS. KAY:

11        Q.  Okay.  So you are not alleging

12   that your intention to take FMLA leave had

13   anything to do with your termination?

14             MR. LEE:  Objection.  The

15   allegations are set out in the complaint.

16   You're asking this witness for a legal

17   conclusion.

18   BY MS. KAY:

19        Q.  You can answer my question.

20        A.  I don't -- I don't believe that

21   there's one reason that -- that FMLA leave

22   is the only reason that I've been

23   terminated.

24        Q.  You believe that's one of the

Page 237

1    reasons you were terminated?

2         A.  I don't think that would be fair

3    for me to say that was the reason I was

4    retaliated against because of the

5    reporting of the EEOC charge.  I'm not

6    going to -- I don't believe that that was

7    the only reason.  I don't know that that

8    was a reason.

9         Q.  Did Eliza Nichols know that you

10   had filed a charge of discrimination with

11   the EEOC?

12        A.  I am not aware of what Eliza

13   Nichols knew.

14        Q.  Did she ever say anything to you

15   about an EEOC charge that you had filed?

16        A.  I can't imagine why she would.  I

17   don't recall her saying anything to me

18   about it.

19        Q.  Did she ever try to -- strike

20   that.  Did she ever say anything about --

21   strike that.

22              When did you submit your FMLA

23   request to Dean Nichols?

24        A.  I don't recall exactly.

Page 238

1    September, perhaps.

2        Q.  Of 2007?

3        A.  Yes.

4        Q.  And she signed it, correct?

5        A.  She did sign it.

6        Q.  So within her capacity as your

7    supervisor, she approved that leave,

8    correct?

9        A.  Yes.

10       Q.  In fact, in the days leading up to

11   your leave, she was asking you to make

12   preparations with others in the office to

13   make sure that your assignments and duties

14   were covered while you were on leave,

15   correct?

16       A.  A few days before, yes.

17       Q.  So, do you have any reason to

18   believe that the reason she terminated you

19   was because you were about to exercise

20   your FMLA rights?

21       A.  Dean Nichols works for Columbia

22   College Chicago, and my problem is with

23   Columbia College Chicago.

24       Q.  Dean Nichols made the decision to

Page 239

1    terminate you, though, correct?

2          MR. LEE:  Objection.  You're

3    asking this witness to speculate as to

4    what was going on in Columbia's collective

5    mind.

6    BY MS. KAY:

7       Q.  Go ahead.

8       A.  I don't know what Dean Nichols was

9    asked to do.

10      Q.  Who terminated you?

11      A.  I was told I couldn't be trusted

12   and was asked to leave by Dean Nichols and

13   Stephanie Griffin.

14      Q.  When did they -- strike that.

15          Who told you you were being

16   terminated?

17      A.  Dean Nichols.

18      Q.  Okay.  And do you have any reason

19   to believe that the decision to terminate

20   was not Dean Nichols' decision?

21          MR. LEE:  Objection.  You're

22   calling for speculation.  You're asking

23   her to speculate what's going in the

24   corporate mind of Columbia College.

1    BY MS. KAY:

2        Q.  Go ahead and answer.

3            MS. KAY:  Would you read the

4    question back?

5                    (Record read as requested.)

6            MR. LEE:  Same objection.

7            THE WITNESS:  Yes, I have reason

8    to believe.

9    BY MS. KAY:

10       Q.  And what is that reason?  What's

11   the basis for that belief?

12       A.  There was not a formal warning or

13   discussion about improper behavior or

14   issues.  I was brought into an office that

15   I was told I wouldn't be brought into.  It

16   was all very vague and confusing, and

17   before the college was going to allow me

18   to be on the medical leave, I believe that

19   they requested that I be terminated.

20       Q.  You had taken FMLA previously as

21   an employee of the college, correct?

22       A.  Yes.

23       Q.  And so why do you believe that

24   your second FMLA leave would be the basis

Page 241

1    for termination if you were permitted to

2    take FMLA leave before?

3         MR. LEE:  Object to the form of

4    the question, argumentative.  Also object

5    because it calls for speculation into

6    whatever the corporate mindset of Columbia

7    College is.  Go ahead.

8         THE WITNESS:  In the mediation

9    that I had in January of -- I believe it

10   was '06, the mediator clearly stated that

11   Columbia College no longer wanted me

12   working and what was it going to take to

13   get rid of me.  It was stated to me that

14   Columbia College no longer wanted me

15   around, during that mediation.

16   BY MS. KAY:

17       Q.  You went to the mediation in

18   January of -- oh, I'm sorry.  What month

19   and year did you attend the mediation?

20       A.  I'd have to check the paperwork.

21   I don't recall.  It was January.

22       Q.  2007, correct?

23       A.  Yes.

24       Q.  And you worked for another ten

Page 242

1  months at Columbia College Chicago,

2  correct?

3      A.  I did work another ten months at

4  Columbia College Chicago, for ten months.

5      Q.  So the basis of your allegation

6  that Columbia College Chicago retaliated

7  against you for exercising your FMLA

8  rights is what the mediator -- the EEOC

9  mediator told you in January 2007?

10          MR. LEE:  Object to the form of

11  the question.

12          MS. KAY:  She brought it up.

13          MR. LEE:  You asked.

14          MS. KAY:  Right.

15          MR. LEE:  Calls for speculation

16  and argumentative, and it misstates the

17  testimony.  Go ahead.

18          MS. KAY:  Can you read the

19  question back, please?

20              (Record read as requested.)

21          MR. LEE:  Also, in addition, I

22  want to add that it calls for a legal

23  conclusion.  Go ahead.

24          THE WITNESS:  I'm confused on the

Page 243

1    question.  I just know for a fact that

2    Columbia had wanted me to stop working for

3    them.

4    BY MS. KAY:

5        Q.  And you knew that because a

6    mediator told you that during a mediation,

7    correct?

8        A.  A mediator had communicated that,

9    yes, to myself and my attorney.

10       Q.  Do you have any knowledge

11   regarding any process that Dean Nichols

12   had to follow to terminate you?

13       A.  As far as I understand, she just

14   had to fill out paperwork and inform them

15   that she wanted me to be terminated.

16       Q.  Who's them?

17       A.  Excuse me, the Human Resources

18   department.

19       Q.  Did the mediator specifically tell

20   you that it was because you wanted to take

21   FMLA leave?  That that was the reason why

22   they didn't want you back to work at

23   Columbia College Chicago?

24       A.  I don't know what the reason was.

Page 244

1    I was just informed that this is what

2    Columbia College had wanted.

3        Q.  Okay.  Who approved your first

4    request for FMLA, if you remember?

5        A.  Dean Lehrer and Human Resources.

6        Q.  After reporting your complaint to

7    Patricia Olalde, you told her you did not

8    want to pursue your complaint because you

9    were worried you would lose the perks of

10   working for Dean Lehrer, correct?

11       A.  I also told her that if there

12   would be nothing that would happen to him,

13   there was perhaps no point in making

14   waves.

15       Q.  But you told her what I asked you,

16   correct?

17       A.  Yes.

18       Q.  You also told her that you never

19   felt threatened by Dean Lehrer, correct?

20       A.  Correct.

21       Q.  And that it wasn't like he was

22   going to rape you or anything, correct?

23       A.  Correct.

24       Q.  You told Patricia Olalde that the

Page 245

1    Provost's office would approve what Lehrer

2    told them he recommended, correct?

3        A.  Pardon me?

4        Q.  You told Patricia Olalde that the

5    Provost's office would approve what Dean

6    Lehrer recommended to them?

7        A.  In regards to what?

8        Q.  Where you were concerned?

9        A.  I -- I don't know exactly what --

10   what happened.

11       Q.  Did you make that statement to

12   Patricia Olalde?

13       A.  Yes, I did.

14       Q.  When did you start work on your

15   thesis project?

16       A.  When did I start work on my thesis

17   project?  I don't recall exactly.

18       Q.  Do you recall generally?

19       A.  I don't recall generally.  I

20   graduated in '08, so it was '07, '06,

21   probably late '06.

22       Q.  Did you have -- did you prepare as

23   part of that project a written script for

24   the audio portion of the project?

1      A.  When would I have prepared it

2   to --

3      Q.  I'm asking if -- if you in your

4   preparation of your thesis, as part of

5   that preparation, prepared a script of

6   what would be read in the audio portion of

7   your project?

8      A.  Yes, I did.

9      Q.  Okay.  And did you prepare that

10  script on your computer or by hand or some

11  other way?

12     A.  By hand.

13     Q.  Did you also generate a script on

14  your computer or was it only by hand?

15     A.  By hand.

16     Q.  Okay.  Do you still have those

17  handwritten -- that handwritten script?

18     A.  I don't recall if I do or not.

19     Q.  If you do, where would it be?

20     A.  In boxes with documents of the

21  thesis project.

22     Q.  And did you keep -- do you have

23  boxes of documents with your thesis

24  project or that were generated from your

Page 247

1    thesis project?

2        A.  I have information regarding my

3    thesis project at home.

4        Q.  Okay.  I would ask that you search

5    for those handwritten notes of the script

6    and produce them to your attorney, please.

7                Do you recall when those --

8    when that handwritten script was prepared?

9    When you wrote it?

10       A.  Probably around October of '07.

11   I'm not sure.

12       Q.  Did you ever discuss your thesis

13   project with Dean Lehrer?

14       A.  I don't believe I discussed my

15   final thesis project with Dean Lehrer.

16       Q.  Did you discuss anything about

17   your thesis project with Dean Lehrer?

18       A.  I don't recall.

19       Q.  And who was your advisor for your

20   thesis project?

21       A.  I had a couple advisors for my

22   thesis project, Jeanine Mellinger, Pat

23   Madoni, and Lynn Hickson.

24       Q.  You allege in your complaint that

Page 248

1    you received harassing e-mails while you

2    worked at Columbia College Chicago,

3    correct?

4         A.  Yes.

5         Q.  How many e-mails did you receive

6    that were harassing in nature?

7         A.  I recall at least two, maybe

8    three, maybe more.

9         Q.  And you reported them to the

10   school in May of 2006, correct?

11        A.  I don't recall.  I think I would

12   have reported them as soon as they came.

13   I thought they came in '05 when I first

14   began graduate school.

15        Q.  So do you know when you reported

16   them?

17        A.  I don't recall, no.

18        Q.  And who did you make your report

19   to?

20        A.  Several people were informed.

21   Dean Lehrer was one of those people, and I

22   believe I had to speak with the Security

23   department, the dean of the Graduate

24   School, and Human Resources.

Page 249

1    Q.  Did you ever find out who sent

2    these e-mails?

3    A.  When I was working in Ann Foley's

4    office, maybe two years later, I was

5    informed that the e-mails were coming from

6    the library at the school, but I don't

7    know who had sent the e-mails.

8    Q.  Okay.  Who told you or gave you

9    that information?

10   A.  One of the IT people.

11   Q.  Do you recall who that was?

12   A.  I don't recall who it was.  It was

13   in the form of an e-mail.

14   Q.  When did you get the last of the

15   harassing e-mails?

16   A.  I don't recall.  Maybe in '06,

17   maybe May of '06.  May, April.  I'm not

18   sure exactly.

19   Q.  Did this IT person who gave you

20   this information tell you whether the

21   source of the e-mails was a student?

22   A.  The IT person did not specify

23   anything other than it was the college

24   library.

Page 250

1     Q.  So as you sit here today, do you

2   know whether the person sending the

3   e-mails was a student of the school?

4     A.  I do not know.

5     Q.  Do you know whether the person was

6   an employee of the school?

7     A.  I do not know the person or their

8   status.

9     Q.  Do you -- as a result -- strike

10  that.  Let me back up just a moment to

11  your termination.

12          You met with Eliza Nichols on

13  October 17th, 2007, correct?

14     A.  Yes.

15     Q.  Okay.  And where did you meet with

16  her?

17     A.  In her office.

18     Q.  Was anyone else present in that

19  meeting?

20     A.  Yes, Stephanie Griffin.

21     Q.  And I think we -- you already

22  testified that that was a meeting to

23  discuss your job performance, correct?

24     A.  Our meeting for job performance

1    was to take place early that morning,

2    around 10:00 o'clock, and Dean Nichols

3    came back in the office around -- a little

4    after 11:00 with Stephanie Griffin.

5        Q.  Okay.  Was anyone else at the

6    meeting besides Stephanie and Dean Nichols

7    and you?

8        A.  No.

9        Q.  And what happened during that

10   meeting?

11       A.  I believe Dean Nichols let me know

12   that she was terminating me or she was

13   releasing me from my position, one of the

14   two.

15       Q.  What did she say?

16       A.  I don't recall exactly.  It was

17   either I'm releasing you from your

18   position or I'm terminating you from your

19   position, something like that.

20       Q.  Did Stephanie Griffin say

21   anything?

22       A.  I don't recall.

23       Q.  Did you say anything to either of

24   them during this meeting?

1     A.  Of course.  I asked, Can we talk

2  about this?  Is this negotiable?  For what

3  reason am I terminated?  And Ms. Nichols

4  stated that she couldn't trust me, and --

5  and I asked for an example; and she

6  responded about, I believe, the computer

7  with Allison, something like that or the

8  -- no.  The meeting with Jim.  I don't

9  remember.  I think it was -- it involved

10  Allison.

11     Q.  Okay.  Was there anything else

12  that Dean Nichols said?

13     A.  I believe she said to return my

14  keys to Stephanie Griffin, get my things,

15  and get out.

16     Q.  Was that all that she said?

17     A.  I believe that is all that she

18  said.  I don't recall exactly everything.

19     Q.  Did you leave that day?

20     A.  Yes.

21     Q.  Are you claiming that you suffered

22  any psychological injury as a result of

23  the events leading up to your termination?

24     A.  Yes.

Page 253

1    Q.  Okay.  What type of psychological

2    injury?

3    A.  It was very confusing being told

4    that I would be in one position working

5    and then in another.  I wasn't getting a

6    straight answer from the college.  I was

7    very upset about going to school and

8    having these problems happening at work

9    without any real resolution.  It made it

10   difficult to -- to keep as much as I, you

11   know, I was supposed to keep in and

12   maintain going to work and going to

13   school.

14   Q.  Have you sought treatment from

15   psychologists or other type of mental

16   health provider?

17   A.  I did speak with a therapist, yes.

18   Q.  Okay.  Who's that therapist?

19   A.  Dr. Alex Sherman.

20   Q.  Have you sought treatment from any

21   other mental health provider?

22   A.  Yes.

23   Q.  Who?

24   A.  Juvaria Jvaria.

Page 254

1     Q.  Can you spell that?

2     A.  J-u-v-a-r-i-a, J-v-a-r-i-a.  I'm

3  not sure.  Juvaria Jvaria, they're very

4  similar.

5     Q.  Dr. Sherman is in Chicago?

6     A.  Yes.

7     Q.  Where is Dr. Jvaria?

8     A.  Michigan.

9     Q.  What city in Michigan?

10     A.  Dearborn, Michigan.

11     Q.  Any other health care providers

12  that you have treated with?

13     A.  Shanta Shantacula (phonetic) in

14  Chicago.

15     Q.  Can you spell that?

16     A.  I'd have to look it up right now.

17     Q.  Okay.  Anyone else?

18     A.  No.

19     Q.  For how long did you treat with

20  Alex Sherman?

21     A.  From May after school was out, I

22  believe, of '07 until, I don't know,

23  sometime in June or July the following

24  year, I'm guessing.  I'd have to check my

Page 255

1    records.

2        Q.  How many times each month did you

3    treat with Alex Sherman?

4        A.  I'd average four times a month.

5        Q.  Okay.  For the entire time you

6    treated with Mr. Sherman?

7        A.  Ms. Sherman.

8        Q.  Ms. Sherman?

9        A.  Yes.  Alexandra Sherman.  It could

10   be less, you know.

11       Q.  Did Ms. Sherman diagnose you with

12   any condition?

13           MR. LEE:  Objection.  It's getting

14   into privileged territory.  We're only

15   claiming garden-variety emotional

16   distress.  So this is not an issue.

17   Instruct the witness not to answer.

18   BY MS. KAY:

19       Q.  Are you following your attorney's

20   advice?

21       A.  Yes.

22       Q.  Okay.  So what type of

23   psychological injury, if any, are you

24   claiming?

1       MR. LEE:  Well, I mean, if you're

2  asking for the legal claims, they've been

3  set forth in our answers and objections to

4  interrogatories.  We're claiming

5  garden-variety emotional distress on the

6  -- on the -- I'm sorry -- on the sexual

7  harassment and retaliation.  On the sexual

8  harassment and sexual harassment

9  retaliation, the FMLA does not carry

10  emotional distress.

11  BY MS. KAY:

12      Q.  So you are making no claim for

13  psychological injury as a result of what

14  happened to you at Columbia College

15  Chicago?

16      MR. LEE:  Objection.  You're

17  asking for a legal conclusion.  The

18  complaint and the answers to

19  interrogatories set forth the technical

20  legal claims that we're making.

21  BY MS. KAY:

22      Q.  You can answer the question.

23      MR. LEE:  You know, I mean, she

24  can answer, but it's a worthless answer,

Page 257

1   you know.  I mean, she's not the lawyer.

2           MS. KAY:  Okay.

3           MR. LEE:  If you're asking what

4   we're making -- what claims we're making.

5           MS. KAY:  Right.

6           MR. LEE:  Go ahead.

7   BY MS. KAY:

8       Q.  You can answer.

9       A.  I do claim that through the sexual

10  harassment and being terminated, I

11  suffered emotional distress.

12      Q.  Have you taken any medication as a

13  result of this emotional distress?

14          MR. LEE:  Claiming privilege here.

15  Again, you know, we're not claiming -- we

16  are only claiming the -- on those causes

17  of action that permit garden-variety

18  emotional distress.  I instruct the

19  witness not to answer.

20  BY MS. KAY:

21      Q.  Are you following your attorney's

22  advice and not answering the question?

23      A.  Yes.

24      Q.  When did you start treating with

1   Shanta Shantacula?

2       A.  I'd have to look.  Sometime in

3   maybe March of '09, April/March.

4       Q.  And do you still treat with this

5   provider?

6       A.  No.

7       Q.  When did you stop?

8       A.  In January of 2010.

9       Q.  Why did you stop?

10      A.  Because I no longer lived in

11  Illinois.

12      Q.  And are you still treating with

13  Juvaria Jvaria?

14      A.  Yes.

15      Q.  When did you start with this

16  individual?

17      A.  Probably April -- February --

18  March or April of 2010 up until the

19  present time.

20      Q.  Let me show you -- just go through

21  some of these documents really quickly.

22          Do you want to take a break

23  before we do that?

24          MR. LEE:  I'm okay.

Page 259

1           THE WITNESS:  I'm okay.

2                   (Said document was marked

3                    for identification as

4                    Deposition Exhibit No. 1.)

5   BY MS. KAY:

6       Q.  Ms. Lewandowski, I'm showing you

7   what we're marking as Lewandowski Exhibit

8   Number 1.  Do you recognize this document?

9       A.  Yes.

10      Q.  This is a letter from Dr. Warrick

11  Carter dated October 17th, 2006, correct?

12      A.  This is a letter to Dr. Carter.

13      Q.  I'm sorry.  I misspoke.  To

14  Dr. Carter from you, correct?

15      A.  Yes.

16      Q.  And this is -- earlier in your

17  deposition you testified that Dr. Carter

18  was -- strike that -- that you were

19  reprimanded for your communications with a

20  board of trustees' member, correct?

21      A.  I was reprimanded for asking a

22  board of trustees' member to contact and

23  call Dr. Carter.

24      Q.  Okay.  And you testified that you

Page 260

1   wrote a letter in response to that

2   reprimand, correct?

3       A.  Correct.

4       Q.  And this is that letter, correct?

5       A.  Correct.

6       Q.  Okay.  I just wanted to make sure

7   we got it.  Oh, let me -- just a moment.

8   Going back to Number 1.

9               Did you draft this letter

10  yourself?  Actually, you already testified

11  to that, right?

12      A.  I did.

13      Q.  You testified that Dean Lehrer

14  reviewed it, correct?

15      A.  Correct.

16      Q.  Does looking at this exhibit

17  refresh your recollection at all as to

18  whether Dean Lehrer made any changes to

19  the document?

20      A.  No.

21               (Said document was marked

22                 for identification as

23                 Deposition Exhibit No. 2.)

24

Page 261

1    BY MS. KAY:

2        Q.  Showing you what we're marking as

3    Lewandowski Exhibit Number 2.  This is a

4    letter dated October 19, 2006, signed

5    Warrick Carter, Ph.D.  Is this the letter

6    you received from Dr. Carter after he

7    learned about -- strike that -- after he

8    received your letter dated October 17th,

9    2006?

10       A.  Yes.

11       Q.  Did you have any further

12   communications with Dr. Carter or anyone

13   in his office regarding this incident?

14       A.  I don't believe so.

15                   (Said document was marked

16                    for identification as

17                    Deposition Exhibit No. 3.)

18   BY MS. KAY:

19       Q.  Showing you what we're marking as

20   Lewandowski Exhibit Number 3.  This is the

21   Columbia College Chicago

22   Anti-Discrimination and Harassment Policy.

23   Did you receive this document while

24   employed at the college?

Page 262

1       A.  Yes.

2       Q.  Okay.  And did you read it?

3       A.  Yes.

4       Q.  Do you recall whether you signed

5   an acknowledgement of your receipt of this

6   policy?

7       A.  I do not recall.

8               (Said document was marked

9                for identification as

10               Deposition Exhibit No. 4.)

11  BY MS. KAY:

12      Q.  Show you what we're marking as

13  Lewandowski Number 4.  It's a two-page

14  document, marked in the lower left-hand

15  corner, Pltf. 057, Pltf. 058.  This

16  appears to be, starting at the very bottom

17  of the first page, an e-mail that you

18  wrote to Carol Ann Stowe.  Is that --

19  would you agree with that?

20      A.  Yes.

21      Q.  And you wrote this, it looks like,

22  April 16th, 2003, correct?

23      A.  Correct.

24      Q.  Okay.  And then Ms. Stowe

1      responded on April 18th, 2003, correct?

2          A.   Correct.

3          Q.   And in this e-mail, she wrote at

4      the top of this second paragraph, "Your

5      job is a 9-5 office position with an hour

6      lunch each day."  Correct?

7          A.   Correct.

8          Q.   Toward the bottom in the fourth

9      paragraph, toward the middle of that

10     paragraph, she writes, "There are,

11     however, differences in our

12     responsibilities..."  This arose from her

13     reprimand to you regarding your

14     whereabouts in April of 2003, correct?

15         A.   Yes.

16         Q.   All right.  Were there any

17     additional reprimands from Carol Ann Stowe

18     to you?

19         A.   I don't recall.

20                     (Said document was marked

21                      for identification as

22                      Deposition Exhibit No. 5.)

23     BY MS. KAY:

24         Q.   We're marking this one as

Page 264

1    Lewandowski Exhibit Number 5.  This

2    document is dated May 22nd, 2004.  This

3    was your request for a title change and a

4    salary range increase, correct?

5        A.  Yes.

6        Q.  And you created this -- did you

7    create this entire document?

8        A.  Yes.

9        Q.  Okay.  You were working in the

10   Early Childhood Education department at

11   that time, correct?

12       A.  Correct.

13       Q.  What title change did you want?

14       A.  Is it stated in this document?

15       Q.  Correct.

16       A.  Is it stated in the document?

17       Q.  No.  I'm asking you:  What title

18   change were you seeking?

19       A.  If it was an administrative

20   assistant, then maybe an assistant to a

21   program director.  I don't recall exactly.

22       Q.  Okay.  Did you get a title change

23   while working in the Early Childhood

24   Education department?

Page 265

1      A.  I don't recall if I did or not.

2      Q.  And who did you submit this to?

3      A.  I believe to the Human Resources

4  department and to Carol Ann Stowe.

5                      (Said document was marked

6                       for identification as

7                       Deposition Exhibit No. 6.)

8  BY MS. KAY:

9      Q.  We're marking this one Lewandowski

10  Exhibit Number 6.  This is your e-mail to

11  Carol Ann Stowe on March 8th, 2005,

12  correct?

13      A.  I'm sorry?

14      Q.  At the top at least, the first

15  entry there, correct?

16      A.  Yes.

17      Q.  Okay.  And you provided to

18  Ms. Stowe names of other employees at the

19  college who had Assistant to Director

20  titles, correct?

21      A.  Correct.

22      Q.  And that is the title that you

23  were seeking?

24      A.  I was seeking a title change.

Page 266

1    Perhaps Assistant to the Director was a

2    suggestion.

3        Q.  Were there others that you would

4    have -- that you wanted?

5        A.  It could have been a coordinator.

6    It could have been any other possible

7    suggestion.

8        Q.  Is Chris, the first name here,

9    Chris Greiner, or is that a different

10   individual that you testified to

11   previously?

12       A.  That is Chris Greiner.

13       Q.  Okay.  And Chris worked in which

14   department?

15       A.  At that time, I think, Academic

16   Initiatives.

17       Q.  Okay.  But you later ended up

18   working in the same department with him

19   while working for --

20       A.  Again, I'm not sure --

21       Q.  -- Dean Lehrer?

22       A.  -- if their department reported to

23   our department and then was later moved to

24   the Provost's office, but --

1      Q.  Did you date Chris?

2      A.  No.

3      Q.  You never dated Chris?

4      A.  No.

5      Q.  Okay.  Did you ever socialize with

6  him outside of work?

7      A.  Yes.

8      Q.  Okay.  Just the two of you?

9      A.  Yes.

10     Q.  How many times did you socialize

11  with him outside of work?

12     A.  Not many times.

13     Q.  Do you recall the dates when you

14  did?

15     A.  I do not.

16                  (Said document was marked

17                   for identification as

18                   Deposition Exhibit No. 7.)

19  BY MS. KAY:

20     Q.  All right.  I'm showing you what

21  we're marking as Lewandowski Exhibit

22  Number 7.  This is your Staff Performance

23  Evaluation from April 26, 2006, correct?

24     A.  Yes.

Page 268

1      Q.  Your supervisor at the time was

2  Leonard Lehrer, correct?

3      A.  Yes.

4      Q.  And the evaluation period was from

5  May 9th, 2005 until April 26th, 2006?

6      A.  Yes.

7      Q.  Going back to the page that's

8  marked on the lower right-hand corner as

9  LL 0296, under the section marked Employee

10  Comments, is that your handwriting?

11      A.  Yes, it is.

12      Q.  And would you read that please in

13  the record?

14      A.  "This office is wonderful to work

15  in because of the quality of people.

16  Highly cooperative and personally a joy to

17  work with and plan together in my

18  experience.  I look forward to the future

19  here."

20      Q.  And that's your signature dated

21  May 31st, 2006, correct?

22      A.  Yes.

23      Q.  And Leonard Lehrer's signature is

24  above your handwritten entry as supervisor

Page 269

1   dated May 31st, 2006 also, correct?

2       A.  Yes.

3       Q.  Were you sincere in -- in your

4   comments there?  Do you believe what you

5   wrote?

6       A.  Yes.

7       Q.  Okay.  Let's go to the next one.

8               (Said document was marked

9                for identification as

10               Deposition Exhibit No. 8.)

11  BY MS. KAY:

12      Q.  This is Lewandowski Number 8.

13  This is an Employee Self Evaluation,

14  correct?

15      A.  Yes.

16      Q.  And this was for you on

17  April 23rd, 2006, correct?

18      A.  Yes.

19      Q.  And at that time, you were

20  supervised by Leonard Lehrer, and your

21  position was Assistant to the Dean, right?

22      A.  Yes.

23      Q.  The evaluation period was May 9th,

24  2005 until the present, correct?

Page 270

1      A.  Uh-huh.

2      Q.  That's right?

3      A.  Yes.

4      Q.  Okay.  On the second page,

5   Number 3, where it says, "Describe how

6   well you performed your job

7   responsibilities," and the words,

8   "Successfully, with ease and grace"

9   appear.  Was that your -- were those your

10  words?

11     A.  Yes.

12     Q.  Okay.  Did you fill out the

13  answers to this form?

14     A.  Yes.

15     Q.  And when you typed that in, did

16  you believe that you had performed your

17  job responsibilities successfully with

18  ease and grace?

19     A.  Yes.

20               (Said document was marked

21                for identification as

22                Deposition Exhibit No. 9.)

23  BY MS. KAY:

24     Q.  This is Lewandowski Number 9.

Page 271

1   Ms. Lewandowski, this is a seven-page

2   document, and I'm asking you if this was

3   the document -- document that you

4   submitted while in Dean Lehrer's office,

5   working for his office, you testified

6   about the proposal for a new position.  Is

7   that what this is?

8        A.  Yes.

9        Q.  Okay.  Did you prepare this

10  document yourself?

11       A.  Yes.

12       Q.  When did you create this document?

13       A.  I don't recall when this was

14  created.  It had to have been during my

15  time at the Dean's office.

16       Q.  Is there anything in here, in this

17  document, that would help you remember?

18       A.  No.

19       Q.  You went online to salary.com to

20  retrieve information about various titles

21  and salaries and job descriptions,

22  correct?

23       A.  Yes.

24       Q.  Those appear at pages 5, 6 -- 5

Page 272

1    and 6 of this document, correct?

2        A.   Correct.

3        Q.   These were not necessarily taken

4    from academic employers, correct?

5        A.   I'm not sure.

6                    (Said document was marked

7                     for identification as

8                     Deposition Exhibit No. 10.)

9    BY MS. KAY:

10       Q.   I'm showing you what we're marking

11   at Lewandowski Number 10.  This is an

12   Employee Information Form.  This shows

13   that effective September 1st, 2006, your

14   salary went from 42,000 to 61,260,

15   correct?

16       A.   Yes.

17       Q.   And the supervisor's signature was

18   Leonard Lehrer on this form, correct?

19       A.   Yes.

20       Q.   Okay.  Did -- was it your

21   understanding that Dean Lehrer secured

22   this pay increase for you?

23       A.   This paperwork was to be submitted

24   to his superiors, and they would sign off

Page 273

1    to approve it.

2        Q.  Okay.  And to your knowledge, did

3    he recommend that it be approved?

4        A.  Yes.

5        Q.  Did he tell you he would support

6    you in your effort to secure a salary

7    increase?

8        A.  I don't know what was said, but he

9    signed the paperwork and sent it forward,

10   so.

11       Q.  Did you have any doubt that he

12   would support your request?

13       A.  I didn't expect him to -- no, I

14   did not.

15                (Said document was marked

16                 for identification as

17                 Deposition Exhibit No. 11.)

18   BY MS. KAY:

19       Q.  We're marking this as Lewandowski

20   Number 11.  This appears to be an e-mail

21   sent to you on May 17th, 2006.  Did -- is

22   this one of the e-mails that you testified

23   to a little while ago in your deposition?

24       A.  Yes.

Page 274

1    Q.  Okay.  But your testimony is that

2    there were others in addition to this one?

3    A.  Yes.

4    Q.  Okay.  Did all of the offensive

5    e-mails come to you at the same e-mail

6    address?

7    A.  I don't recall.  I know that I was

8    getting harassing e-mails sent to my work

9    e-mail suggested by Google Alerts.

10   Q.  What do you mean suggested by

11   Google Alerts?

12   A.  For instance, if you wanted to

13   know what the score of the Tigers' game

14   was or anything related to the Tigers, you

15   could type in your e-mail address and new

16   information regarding the Tigers, and it

17   would be directed into your work e-mail.

18   Q.  Okay.  You received an offensive

19   -- a harassing e-mail through that route?

20   A.  Yes.

21   Q.  Through your Google Alerts?

22   A.  Into my work e-mail.

23   Q.  Okay.

24

1              (Said document was marked

2                 for identification as

3                 Deposition Exhibit No. 12.)

4    BY MS. KAY:

5        Q.  This is Lewandowski Number 12.

6    It's a letter from Columbia College

7    Chicago, Assistant Vice President for

8    Human Resources, Stephanie Griffin, to

9    you, correct?

10       A.  Yes.

11       Q.  And the date is June 27th, 2006?

12       A.  Correct.

13       Q.  Ms. Griffin indicates that the

14   Office of Human Resources is working with

15   the Security and Information Technology

16   department to assist you in finding out

17   who was behind this, and then she gives an

18   e-mail address account.  She then writes,

19   "The Information Technology department is

20   working with the abuse group at Hotmail."

21   And the IT department has blocked the

22   address from sending anything to Columbia

23   College Chicago.  Do you believe that all

24   of those efforts were being made in

Page 276

1    response to your concern about the

2    e-mails?

3        A.  Yes.

4        Q.  Okay.  The letter indicates that

5    the IT department recommends that you

6    perform a couple of critical steps to

7    prevent more of these disturbing e-mails

8    being sent to you.  The first one is

9    changing all of your personal e-mail

10   addresses.  Did you do that?

11       A.  I stopped using the e-mail address

12   at Hotmail.

13       Q.  Okay.

14       A.  And I created new e-mail accounts

15   through Gmail.

16       Q.  Did you change all of your

17   personal e-mail addresses?

18       A.  Yes.

19       Q.  And did you manage all of your

20   alerts as is recommended in Number 2 by

21   going directly to google.com and removing

22   yourself from the alerts with, quote,

23   "LISA," close quote, in them?

24       A.  I did not do that.

Page 277

1    Q.  Is there a reason why you did not

2  do that?

3    A.  I -- I didn't -- I don't know -- I

4  don't think I understood how these alerts

5  were to be removed.

6    Q.  Did you seek help in performing

7  that task?

8    A.  I did call the IT department, and

9  they said that they had taken and stopped

10  any Google alerts from coming into my work

11  e-mail.

12    Q.  The letter also says that, "The

13  Security department recommends you do the

14  following to prevent this situation.

15  Recommendations include:  Number 1, Filing

16  a police report directly by you, regarding

17  the two disturbing email letters you

18  received."  Did you file a police report?

19    A.  Yes, I did.

20    Q.  Okay.  And was it, in fact, two

21  disturbing e-mails that you received?

22    A.  I believe it was two disturbing

23  e-mails.  One alluded to some of my work

24  at school and using the e-mails at school,

1   which made me anxious and nervous, and I

2   wondered who was doing this, knowing

3   personal information and now affecting my

4   schooling as well as my work.

5      Q.  Number -- Item Number 2 recommends

6   that you change your home e-mail address.

7   Did you do that?

8      A.  Yes.

9      Q.  Okay.  The letter also indicates

10  that Ms. Griffin -- on page 2 she says, "I

11  have spoken with both Martha Meegan,

12  Director of Security and Bernadette

13  McMahon, Chief Information Officer about

14  your complaint and they are working with

15  their staff in response to your

16  complaint."  Do you doubt that Ms. Griffin

17  did speak Ms. Meegan and Ms. McMahon?

18     A.  I do not know.

19     Q.  Do you have any criticism --

20  criticism of the way that Columbia College

21  responded to your concern about these two

22  e-mails?

23     A.  My criticism came afterwards

24  wherein they first told me they couldn't

1    locate where the e-mail was coming from.

2    Yet while I was working in Ann Foley's

3    office, they were able to determine where

4    the e-mail was coming from.  So that

5    seemed slightly confusing to me.

6        Q.  Why is that confusing?

7        A.  I mean, how was it discovered

8    later but not right away?

9        Q.  Okay.  Any other criticism that

10   you have on that, on the question of

11   Columbia's response to your e-mail

12   concern?

13       A.  No.

14                  (Said document was marked

15                   for identification as

16                   Deposition Exhibit No. 13.)

17   BY MS. KAY:

18       Q.  This is Lewandowski 13.

19   Ms. Lewandowski, this is an e-mail sent

20   from you October 11th, 2007 to Patricia

21   Olalde, correct?

22       A.  Yes.

23       Q.  And you were asking for her

24   assistance, correct?

Page 280

1     A.  Yes.

2     Q.  You complain that you're not

3 getting much clarity as to what you are

4 responsible to do.  In the second

5 paragraph, the second sentence in that

6 paragraph, you write, "Within Eliza's

7 restructure there are things that I feel

8 she is unhappy regarding my performance."

9 So it was your observation that -- that

10 Dean Nichols was unhappy with your

11 performance, correct?

12     A.  I felt that she could be unhappy

13 regarding my performance.

14     Q.  Okay.

15     A.  And we had discussed that there

16 were things that she liked and things that

17 she didn't like, and that she was a

18 straight-shooter and, therefore, we would

19 discuss it in the future.

20     Q.  Okay.  When you referred to

21 Eliza's restructure, what are you

22 referring to?

23     A.  I'm referring to her taking the

24 assistants that I had away from me.

Page 281

1    Primarily, my duties were lessened.

2        Q.   What duties were lessened?

3        A.   Many duties.  Such as information.

4        Q.   What do you mean?

5        A.   I just was given calendar

6    assignments and lesser assignments than I

7    had been given previously.

8        Q.   You testified that there were many

9    duties lessened, and when I asked what

10   duties, you just said information.  Is

11   there anything else that was -- any other

12   duty that was lessened due to Dean

13   Nichols' restructure?

14       A.   Searches and the processes for

15   working with the chairs were changed,

16   event planning, things like that, were

17   being handled by Allison and Abbie.

18       Q.   She was the new dean coming into a

19   new job, correct?

20       A.   Yes.

21       Q.   Okay.  And she was restructuring

22   the office to fit her idea of what that

23   office should look like, correct?

24            MR. LEE:  Object to the form of

Page 282

1    the question, assumes facts not in

2    evidence.

3            THE WITNESS:  I don't know what

4    she was thinking or what she could have

5    wanted.  It was very vague what our

6    responsibilities were.

7    BY MS. KAY:

8        Q.  Okay.  She moved Allison Ratliff

9    from -- strike that.

10            Had you previously supervised

11   Allison?

12       A.  Yes, as I testified earlier.

13       Q.  Okay.  And when you returned to

14   the Dean's office when Dean Nichols was in

15   place, you were no longer supervising

16   Allison, correct?

17       A.  At some point when I worked in the

18   Dean's office, Dean Nichols let me know

19   that, yes, Allison would report to Jim.

20       Q.  That was Dean Nichols' decision,

21   as far as you knew, correct?

22       A.  I have no idea whose decision.  I

23   was just informed that that was the

24   situation.

Page 283

1      Q.  Okay.  Do you know why that change

2  was made?

3      A.  I do not know.

4          MS. KAY:  Okay.  Take about a

5  five-minute break or so?

6          MR. LEE:  Sure.

7              (Whereupon a short recess

8              was had.)

9  BY MS. KAY:

10     Q.  Just a few follow-up.

11  Ms. Lewandowski, we talked a little bit

12  about your thesis project, and I want to

13  go back to that just a little bit more.

14  You testified that you started work on it

15  -- I think you said in the fall of 2006,

16  correct?

17     A.  Yes.

18     Q.  Okay.  And what was that work that

19  you were starting at that time?

20     A.  I'd have to look back at my notes.

21  Developing, you know, a presentation for

22  my graduate work.

23     Q.  Okay.  What -- when did you decide

24  on the -- or what was this project to be

Page 284

1    called?

2        A.  I don't recall what the project

3    was to be called in October of '06.

4        Q.  Can you -- so you were working on

5    a portion of it in October 2006, correct?

6        A.  Yes.

7        Q.  Did you -- were you working on any

8    -- but you don't recall what portion you

9    were working on at that time?

10       A.  With a thesis project, you have so

11   many different -- I had several different

12   ideas I was investigating and determining

13   which direction I was going to end up in.

14   It was just kind of the beginning of the

15   process for me.

16       Q.  Okay.  What ideas in October 2006

17   were you investigating?

18       A.  I would have to look back at the

19   thesis proposals back then in 2006.

20       Q.  So you have no memory at all about

21   what different ideas you were considering

22   at that time?

23       A.  I don't recall all of the

24   specifics.  I mean, there was a lot going

Page 285

1    on.  I was getting the e-mails and the --

2    you know, things at work were busy, and

3    there was a lot going on, so.  I don't

4    recall all of those ideas.

5        Q.  Did any of your work on your

6    thesis project predate the fall of 2006?

7    Did you start any of it in that summer or

8    even earlier that year?

9        A.  I don't recall.  Possibly.

10       Q.  So it's possible that some of it

11   did?

12       A.  I don't recall.  I'd have to

13   really look.  I mean --

14       Q.  Was -- is that when your decision

15   to include -- a sexual harassment

16   component was made?

17       A.  I don't recall when that decision

18   was made.

19       Q.  Okay.  What was -- or I think I

20   already asked you, what the name of the

21   project was called when it was finished?

22       A.  The final thesis project, I

23   believe, was called -- it was a long title

24   -- something about Dirty Joy Womanness and

Page 286

1    something about sexuality.  I don't recall

2    exactly what it was.

3        Q.  When did you select that title?

4        A.  I'd have to look again.  I don't

5    recall.

6        Q.  Do you have documents that would

7    indicate when you made decisions about or

8    a decision about the title?

9        A.  I have documents that were

10    submitted to my advisors throughout my

11    curriculum that could, you know, in

12    conjunction help me to determine that

13    specifically.

14        Q.  And do you have all of those

15    documents in storage?

16        A.  I do not know if I have all of

17    those documents.  I know that -- I could

18    talk with the advisors and perhaps try to

19    determine that.

20        Q.  Do you have some of them in

21    storage?

22        A.  I should have some of them, yes.

23        Q.  Where are they located?

24        A.  They should be in Dearborn,

1    Michigan.

2         Q.  At your mother's home?

3         A.  Yes.

4         Q.  Okay.  In the process of putting

5    together this thesis project, can you tell

6    me where you started, what you did, and if

7    you can as part of that just describe what

8    this project was?  I have not seen it.  So

9    can you explain what the project was?

10        A.  The final project?

11        Q.  Yeah.  Let's start there.  Was

12   there an interim project?  You keep

13   referring to something as the final title,

14   the final project?

15        A.  The process of art and thesis

16   development is just that, a process.  You

17   begin with, you know, a sketch and you

18   develop it and re-edit and evolve.  And so

19   what may begin as a circle, can turn out

20   to be a triangle at the end depending on

21   the choices you make and the directions

22   that you choose to go.

23        Q.  Okay.  What -- let's start here.

24   What -- what media did you use for this

Page 288

1  project?

2      A.  I used an interdisciplinary

3  component wherein I performed a portion of

4  it.  I recorded a portion of it on video.

5  I recorded and edited the video and the

6  audio.  I produced a pamphlet of data and

7  other sort of written paraphernalia and

8  put it up in a space that existed as an

9  office space.

10     Q.  When did you record the audio

11 portion?

12     A.  Toward the end of my thesis

13 project.  Probably in, I don't know,

14 February, May.  Sometime in 2008.

15     Q.  Okay.  Whose voices appeared in

16 that audio portion?

17     A.  Whose voices?

18     Q.  Uh-huh.

19     A.  My voice, and I think two other --

20 maybe three other peoples' voices.

21     Q.  Who were those people?

22     A.  They were people that worked in

23 the Audio department.

24     Q.  Okay.  And who are they?

Page 289

1    A.  I don't recall off the top of my

2    head.  I would have to look it up.

3    Q.  You don't know any of those names

4    as you sit here today?

5    A.  (Indicating.)

6    Q.  That's correct?

7    A.  Yes.  Excuse me.

8    Q.  Would their identity be found

9    anywhere in the documents you retained?

10    A.  I believe so, yes.

11    Q.  But you are one of the voices on

12    the -- the audio portion, correct?

13    A.  Yes.

14    Q.  And is the video portion -- what

15    does the video portion depict?

16    A.  It depicts skin and the human

17    female form being looked at through a

18    keyhole, and then you see an eye look back

19    at you through the keyhole.

20    Q.  When -- is there actually a person

21    depicted in this video portion, this video

22    component?

23    A.  A specific person?

24    Q.  Uh-huh.

Page 290

1      A.  No.

2      Q.  Okay.  Where did you get the

3   images for this video portion?

4      A.  I shot the images myself.

5      Q.  And did you use models for the

6   female form?

7      A.  No.

8      Q.  Where did that come from?

9      A.  I was the female form.

10      Q.  There was a desk also appearing in

11   the visual component?

12      A.  Yes.  It was set up as an office.

13   So there was a desk and a monitor, audio

14   speakers.

15      Q.  Where did the desk come from?

16      A.  It was around campus somewhere.

17   I'm not sure.

18      Q.  When did you shoot the video

19   portion?

20      A.  I'd have to check.  I'm not sure.

21      Q.  Did you shoot all of the video

22   portion yourself?

23      A.  Yes.

24      Q.  Okay.  Did you record all of the

1    audio yourself?

2        A.  Yes.

3        Q.  And where did you do your

4    recording?

5        A.  At the Audio department at

6    Columbia College.

7        Q.  Okay.  No one assisted you in

8    creating -- aside from the people you

9    testified gave their voices to the

10   recording, nobody assisted you in making

11   that recording?

12       A.  There are people that work at the

13   Audio department that help you set up the

14   microphones, et cetera, but I pushed the

15   record button.

16       Q.  Okay.  Was there anything -- there

17   was a letter on this desk in the video

18   portion, correct?

19       A.  Yes, it was part of the written

20   documents.

21       Q.  What written documents?

22       A.  Well, I had spoke of other sort of

23   written documents that I had.  I had

24   comprised a letter, a pamphlet, calling

Page 292

1    cards.

2        Q.  Oh, I see.  So you're saying there

3    was an actual desk in front of -- as part

4    of the project that people could see.

5    This desk was not depicted in the video

6    portion.  It was actually part of the set?

7        A.  It was -- it was an installation.

8    So it was an interactive installation

9    wherein you walked through an area and you

10   are now a part of -- the presence of an

11   audience member is part of the

12   installation.

13       Q.  What did the letter say?

14       A.  I'd have to check what the letter

15   specifically said.  I'm sure I have a copy

16   of it in my files.

17       Q.  I'd ask that you produce that

18   to -- actually, anything that you've got,

19   I'd like you to -- anything that you've

20   retained concerning the project or your

21   development of the project, if you would

22   provide that to your attorney.  We'll ask

23   for copies of that.

24              What did -- you said

Page 293

1    generally or specifically you don't recall

2    what the letter said.  What were the

3    contents generally, if you remember?

4         A.  Generally, it talked about

5    generally being moved in an office space

6    and then being released from a position.

7         Q.  Did the letter reference sexual

8    harassment?

9         A.  I don't recall if it did or not.

10        Q.  Did you do any previous

11   recordings?  Did you create any previous

12   recordings of either the audio or the

13   visual -- I'm sorry -- the audio or the --

14   let's start with the audio.  Were there

15   preliminary recordings that you made that

16   did not end up in the final thesis

17   project?

18        A.  Of course, yes.

19        Q.  Okay.  And what did you do with

20   those?

21        A.  They're --

22        Q.  Do you still have them?

23        A.  I -- I may still have them.  I

24   don't know if I have the software that can

Page 294

1    access them, but I may have them.

2         Q.  Where are they?  When you say

3    software to access them --

4         A.  They may have a -- Pro Tools is an

5    audio software that reads the data.  I

6    don't actually own it.

7         Q.  Okay.

8         A.  It's -- it's a specific software.

9         Q.  So if this could be accessed,

10   where would it -- where is it located?  In

11   your computer?

12        A.  It would be on a -- like a DVD

13   data disc.  So it would be like a

14   Microsoft Word document that you're trying

15   to open with Microsoft Processer Word.

16   That's not -- you know what I mean --

17   Office.  You couldn't really open it.

18        Q.  Where does it exist now, though?

19   You're talking to someone who's,

20   obviously, technically illiterate.

21        A.  Where does --

22        Q.  Where do these prior recordings

23   live?  Are they in your computer hard

24   drive?  Where are they?

Page 295

1      A.  No.  They're on a data disc.

2      Q.  Okay.  So you have them on a disc?

3      A.  Yes.

4      Q.  In Michigan?

5      A.  Yes.

6      Q.  Okay.  And do you have these data

7   discs for prior recordings of video and

8   audio?

9      A.  Yes.

10      Q.  Okay.  I'd ask that those be

11   produced as well.

12          Did you have to submit a

13   proposal to Columbia College before or --

14   strike that.

15          Did you have to at any time

16   submit a thesis proposal to the school, to

17   the college?

18      A.  Of course.  Yes, I did.

19      Q.  Okay.  And who did you submit it

20   to?

21      A.  I'm not sure specifically who we

22   were asked to submit it to, but to the

23   faculty of the Interdisciplinary Arts

24   department.

Page 296

1    Q.  When did you make that submission?

2    A.  I'd have to check.  I don't know.

3    Q.  Is there more than one submission

4  that you have to make in the process or is

5  it only -- is it a one-time deal?

6    A.  I think that it's an evolving

7  process.  So I think that you submit your

8  initial project, and if it evolves into

9  something else, it becomes something else.

10  So I don't know that you resubmit it.  You

11  edit it.

12    Q.  But what did you do?

13    A.  I don't really recall.  I mean, it

14  was a very arduous process.  It took a lot

15  of paperwork and presentation.

16    Q.  Did you make more than one

17  proposal?

18    A.  Yes, I believe I did.

19    Q.  How many did you make?

20    A.  I don't recall.

21    Q.  And you said in general terms that

22  it's an evolving process.  Did your

23  project evolve?  Yours specifically did

24  evolve?

1    A.  Yes.

2    Q.  And can you recall what changes

3  occurred in this evolution?

4    A.  I can't recall.

5    Q.  You through your attorney

6  submitted some initial disclosures of

7  information pursuant to one of the Federal

8  Rules of Civil Procedure, and I'll go

9  ahead -- why don't we go ahead and mark

10  this as an exhibit?

11      MS. KAY:  David, these are yours.

12  I'll let you take a look.

13          (Said document was marked

14            for identification as

15            Deposition Exhibit No. 14.)

16  BY MS. KAY:

17    Q.  On page 5, you list among your

18  computations, a category of damages, a

19  therapist, estimated at $35 per week for

20  52 weeks for a total of $1,820.  Are you

21  claiming those therapist charges as an

22  element of your damages?

23    A.  Yes.  I submitted them.

24    Q.  Okay.  So, are you still refusing

Page 298

1    to give testimony regarding a diagnosis

2    that you may have received from your

3    therapist or therapists and medication

4    that you took or may have been provided?

5        A.  I'm not sure what the process is

6    or what I need to do.  I would have to

7    speak with my attorney about it.  Yes.

8        Q.  Okay.  Do you want to do that now?

9            MR. LEE:  If you're asking if I'm

10   waiving the objection, the answer is no.

11   That's not a pocket.  That's not an

12   emotional distress other than, you know.

13   The only emotional distress we're claiming

14   is garden variety.  That's an

15   out-of-pocket expense.

16           MS. KAY:  Okay.  So you're saying

17   that as an element of her damages, we

18   should pay for therapy, but she's not --

19   but you're not permitting her to testify

20   what she was treated for?

21           MR. LEE:  I'm saying you should

22   pay the out-of-pocket, you know.

23           MS. KAY:  How does out of pocket

24   -- how does the -- whether it was out of

1    pocket, gratis, you know, for free, how

2    does that relate to whether these damages

3    are recoverable and whether we should have

4    the opportunity to question her about

5    those charges?

6           MR. LEE:  For medical, the element

7    of damage is whether or not it's

8    reasonable, and, you know, the law

9    provides, for example, that a paid bill is

10   prima facie reasonable.

11          MS. KAY:  Right.  But that's --

12          MR. LEE:  That's different from

13   whether we're claiming the, you know, the

14   -- that a diagnosable medical condition

15   was caused by that.  As I said, we're only

16   claiming garden variety.

17          MS. KAY:  Right.  But in a case

18   like you said where the payment of a

19   medical bill is prima facie evidence of

20   its reasonableness, counsel is entitled to

21   question the party claiming that as --

22   question them regarding what treatment was

23   provided and what was sought.

24          MR. LEE:  I don't think so.

Page 300

1          MS. KAY:  And so she -- your

2   objection stands with regard to her

3   injury.  You're not permitting her to

4   testify at all regarding any injury for

5   which she sought treatment that she is

6   seeking recovery for?

7          MR. LEE:  Our objection is that

8   the only emotional distress we're claiming

9   is garden-variety emotional distress.

10         MS. KAY:  For which she sought

11   therapy.

12         MR. LEE:  For which she sought --

13   no.

14         MS. KAY:  So what is the therapy

15   for?

16         MR. LEE:  The therapy is an

17   out-of-pocket expense.  The emotional

18   distress we're claiming is garden-variety

19   emotional distress.

20         MS. KAY:  It was an out-of-pocket

21   expense for treatment for garden-variety

22   emotional distress?

23         MR. LEE:  No.  I say the only

24   element of emotional distress we're

Page 301

1    claiming is garden-variety emotional

2    distress.

3           MS. KAY:  Okay.  I'll just --

4    we've got a record, obviously, of this.

5            MR. LEE:  Yes.

6            MS. KAY:  I'll reserve my right to

7    depose Ms. Lewandowski about the specific

8    treatment, and we'll make a decision,

9    obviously, about whether we're going to

10   pursue it or not.

11          MR. LEE:  Okay.

12          MS. KAY:  Assuming that your

13   objection -- you're not withdrawing your

14   objection?

15          MR. LEE:  I'm not withdrawing the

16   objection.

17          MS. KAY:  Okay.  All right.  I

18   have nothing else.  Do you have anything?

19           MR. LEE:  I don't believe I have

20   anything either.  We'll waive signature,

21   if you're willing to waive?

22           MS. KAY:  Sure.

23

24           FURTHER DEPONENT SAITH NOT...

Page 302

1    STATE OF ILLINOIS )
                       ) SS.
2    COUNTY OF C O O K )

3

4         I, RENAY PATTERSON-SEBANC,

5    Certified Shorthand Reporter, Registered

6    Professional Reporter, Notary Public in

7    and for the County of Cook, State of

8    Illinois, do hereby certify:

9         That previous to the commencement

10   of the examination of the witness, the

11   witness was duly sworn to testify the

12   whole truth concerning the matters herein;

13        That the foregoing deposition was

14   reported stenographically by me, was

15   thereafter reduced to a printed transcript

16   by me through computer-aided

17   transcription, and constitutes a true

18   record of the testimony given and the

19   proceedings had;

20        That the said deposition was

21   taken before me at the time and place

22   specified, and that there were present

23   Counsel as specified;

24        That the reading and signing by